Steven W. Fogg, WSBA No. 23528
CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, WA 98104-1001
Ph: (206) 625-8600

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| NATIONAL SHOOTING SPORTS FOUNDATION, INC.,<br><br>       Plaintiff,<br><br>v.<br><br>ROBERT W. FERGUSON, ATTORNEY GENERAL OF THE STATE OF WASHINGTON,<br><br>       Defendant. | No.<br><br>COMPLAINT |

Plaintiff National Shooting Sports Foundation, Inc. ("NSSF") brings this complaint against Robert W. Ferguson, Attorney General for the State of Washington. NSSF brings this complaint based on personal knowledge as to all NSSF facts, and on information and belief as to all other matters.

## PRELIMINARY STATEMENT

1.     This lawsuit challenges the constitutionality of a new Washington "public nuisance" statute specifically designed to evade the judgment of Congress—and the Constitution.

COMPLAINT - 1

2.     On April 25, 2023, Governor Inslee signed into law Senate Bill 5078 ("SB 5078"), which radically redefines the tort of "public nuisance" in Washington as it applies to members of the firearm industry.  Under SB 5078, the lawful and constitutionally protected "sale, manufacturing, distribution, importing, or marketing of a firearm industry product" may be deemed to violate Washington law—and justify the imposition of sweeping liability—if a Washington judge or jury later finds that such conduct "contribute[d] to a public nuisance." §2(3).  The statute does not independently define what constitutes a "public nuisance," but Washington elsewhere defines "nuisance" as "unlawfully doing an act, or omitting to perform a duty, which act or omission either annoys, injures or endangers the comfort, repose, health or safety of others, offends decency, . . . or in any way renders other persons insecure in life, or in the use of property."  Wash. Rev. Code §7.48.120.

3.     Although criminal misuse of a firearm triggers the statute's application, SB 5078 does not regulate the use of firearms.  Nor does it impose liability on individuals who misuse firearms to the detriment of themselves or others.  Instead, SB 5078 regulates selling, manufacturing, and advertising lawful (and constitutionally protected) firearms and related products.  In other words, SB 5078 regulates commerce in and speech relating to arms—even when that commerce and speech takes place entirely outside of Washington, as will often be the case.  SB 5078 also removes traditional elements of tort law that ensure that judges and juries do not impose liability on private parties for constitutionally protected conduct.  For instance, speech-based torts traditionally required proof of reliance.  SB 5078 not only does away with that bedrock requirement, but allows judges and juries to impose liability based on truthful, non-misleading speech about lawful products.  Making matters worse, SB 5078 redefines proximate cause to include "criminal

COMPLAINT - 2

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

actions by third parties" with whom a defendant never dealt, *see* §2(9), which is not proximate cause at all.

4.      None of that is consistent with the Constitution. The Commerce Clause prohibits states from regulating commerce that takes place beyond their borders, even when that commerce has effects within the state.  The First Amendment prohibits states from punishing wide swaths of truthful speech about lawful products, even if the products are dangerous or the speech is unpopular.  The Second Amendment protects commerce in arms.  And the Due Process Clause prohibits states from punishing one private party for the conduct of someone else.

5.      All of that is reason enough to invalidate Washington's new statute. But there is an even more obvious problem with SB 5078:  It is squarely preempted by federal law.  In the late 1990s and early 2000s, several state and local governments sought to use novel applications of common-law theories like negligence and nuisance to impose civil liability on manufacturers and sellers of firearms and ammunition when third parties misused their products.  Congress saw these lawsuits for what they were: unconstitutional efforts to stamp out lawful and constitutionally protected activity.  To end such incursions, Congress enacted the Protection of Lawful Commerce in Arms Act ("PLCAA") in 2005 by wide margins on a substantially bipartisan basis.  The PLCAA expressly prohibits and preempts state-law civil actions "brought by any person against a manufacturer or seller of [firearms or ammunition] . . . for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of [firearms or ammunition] by the person or a third party."  15 U.S.C. §7903(5)(A).

COMPLAINT - 3

6.     Washington is now trying to resurrect the very kinds of lawsuits that the PLCAA was enacted to eliminate. Indeed, SB 5078 acknowledges on its face that it is crafted to try to evade the PLCAA. *See* §1(4). While the state may get credit for its candor, that does not make its law any more consistent with the protections afforded by Congress and the Constitution.

7.     For these reasons and those set forth below, NSSF seeks a declaration that SB 5078 is preempted and unconstitutional, an injunction preventing Washington from enforcing the statute against NSSF or its members, and nominal damages.

## **THE PARTIES**

8.     NSSF is a Connecticut non-profit, tax-exempt, non-stock corporation with its principal place of business in Connecticut.  It is the trade association for the firearm, ammunition, and hunting and shooting sports industry.  It has a membership of more than 10,000 manufacturers, distributors, and retailers of firearms, ammunition, and related products, as well as other industry members throughout the United States.  NSSF's mission is to promote, protect, and preserve hunting and shooting sports by providing leadership in addressing industry challenges, advancing participation in and understanding of hunting and shooting sports, reaffirming and strengthening its members' commitment to the safe and responsible sale and use of their products, and promoting a political environment supportive of America's traditional hunting and shooting heritage.  NSSF serves the interests of its members, which are impaired by the threat of sweeping liability under SB 5078 not only to members, but to their employees and agents as well.  NSSF is authorized to bring this action on their behalf.

COMPLAINT - 4

1  9.  Defendant Robert W. Ferguson is the Attorney General of Washington.

2  He is Washington's chief law enforcement officer and, in that capacity, has a duty

3  to "[i]nstitute and prosecute all actions and proceedings for . . . the state," and to

4  "defend all actions and proceedings against any state officer." Wash. Rev. Code

5  §43.10.030. Attorney General Ferguson is a resident of Washington, and his

6  principal place of business is 1125 Washington Street SE, PO Box 401001, Olympia,

7  WA 98504. At all relevant times, Attorney General Feguson, as well as those subject

8  to his supervision, direction, or control, are and will be acting under color of state

9  law.

10  ## BACKGROUND

11  **Congress Enacted the PLCAA to Prevent State-Law Civil Actions that Unduly
12  Burden the National Firearm Industry and Infringe Fundamental
   Constitutional Rights.**

13  10.  The Constitution "confer[s] an individual right to keep and bear arms."

14  *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2127 (2022) (quoting

15  *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008)); *see* U.S. Const. amend.

16  II.  And "the core Second Amendment right to keep and bear arms for self-defense

17  'wouldn't mean much' without the ability to acquire arms." *Teixeira v. Cnty. of*

18  *Alameda*, 873 F.3d 670, 677 (9th Cir. 2017).

19  11.  Nevertheless, in the late 1990s, state and local governments began

20  trying to use novel applications of state tort law to hold "manufacturers, distributors,

21  dealers, and importers of firearms that operate as designed and intended"

22  accountable "for the harm caused by the misuse of firearms by third parties,

23  including criminals." 15 U.S.C. §7901(a)(3); *see id.* §7901(a)(4). They invoked a

24  variety of theories, including: strict liability for abnormally dangerous activities or

25

COMPLAINT - 5

defective design, *Penelas v. Arms Tech., Inc.*, 778 So.2d 1042, 1043–44 (Fla. Ct. App. 2001); negligent marketing, *City of St. Louis v. Cernicek*, 145 S.W.3d 37, 38, 40 (Mo. Ct. App. 2004) (per curiam); negligent distribution, *District of Columbia v. Beretta U.S.A. Corp.*, 847 A.2d 1127, 1131 (D.C. Ct. App. 2004); deceptive trade practices, *Taurus Holdings, Inc. v. U.S. Fidelity & Guar. Co.*, 367 F.2d 1252, 1252–53 (11th Cir. 2004); and public nuisance, *Sills v. Smith & Wesson Corp.*, No. 99C-09-283-FSS, 2000 WL 33113806, at *7 (Del. Super. Ct. Dec. 1, 2000), among others.

12.    Some of these suits succeeded in stretching the common law far beyond its traditional limits—and in permitting one state's courts to police the business practices of industry members operating elsewhere. *See*, e.g., City of Cincinnati v. Beretta U.S.A. Corp., 768 N.E.2d 1136, 1143–47 (Ohio 2002); *James v. Arms Tech., Inc.*, 820 A.2d 27, 37–44, 46–47, 50–53 (N.J. Super. Ct. 2003); *City of Gary ex rel. King v. Smith & Wesson Corp.*, 801 N.E.2d 1222, 1231–32, 1241–42 (Ind. 2003). Others were unsuccessful. *See, e.g., Camden Cnty. Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp.*, 273 F.3d 536, 540 (3d Cir. 2001) (per curiam); *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1147–48 (Ill. 2004).

13.    But the final tally told only part of the story.  Had these sprawling suits been permitted to persist and proliferate, "[t]he legal fees alone" would have been "enough to bankrupt the industry." Sharon Walsh, *Gun Industry Views Accord as Dangerous Crack in Its Unity*, Wash. Post (Mar. 18, 2000), https://wapo.st/2Zcp5KS.  That, indeed, was in large part the point: "[M]unicipal leaders pressed on regardless of their chance of success, spending taxpayers' money in a war of attrition against the firearms industry."  Recent Legislation, *Protection of Lawful Commerce in Arms Act*, 119 Harv. L. Rev. 1939, 1940 (2006).

COMPLAINT - 6

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

14.     It did not take long for Congress to recognize these lawsuits for what they were:  a coordinated effort to try to destroy the firearms industry by saddling it with liability for the acts of criminals.  States pressed "theories without foundation in hundreds of years of the common law and jurisprudence of the United States" and threatened interstate comity by permitting one state to penalize lawful conduct in another state.  15 U.S.C. §7901(a)(7)–(8).  They did so, moreover, at substantial cost to individual rights, including the Second Amendment right to keep and bear arms, *id.* §7901(a)(2), (a)(6), as well as the rights of industry members to pursue their trade consistent  with  the  Constitution's  privileges  and  immunities  guarantee,  *id.* §7901(a)(7). And it was profoundly unfair, to boot, to hold lawful businesses engaged in the lawful sale of constitutionally protected products liable "for the harm caused by those who criminally or unlawfully misuse . . . products that function as designed and intended."  *Id.* §7901(a)(5).

15.     Congress enacted the PLCAA to put an end to such state-law actions. Indeed, the PLCAA's very first enumerated "purpose[]" is to "prohibit causes of action against manufacturers, distributors, dealers, and importers of firearms or ammunition products, and their trade associations" based on harm "caused by the criminal or unlawful misuse of firearm products" by third parties.  *Id.* §7901(b)(l); *see also id.* §790l(a)(6) (finding that such suits are "an abuse of the legal system, . . . threaten[] the diminution of a basic constitutional right and civil liberty, . . . and constitute[] an unreasonable burden on interstate and foreign commerce").

16.     The statute makes good on that promise, prohibiting all such suits from being "brought in any Federal or State court."  *Id.* §7902(a).  The PLCAA preempts "civil action[s] . . . brought by any person against a manufacturer or seller of a qualified product, or a trade association, for damages, punitive damages, injunctive

COMPLAINT - 7

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party." *Id.* §7903(5)(A); *see id.* §7903(2)–(4), (6), (8)–(9) (defining "person," "manufacturer," "seller," "trade association," "qualified product," and "unlawful misuse").

17.     Only six enumerated types of claims are not so prohibited. *See id.* §7903(5)(A). These exceptions are limited to circumstances in which the manufacturer or seller itself engaged in some well-defined type of wrongful conduct, such as claims for design or manufacturing defect, fraudulent transfer, negligent entrustment, and breach of contract or warranty.

18.     None of the enumerated exceptions extends to state laws that impose "public nuisance" liability against manufacturers and sellers of firearms and ammunition for allegedly contributing to the criminal conduct of third parties.  In fact, such efforts, founded on novel expansions of general common-law tort theories, are exactly what the PLCAA was enacted to—and does—stamp out. *See* 15 U.S.C. §7901(a)(7); *Camden Cnty.*, 273 F.3d at 540–41 ("To extend public nuisance law to embrace the manufacture of handguns would be unprecedented . . . .").

**Courts Uphold the PLCAA Against Constitutional Challenges and Routinely Reject Efforts to Circumvent Its Protections.**

19.     After Congress passed the PLCAA, federal and state courts routinely rejected efforts to evade the law's protections for the firearms industry.

20.     Some plaintiffs challenged the statute's constitutionality, but courts across the country rejected such challenges, holding that the PLCAA is a lawful exercise of Congress' Commerce power, *see, e.g.*, *Adames v. Sheahan*, 909 N.E.2d 742, 765 (Ill. 2009); *City of N.Y. v. Beretta U.S.A. Corp.*, 524 F.3d 384, 393–95 (2d

COMPLAINT - 8

Cir. 2008); that the PLCAA is consistent with the Constitution's separation of powers, *see, e.g.*, *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1139–40 (9th Cir. 2009); *District of Columbia v. Beretta*, 940 A.2d 163, 172–73 (D.C. Ct. App. 2008); *City of N.Y.*, 524 F.3d at 395–96; that the PLCAA comports with the Tenth Amendment, *see, e.g.*, *Delana v. CED Sales, Inc.*, 486 S.W.3d 316, 323–24 (Mo. 2016); *City of N.Y.*, 524 F.3d at 396–97; *Adames*, 909 N.E.2d at 765; and that the PLCAA does not violate the Takings, Equal Protection, Due Process, or Petition Clauses, *see, e.g.*, *Ileto*, 565 F.3d at 1140–42; *Delana*, 486 S.W.3d at 324; *District of Columbia*, 940 A.2d at 173–82; *City of N.Y.*, 524 F.3d at 397–98.

21.     Other plaintiffs sought to skirt the PLCAA's general prohibition on covered actions. Just as often, courts carefully policed the statute's ban and rejected efforts to expand its narrow exceptions. For instance, the Missouri Supreme Court held that, to qualify as a prohibited action "resulting from criminal misuse" of a firearm under §7903(5)(A), the PLCAA does not require the criminal misuse to have resulted in criminal conviction or to have been the sole cause of injury. *Delana*, 486 S.W.3d at 321. The Supreme Court of Texas rejected an effort to invoke the negligent entrustment exception under §7903(5)(A)(ii) because that state's common law did not recognize such an action. *In re Academy, Ltd.*, 625 S.W.3d 19, 30–32 (Tex. 2021). And the Second and Ninth Circuits concluded that statutory codification of state tort law on wrongful death, nuisance, and negligence actions could not satisfy the so-called "predicate exception" set forth in §7903(5)(A)(iii). *City of N.Y.*, 524 F.3d at 400–04; *Ileto*, 565 F.3d at 1137–38.

COMPLAINT - 9

**In the Wake of Bruen, States Again Attempt to Circumvent the PLCAA.**

22.    Last June, the Supreme Court decided *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022), which confirmed that the right "to keep and bear Arms" means just that—the right to keep and bear arms, whether inside or outside of the home. *Id.* at 2134–35. That guarantee, moreover, is no "second-class right," subject to a unique set of rules or available to only those with "some special need" to exercise it. *Id.* at 2156. Accordingly, when evaluating government burdens on the Second Amendment's "unqualified command," courts must assess "this Nation's historical tradition" of regulating firearms—not conduct some means-end balancing. *Id.* at 2125–34. Applying that test, the Court invalidated a New York law requiring law-abiding citizens to show special need to carry a firearm outside the home. *Id.* at 2134–56.

23.    *Bruen* should have prompted states to reconsider their laws to make them more protective of rights the Supreme Court had just reaffirmed as fundamental. Unfortunately, it has prompted the opposite reaction in states that are least protective of the Second Amendment right. Almost immediately, some of the same very few states that had endeavored to keep their law-abiding citizens from carrying firearms undertook efforts "to offset the impact of the court's decision." Giavanni Alves, *N.Y.'s New Gun Control Laws*, Staten Island Live (July 9, 2022), *available at* https://bit.ly/3Q8l2K0 (last visited April 25, 2023). Some of those efforts were re-runs. In particular, a few states (following the lead of New York, the state whose restrictive carry regime was invalidated in *Bruen*) passed legislation purporting to authorize civil suits against firearms manufacturers, distributors, and sellers based on the harms caused by gun violence—in other words, purporting to authorize the

COMPLAINT - 10

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

very same types of lawsuits that prompted Congress to pass the PLCAA almost 20 years ago. *See, e.g.*, N.J. Assembly Bill 1765, 2022–2023 Session (July 5, 2022); Del. Senate Bill 302 (June 30, 2022); *cf.* N.Y. Gen. Bus. Law §§898-a–898-e (July 9, 2021).

**Washington's Recently Enacted Senate Bill 5078 Authorizes Exactly the Sort of Sprawling Tort Actions that Congress Passed the PLCAA to Prohibit.**

24.    On April 25, 2023, Governor Jay Inslee signed into law Senate Bill 5078, titled "the firearm industry responsibility and gun violence victims' access to justice act."

25.    SB 5078 is fundamentally inconsistent with the PLCAA.  The statute not only declares its intention to control the entire "firearm industry" through regulating legal commerce in legal products, *see* §1(3), but purports to chart a way around federal law by codifying the very sort of novel tort theories that the PLCAA explicitly forbids.  *But see Ileto*, 565 F.3d at 1136 ("[T]he text and purpose of the PLCAA shows that Congress intended to preempt general tort theories of liability even in jurisdictions . . . that have codified such causes of action.").

26.    SB 5078 applies exclusively to "firearm industry member[s]," *i.e.*, those "engaged in the wholesale or retail sale, manufacturing, distribution, importing, or marketing of a firearm industry product."  §2(1)(a), (2); *see also* §2(1)(b), (1)(e) (defining "firearm industry product" broadly to include any "firearm," "[a]mmunition," or "component part" "used or possessed in [Washington]," even one not "sold, made, distributed, or marketed in this state").

27.    The new cause of action is sweeping.  A "firearm industry member" may be held liable for the "manufacture, distribution, importation, marketing, or wholesale or retail sale of a firearm industry product," even if that conduct was fully

COMPLAINT - 11

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

lawful where it occurred and fully compliant with federal law, if it later is deemed by a Washington judge or jury to have "knowingly create[d], maintain[ed], or contribute[d] to a public nuisance," §2(2–3).

28.    Lawful conduct protected by the First Amendment ("marketing") and the Second Amendment ("manufacture, distribution, importation . . . or wholesale or retail sale of a firearm industry product") thus may be the basis of a Washington tort action if a product lawfully marketed, lawfully made, and lawfully sold is later used or possessed unlawfully *by someone else* in Washington. SB 5078 provides no protection for manufacturers or sellers of firearms who are fully compliant with applicable law from being held liable for the criminal misdeeds of a third party.

29.    And the law does not stop there.  "A firearm industry member" may also be held liable under SB 5078 for failing to "establish, implement, and enforce reasonable controls regarding its manufacture, sale, distribution, importing, use, and marketing of firearm industry products," §2(4), even if the relevant products were not "sold, made, distributed, or marketed" in Washington, *see* §2(1)(b).

30.    To make matters worse, the statute does not key "reasonable controls" solely to the many federal, state, and local laws with which firearms manufacturers and sellers must already comply.  Nor does it identify what controls beyond compliance with existing statutory obligations are or are not "reasonable."  Instead, the most SB 5078 does to define "reasonable controls" is supply a recursive gloss: "'Reasonable controls,'" the law says, "means *reasonable* procedures, safeguards, and business practices."  §2(1)(f) (emphasis added).  Then, in a gloss upon this gloss, SB 5078 points to what such "controls" are supposed to accomplish:

     i.    Prevent the sale or distribution of a firearm-related product to a straw purchaser, a firearm trafficker, a person prohibited from

COMPLAINT - 12

1
2
3
4
5

    possessing a firearm under state or federal law, or a person who the firearm industry member has reasonable cause to believe is at substantial risk of using a firearm industry related product to harm themselves or unlawfully harm another, or of unlawfully possessing or using a firearm industry product;

ii.    Prevent the loss of a firearm industry product or theft of a firearm industry product from a firearm industry member; and

6
7
8
9

iii.    Ensure that the firearm industry member complies with all provisions of state and federal law and does not otherwise promote the unlawful sale, manufacture, distribution, importing, possession, marketing, or use of a firearm industry product.

§2(1)(f).

10
11
12
13
14
15

    31.    In other words, "reasonable controls" are all "reasonable procedures" that will achieve goals as sweeping and abstract as preventing criminal conduct by third parties and complying with all federal and state law.  And under §2(1)(f), (7), the failure to implement any one of potentially infinite and unnamed procedures "designed and implemented to" achieve those goals likewise "is a public nuisance," regardless of where the supposed failure occurred.

16
17
18
19
20

    32.    SB 5078 does not stop there.  The statute separately requires "firearm industry member[s]" to "take reasonable precautions to ensure [they] do[] not sell or distribute a firearm industry product to a downstream distributor or retailer of firearm industry products that fails to establish and implement reasonable controls." §2(5).

21
22
23
24
25

    33.    Unlike with the "reasonable controls" provision, SB 5078 provides no definition, not even a gloss, for what constitutes "reasonable precautions" that could violate §2(5).  So, under this provision, failing to take undefined precautions before selling or distributing a product to a distributor or retailer who themselves fail to take certain unnamed reasonable controls is grounds for liability for supposedly

COMPLAINT - 13

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1    creating or contributing to a public nuisance.  And the scope of this provision is

2    breathtaking:  Section 2(5) applies even if both the "firearm industry member" and

3    "downstream distributor or retailer" are operating outside of Washington.

4        34.    SB 5078 goes on to prohibit still more constitutionally protected

5    conduct in constitutionally suspect ways. For instance, under §2(6)(b), a "firearm

6    industry member" is barred from "manufactur[ing], distribut[ing], import[ing],

7    market[ing], offer[ing] for wholesale, or offer[ing] for retail sale a firearm industry

8    product" if that product is "[d]esigned, sold, or marketed in a manner that is targeted

9    at minors"—even though, under existing Washington law, a minor is permitted to

10   possess a firearm in many circumstances, including "target shooting at an established

11   range" or "where the discharge of a firearm is permitted, is not trespassing, and the

12   person . . . is under the supervision of a parent, guardian, or other adult approved for

13   the purpose by the parent or guardian," Wash. Rev. Code §9.41.042(2), (5)(b).  SB

14   5078 would thus prohibit, for example, the designing of a firearm that is purposefully

15   made to be safer for lawful use by minors.

16       35.    The broad language of SB 5078 expands the scope of public nuisance

17   law in other unprecedented ways as well.  Most notable, the statute radically relaxes

18   "proximate cause" to mean something far different than traditional proximate cause.

19   Under SB 5078, "[a] firearm industry member's conduct . . . constitutes a proximate

20   cause of the public nuisance if the harm is a reasonably foreseeable effect of the

21   conduct, notwithstanding any intervening actions, including but not limited to

22   criminal actions by third parties." §2(9). What is more, the statute explicitly removes

23   the need to prove intent:  Liability may attach without regard to whether "the firearm

24   industry member acted with the purpose to engage in a public nuisance or otherwise

25   cause harm to the public."  §2(13).

COMPLAINT - 14

36.     SB 5078 makes clear that a private right of action may be brought for violations of the statute pursuant to Washington's public nuisance law contained in §7.48 of Washington's Revised Code. §2(12). Under those provisions of Washington law, a "private person may maintain a civil action for a public nuisance, if it is specially injurious to himself or herself." Wash. Rev. Code §7.48.210. The remedies provided for under that chapter include "an action for damages and other and further relief," to "have the defendant enjoined," or an "order . . . to abate the nuisance at the expense of the defendant." *Id.* §§7.48.010, .020, .030.

37.     SB 5078 also specifically authorizes the Attorney General to "commence an action." §2(10). In addition to the regular "remedies available for violations of this chapter," the Attorney General may seek "punitive damages up to an amount not to exceed three times the actual damages sustained by the state, reasonable attorneys' fees, and costs of the action." §2(10). These penalties apply even if the relevant conduct occurred entirely out of state, will continue to occur entirely out of state, and was and is protected by the Constitution and/or necessary to ensure that law-abiding citizens may exercise their constitutional rights.

## JURISDICTION AND VENUE

38.     Plaintiff's causes of action arise under 42 U.S.C. §1983 and the United States Constitution. This Court therefore has jurisdiction pursuant to 28 U.S.C. §1331.

39.     This Court also has jurisdiction under 28 U.S.C. §1343(a)(3) because this action seeks to "redress the deprivation, under color of a[] State law," of "right[s], privilege[s] or immunit[ies] secured by . . . an[] Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States."

COMPLAINT - 15

40.    Venue lies in this district pursuant to 28 U.S.C. §1391 because Defendant is located in and performs his official duties in the Eastern District of Washington and is therefore considered to reside within this district as a matter of law.

## CLAIMS FOR RELIEF

### COUNT ONE

### (Preemption)

41.    Plaintiff re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

42.    The Supremacy Clause, which provides that the Constitution, federal statutes, and treaties are "the supreme Law of the Land," U.S. Const. art. VI, cl. 2, provides "a rule of decision" for determining whether federal or state law applies in a particular situation. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015). When a federal law "imposes restrictions" and a state law "confers rights . . . that conflict with the federal law," "the state law is preempted." *Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020).

43.    That is exactly the situation here. To stamp out unjustified expansions of the common law and undue intrusions into lawful commerce in arms, the PLCAA imposes clear restrictions: Courts may not entertain any "civil action . . . against a manufacturer or seller of a [firearms] product . . . for damages . . . or other relief, resulting from the criminal or unlawful misuse of a [firearms] product by . . . a third party." 15 U.S.C. §7903(5)(A). Yet SB 5078 explicitly authorizes parties to sue "firearm industry members" for damages and other relief resulting from a third

COMPLAINT - 16

1   party's misuse of an industry member's products.  §2(9)–(12).  That direct effort to

2   countermand federal law is plainly preempted.

3        44.    Under the PLCAA, a "qualified civil liability action may not be brought

4   in any Federal or State court."  15 U.S.C. §7902(a).  Yet the whole point of SB 5078

5   is to authorize "qualified civil liability action[s]."

6        45.    The PLCAA defines a "qualified civil liability action" as a "[1] civil

7   action . . . [2] brought by any person" ("including any governmental entity") "[3]

8   against a manufacturer or seller of a qualified product . . . [4] for damages . . . or

9   other relief, [5] resulting from the criminal or unlawful misuse of a qualified product

10  by . . . a third party." *Id.* §7903(5)(A).

11       46.    SB 5078 suits satisfy each element.

12       47.    A suit under SB 5078 [1] is a "civil action" that [2] can be brought by

13  individuals and government officers.  SB 5078 specifically authorizes the

14  Washington "Attorney General" to "commence an action," §2(10), and makes clear

15  that a private right of action exists "to seek damages, abatement, or any other remedy

16  available for a public nuisance," §2(12).

17       48.    A suit under SB 5708 [3] can be brought "against a manufacturer or

18  seller of a qualified product, or trade association."  15 U.S.C. §7903(5)(A).  In fact,

19  a suit under SB 5708 can be brought only against such a party; the statute applies to

20  "firearm industry member[s]" and them alone. §2(2)–(6); §2(1)(a) (defining

21  "Firearm industry member" to mean "a person engaged in the wholesale or retail

22  sale, manufacturing, distribution, importing, or marketing of a firearm industry

23  product").

24       49.    Finally, SB 5078 [4] authorizes recovery of damages and other relief

25  from firearm industry members [5] for injuries "resulting from" third parties' misuse

COMPLAINT - 17

of their products. *See* 15 U.S.C. §7903(5)(A). Indeed, that is the statute's very reason for being. As its codified "find[ings]" explain, SB 5078 is designed to facilitate efforts to hold "firearms industry members" liable for harms resulting from "the public health crisis of gun violence." §1(1).  And SB 5708 does just that, subjecting a firearm industry member to liability for harm caused by "intervening . . . criminal actions by third parties," §2(9), if the industry member's "manufacture, distribution, importation, marketing, or wholesale or retail sale" "knowingly contribute[s] to a public nuisance," §2(3), or if the industry member fails to employ "reasonable procedures, safeguards, and business practices" to keep firearms out of the hands of third parties who misuse them, §2(1)(f), (4). SB 5078 further makes an industry member liable for the failure of a "downstream distributor or retailor . . . to establish and implement reasonable controls" if the industry member fails to "take reasonable precautions" against the sale or distribution of the product to the "downstream distributor or retailor."  §2(5). SB 5078 plainly authorizes "qualified civil liability actions" under the PLCAA.

50.    The kind of liability SB 5078 seeks to impose does not fit within any of the narrow exceptions to the PLCAA's preemptive scope enumerated in 15 U.S.C. §7903(5)(A).  SB 5078 does not authorize suits by the U.S. Attorney General to enforce any federal laws (§7903(5)(A)(vi)); and it does not confine liability to instances in which a manufacturer or seller knowingly transferred a firearm to a prohibited person (§7903(5)(A)(i)), negligently entrusted a firearm (§7903(5)(A)(ii)), breached a contract or warranty (§7903(5)(A)(iv)), or defectively made a product (§7903(5)(A)(v)).

51.    Nor does SB 5078 fit within the PLCAA's so-called "predicate exception," which exempts "an action in which a manufacturer or seller of a

COMPLAINT - 18

qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought." *Id.* §7903(5)(A)(iii).

52.     As the Ninth Circuit has explained, the term "applicable" in §7903(5)(A)(iii) must be read in light of both "the specific context in which [it] is used" and "the broader context of the statute as a whole." *Ileto*, 565 F.3d at 1134 (quoting *Robinson v. Shell Oil Co*, 519 U.S. 337, 341 (1997)); *accord City of N.Y.*, 524 F.3d at 400.  And both the immediately surrounding text and the language that immediately follows provide clear indications that the predicate exception exempts from the PLCAA's preemptive reach only statutes that impose concrete obligations and prohibitions that a firearms industry member can understand and comply with, not statutes that merely impose broad duties of care.  Indeed, that is the only sensible way to read the predicate exception, as interpreting it to permit states to reinstate exactly the same kinds of novel nuisance suits that led Congress to enact the PLCAA through the simple expedient of codifying the same amorphous theories in statutes would "allow the predicate exception to swallow the statute."  524 F.3d at 403*; see also Ileto*, 565 F.3d at 1137 (noting that, in enacting the PLCAA, "Congress was primarily concerned with novel nuisance cases like *Ileto*" (quoting *Adames v. Sheahan*, 880 N.E.2d 559, 586 (Ill. App. Ct. 2007), *rev'd on other ground*s, 909 N.E.2d 742 (Ill. Sup. Ct. 2009))).

53.     At a minimum, SB 5078 is preempted to the extent it authorizes the imposition of liability in the absence of either knowing violations or traditional proximate cause.

54.     The predicate exception exempts only "an action in which a manufacturer or seller of a qualified product *knowingly* violated a State or Federal

COMPLAINT - 19

1    statute applicable to the sale or marketing of the product, *and the violation was a*

2    *proximate cause of the harm for which relief is sought*." 15 U.S.C. §7903(5)(A)(iii)

3    (emphases added).

4        55.    By its terms, SB 5078 does not require a violation of two of its

5    categories of prohibited activities to be "knowing."

6        56.    Neither the provision requiring a "firearm industry member" to

7    "enforce reasonable controls regarding its manufacture, sale, distribution, importing,

8    use, and marketing," nor the provision to "take reasonable precautions . . . not sell

9    or distribute a firearm industry product to a downstream distributor or retailer . . .

10   that fails to establish and implement reasonable controls," contain any mens rea

11   element; both set up a strict liability offense based on any failure to "enforce

12   reasonable controls" or "take reasonable precautions." §2(4), (5). Industry members

13   thus can face liability for each and every failure to abide by these amorphous

14   commands. With regard to "reasonable controls," this means that industry members

15   may be liable even if they do not know that their "procedures, safeguards, and

16   business practices" are "unreasonable" means of "prevent[ing]" or "ensur[ing]" SB

17   5078's abstract goals. §2(1)(f). And with regard to "reasonable precautions," this

18   means that industry members can be held liable for their transactions with

19   downstream distributors or retailors regardless of whether they had any idea that the

20   precautions they took would later be deemed "unreasonable" by a Washington judge

21   or jury. §2(5).

22       57.    Making matters worse, SB 5078 does not require "proximate causation"

23   in the traditional sense.

24       58.    Courts "ordinarily presume that 'Congress intends to incorporate the

25   well-settled meaning of the common-law terms it uses,'" *Jam v. Int'l Fin. Corp.*, 139

COMPLAINT - 20

S. Ct. 759, 769–70 (2019), and "proximate cause" is a familiar common-law term. "The term 'proximate cause' is shorthand for a concept:  Injuries have countless causes, and not all should give rise to legal liability." *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 692 (2011) (emphasis omitted).  To distinguish proximate cause from cause-in-fact, courts have set down several guidelines: "[F]oreseeability alone is not sufficient to establish proximate cause," *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 201 (2017), and there must be a "direct relation between the injury asserted and the injurious conduct alleged," *Holmes v. Secs. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992).

59.    SB 5078 explicitly discards any such inquiry. "A firearm industry member's conduct" is declared to "constitute[] a proximate cause of the public nuisance" under SB 5078 "if the harm is a reasonably foreseeable effect of the conduct, notwithstanding any intervening actions, including but not limited to criminal actions by third parties."   §2(9); *see also* §2(13) ("To prevail in an action under this section, the party seeking relief is not required to demonstrate that the firearm industry member acted with the purpose to engage in a public nuisance or otherwise cause harm to the public.").  That, of course, is consistent with SB 5078's chief aim—imposing liability on participants in the firearm industry for harms caused by third parties.  But it is fundamentally inconsistent with what the PLCAA demands.  For that reason, too, SB 5078 is preempted.

## COUNT TWO

### (Commerce Clause)

60.    Plaintiff re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

COMPLAINT - 21

61.    Consistent with the Framers' "special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres," the Supreme Court has long held that the Commerce Clause (U.S. Const. art. I, §8, cl. 3) prohibits any state from "control[ling] commerce occurring wholly outside [its] boundaries." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 335–36 (1989) (footnote omitted). A state law that has "'the practical effect' of regulating commerce occurring wholly outside [the] State's borders" thus "exceeds the inherent limits of the enacting State's authority" and is invalid. *Id.* at 332, 336. Such a law is unconstitutional even if it "is addressed only to" conduct "in [the state]," *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986), and even if the regulated commerce "has effects within the State," *Healy*, 491 U.S. at 336.

62.    SB 5078 violates this bedrock constitutional constraint.

63.    SB 5078 does not define "firearm industry member" to require that the entity actually do business in Washington.  §2(1)(a) ("'Firearm industry member' means a person engaged in the wholesale or retail sale, manufacturing, distribution, importing, or marketing of a firearm industry product.").  And it defines "firearms industry product" to include not just a product "sold, made, distributed, or marketed in this state," but also a product merely "*used* or *possessed* in this state."  §2(1)(b) (emphases added).  A manufacturer that does not engage in any commerce in Washington therefore still could be held liable under SB 5078 for manufacturing, selling, or marketing its products in other states in ways that meet with Washington's disapproval.

COMPLAINT - 22

64.     That is clear on the face of the statute.  SB 5078 prohibits any "firearm industry member"—not just one that operates in Washington—from "knowingly creat[ing], maintain[ing] or contribut[ing] to a public nuisance in this state through the sale, manufacturing, distribution, importing, or marketing of a firearm industry product."  §2(3).  And its requirement that industry members employ "reasonable controls" is not limited to any commercial activities in Washington.  §2(4).  So, for instance, if a native of Little Rock, Arkansas, moves to Olympia, Washington, with a firearm he lawfully purchased in his home state and proceeds to misuse it in a way that creates a "public nuisance" for his new neighbors, SB 5078 could be deployed to impose liability on a manufacturer operating entirely in Texas and a retailer operating entirely in Arkansas.  §2(3)–(4).

65.     The same is true for SB 5078's requirement that industry members "take reasonable precautions" before selling or distributing to a "downstream distributor or retailor." §2(5). Nothing in SB 5078 requires *either* the industry member *or* the downstream distributor or retailer to be in Washington. In fact, nothing in the statute even requires that the supposedly offending conduct (or inaction) take place in the state. Thus, if a manufacturer in Texas sells a firearm industry product to a wholesaler in Arkansas, who distributes that product to a retailer in Oregon, who sells the product to a customer, who uses that product to create a public nuisance in Washington, the Texas manufacturer can be held liable for failing to take "reasonable precautions" to ensure that the Oregon retailer implemented "reasonable controls." §2(5). This is true even though the Texas manufacturer did not deal with the Oregon retailer and the entire chain of business transactions occurred outside of Washington.

COMPLAINT - 23

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

66.     SB 5078 further prohibits "firearm industry members" from "manufactur[ing], distribut[ing], import[ing], market[ing], offer[ing] for wholesale, or offer[ing] for retail sale a firearm industry product" that is "[d]esigned, sold, or marketed in a manner that foreseeably promotes conversion of legal firearm industry products into illegal firearm industry products" or "in a manner that is targeted at minors or individuals who are legally prohibited from purchasing or possessing firearms." §2(6). As explained by Washington Governor's Senior Policy Advisor on Public Safety, Barbara Serrano, this provision would apply to "a website that is run by an-out-of-state manufacturer." *Public Hearing Before H. Civil Rights & Judiciary*, 2023 Reg. Sess. 2023–2024 (Wash. 2023) (statement by Barbara Serrano), https://bit.ly/41MLjUw. SB 5078 thus imposes liability on an out-of-state industry member with no ties to Washington, for designing a product that, even if entirely lawful in the industry members' state, does not meet with Washington's approval; all that is required is that the product is at some point "possessed" or "used" in the state. §2(1)(b)(iii), (6).

67.     Indeed, Washington Senator Jamie Pedersen, testifying at a House Civil Rights & Judiciary hearing on SB 5078, explicitly stated that "I don't think the responsibility of manufacturers is different depending on place of the manufacturers. So, in other words folks who sell into Washington who manufacture guns that are going to be used in Washington have the same responsibilities whether they are based in Portland, Oregon, or Portland, Maine, or Steilacoom." *Public Hearing Before H. Civil Rights & Judiciary*, 2023 Reg. Sess. 2023–2024 (Wash. 2023) (statement by Sen. Jamie Pedersen).

68.     None of this is remotely consistent with the Commerce Clause. Indeed, imposing state-law liability (and damages and other relief) on out-of-state actors for

COMPLAINT - 24

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1 actions taken entirely out of state is the definition of unconstitutional extraterritorial

2 state regulation.

3      69.    SB 5078 is no less unconstitutional *vis-à-vis* the out-of-state commerce

4 of firearm industry members that do other business in Washington.  What matters is

5 where the regulated commerce takes place:  "If the transaction to be regulated occurs

6 'wholly outside' the boundaries of the state, the regulation is unconstitutional," even

7 if the actor, *e.g.*, is incorporated in the regulating state or does some other business

8 in that state.  *A.S. Goldmen & Co. v. N.J. Bur. of Sec.*, 163 F.3d 780, 786 (3d Cir.

9 1999). That is why the en banc Ninth Circuit in *Sam Francis Foundation v.*

10 *Christie's, Inc.*, 784 F.3d 1320 (9th Cir. 2015), held that a statute that regulated art

11 sales was facially unconstitutionally as applied to out-of-state art sales, *even though*

12 *the statute there applied out of state only if a Californian was a party to the sale.  Id.*

13 at 1323.

14      70.    By directly regulating commerce that takes place entirely in other states,

15 SB 5078 plainly violates the constitutional prohibition on extraterritorial state

16 regulation.

17      71.    SB 5078 violates the Commerce Clause in another way as well. In

18 addition to prohibiting states from regulating conduct that takes place outside of their

19 borders, the Commerce Clause "prohibit[s] States from discriminating against or

20 imposing excessive burdens on interstate commerce" within their borders.

21 *Comptroller of Treasury of Maryland v. Wynne*, 575 U.S. 542, 549 (2015); *see also*

22 *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). SB 5078 does that too.

23 Because it imposes liability for commercial transactions occurring in other states,

24 SB 5078 unlawfully discriminates against and burdens out-of-state commercial

25 interests within the state.

COMPLAINT - 25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## COUNT THREE

### (First Amendment)

72.     Plaintiff re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

73.     SB 5078 does not just regulate commerce ("the sale, manufacturing, [and] importing . . . of a firearm-related product"). It also regulates "marketing"— *i.e.*, speech protected by the First Amendment.  "A firearm industry member" may be held liable under SB 5078 if its "marketing" is deemed to have "contribute[d] to a public nuisance," if it failed to employ "reasonable controls" as to its "marketing," or if its products are "marketed in a manner that is targeted at minors"—even if the product is a (lawful) youth-model firearm.  §2(3), (4), (6)(b).

74.     That is a textbook First Amendment violation.

75.     Laws that single out speech on the basis of its content or viewpoint are subject to the strictest of scrutiny, which they "rare[ly]" survive.  *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 790–91, 799 (2011).  SB 5078 does both of those things.  And far from being narrowly tailored or even closely drawn to achieve a compelling or important government interest, SB 5078 is radically overbroad in relation to any legitimate objective it may further.

76.     Start with content-based discrimination.  SB 5078 undoubtedly regulates speech based on its content or "the topic discussed."  *City of Austin v. Reagan Nat'l Advert. of Austin*, LLC, 142 S. Ct. 1464, 1471 (2022).  After all, the statute does not apply to all marketing; it applies only to "marketing *of a firearm industry product*."  §2(1)(a) (emphasis added).  Indeed, SB 5078 does not even apply to all speech about firearms—only the speech of "firearm industry member[s]," *i.e.*,

COMPLAINT - 26

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

those "engaged in the wholesale or retail sale, manufacturing, distribution, importing, or marketing of a firearm industry product."  §2(1)(a).

77.     That speaker-based discrimination is no accident.  SB 5078 fixates on gun-related speech by gun-related actors because their speech is uniquely likely to communicate a particular *viewpoint* that Washington disfavors.  *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564 (2011).

78.     The topics and views that Washington has singled out in SB 5078 do not fall into any "well-defined and narrowly limited classes of speech" unprotected by the First Amendment. *Brown*, 564 U.S. at 786, 791. To be sure, the First Amendment does not preclude imposing liability for false, deceptive, or otherwise "misleading" commercial speech. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 564 (1980).  But SB 5078 does not even purport to target speech that is false or misleading.  It authorizes the imposition of liability for speech about lawful products—products expressly protected by the Constitution, no less—*even when that speech is truthful and not misleading*. Indeed, the words "false," "misleading," and "deceptive" appear nowhere in the statute. A manufacturer that publishes advertisements containing *entirely accurate* specifications of its lawful products—ammunition size, magazine capacity, weight, retail price, etc.—thus could be liable under SB 5078 if its advertisement was considered to be a "public nuisance" or deemed to be "targeted at minors," §2(3), (6)(b), even though, as explained, there are multiple situations in which a minor may lawfully possess or use a firearm, *see* Wash. Rev. Code. §9.41.042.  So too could an industry member that fails to establish what Washington deems to be a "reasonable procedure" with respect to its marketing materials (whatever that may be)—again, no matter how accurate its marketing materials or lawful the products they discuss. *See* §2(4).

COMPLAINT - 27

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

79.    The state apparently thinks that laws restricting speech about firearms are subject to more relaxed scrutiny, perhaps because firearms are dangerous.  But the Supreme Court has made clear that truthful speech promoting a lawful product or service is protected by the First Amendment even if the product or service is known to have deleterious health effects.  *See, e.g.*, *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (tobacco); *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 184–85 (1999) (gambling); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 504 (1996) (liquor); *Bigelow v. Virginia*, 421 U.S. 809, 818–25 (1975) (abortion).  Simply put, the mere fact a product is dangerous does not transform promotion of that product (*i.e.*, speech) into a tort for which liability may be imposed.  And that is of course true *a fortiori* when it comes to promotion of products that not only are legal, but are protected by the Second Amendment.

80.    The only way Washington could justify SB 5078's speech restrictions, then, would be to affirmatively prove that those restrictions are sufficiently tailored to achieve a sufficiently important state interest.  *See Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2384 (2021).  That, it cannot do, as SB 5078 is both "seriously underinclusive" and "seriously overinclusive" in relating to any public safety interests the state may assert.  *Brown*, 564 U.S. at 805.

81.    While purportedly aimed at a "public health crisis of gun violence," §1(1), the statute does nothing to police the conduct of *criminals* who misuse firearms to perpetrate that problem and endanger the public's health and safety.  Nor does it regulate vast swathes of speech—*e.g.*, action and horror films, video games, direct incitements to violence, and countless other forms of expression—that may actually encourage criminal gun violence, leaving it "wildly underinclusive," *Brown*, 564 U.S. at 801–02, even as a regulation of speech.

COMPLAINT - 28

82.     Conversely, by imposing sweeping liability—and even potentially punitive damages—for *any* firearms marketing that could later be thought to "contribute to a public nuisance" in Washington, even if it is nothing more than entirely truthful, non-misleading speech, *see* §2(3), (4), SB 5078 is "vastly overinclusive" as well. *Brown*, 564 U.S. at 804.  The statute is further overinclusive in so far as it prohibits *any* marketing "targeted at minors." §2(6).  This would prohibit marketing for conduct that Washington *explicitly marks out as lawful* for minors, such as "attendance at a hunter's safety course or a firearms safety course." Wash. Rev. Code. §9.41.042(1). SB 5078 thus has the inevitable effect of "prohibit[ing] or chill[ing]" fully protected expression, *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002), destroying the "breathing space" that "the First Amendment needs," *Broadrick v. Oklahoma*, 413 U.S. 601, 611–12 (1973).

83.     SB 5078 is not remotely tailored to any permissible state objective.  It also suffers from a fatal vagueness problem. Vagueness "raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno v. ACLU*, 521 U.S. 844, 871–72 (1997). After all, vague laws risk chilling would-be speakers by forcing them to "steer far wider of the unlawful zone" than they otherwise would "if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964).  For that reason, laws touching on speech must themselves speak "only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963).

84.     SB 5078 does precisely the opposite.  Indeed, the statute makes it virtually impossible for regulated parties to tell what speech is and is not permitted, leaving them with no realistic choice but to err on the side of refraining from exercising their First Amendment rights.

COMPLAINT - 29

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

85.    By its terms, SB 5078 renders unlawful any marketing that "contribute[s] to a public nuisance," §2(3), and "public nuisance" is defined so broadly as to sweep in, *e.g.*, marketing that "annoys, injures or endangers the comfort, repose, health or safety of others," or "offends decency," Wash. Rev. Code. §7.48.120.  SB 5078 further bans any marketing that is not subject to sufficiently "reasonable procedures, safeguards, and business practices." §2(2)(f), (4). The statute's speech restrictions thus necessarily "will provoke uncertainty among speakers," *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 871 (1997), as such incomprehensible and subjective abstractions do not even articulate at all—let alone articulate with "narrow specificity"—what kind(s) of speech may later be deemed to have contributed to a "public nuisance."

86.    Those restrictions are problematic enough. And SB 5078 further prohibits firearm industry products that are "marketed in a manner that is targeted at minors." §2(6)(b).  There is no shortage of problems with this provision, which on its face makes it illegal for a sporting goods store or firearms manufacturer to point out which firearms it sells are safest for minors.  And the state apparently intends for this provision to be taken to the extreme.  In describing the scope of this provision, Barbara Serrano, Washington Governor's Senior Policy Advisor on Public Safety, explained that it covers a website that "use[s] language, or, you know, *other things* on the site to cater to young people."  *Public Hearing Before H. Civil Rights & Judiciary*, 2023 Reg. Sess. 2023–2024 (Wash. 2023) (statement by Barbara Serrano) (emphasis added). This makes it impossible for industry members to design websites with any kind of certainty as to whether their use of bright colors or animations might later be deemed "targeted at minors."

COMPLAINT - 30

87.    That profound uncertainty not only "raises special First Amendment concerns because of its obvious chilling effect on free speech," but creates a "risk of discriminatory enforcement," which make the chilling effect even more acute. *Reno*, 521 U.S. at 871–72. After all, "[i]t is not merely the sporadic abuse of power by the censor but the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion." *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940). And that threat is even more pervasive when, as here, a law "does not aim specifically at evils within the allowable area of State control but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech or of the press." *Id.* That inherent vagueness dooms SB 5078 under the First Amendment.

88.    There is another problem here too. Even when speech about a product is actually false or misleading—which, again, SB 5078 does not require—the traditional principles that govern judicial actions for misrepresentations, including proof of reliance on the allegedly false speech, have always required a substantial link between that speech and the injury for which redress is sought before liability may be imposed. *See, e.g.*, *Restatement (Second) of Torts* §525 (1977); *Stewart v. Wyo. Cattle Ranche Co.*, 128 U.S. 383 (1888). That link is essential to ensure that efforts to impose liability based on speech remain consistent with the First Amendment. If liability could be imposed for misleading (or even truthful) speech at the behest of plaintiffs who did not rely on it and cannot demonstrate injury from it (as opposed to from the intervening acts of a third party), then the threat of massive tort liability could inhibit a speaker from voicing his view "even though [he] believe[s] [it] to be true and even though it is in fact true." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964). Yet SB 5078 *does not require proof of reliance*.

COMPLAINT - 31

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

89.     Nor does SB 5078 require a plaintiff to trace alleged injuries directly to the speech in question. On the contrary, under SB 5078 "[a] firearm industry member's conduct," *including its speech*, is deemed to "constitute[] a proximate cause of the public nuisance if the harm is a reasonably foreseeable effect of the conduct, notwithstanding any intervening actions, including but not limited to criminal actions by third parties." §2(9). The First Amendment demands far more, particularly of speaker-based restrictions on speech. *See Sorrell*, 564 U.S. at 565–66.

90.     The First Amendment jealously protects speech by guarding against the imposition of massive liability on speech without significant protections. That is true even of torts that pre-date the Republic and the First Amendment. And it is true a *fortiori* of novel and extreme theories of liabilities with no comparable historical pedigree. SB 5078 flunks First Amendment 101 at every turn.

## COUNT FOUR

### (Second Amendment)

91.     Plaintiff re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

92.     "[T]he Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense." *Bruen*, 142 S. Ct. at 2125; *see also* 15 U.S.C. §7901(a)(1)–(2). And "the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms." *Teixeira*, 873 F.3d 670 at 677. Commerce in arms is thus constitutionally protected. *See Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and

COMPLAINT - 32

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1  to purchase and provide ammunition suitable for such arms, and to keep them in
2  repair.").

3      93.    SB 5078 infringes this essential component of the Second Amendment
4  right to keep and bear arms.  Under *Bruen*, a law that regulates Second Amendment
5  activity is unconstitutional unless the state can prove that it "is consistent with this
6  Nation's historical tradition."  142 S. Ct. at 2126.  SB 5078 is not remotely consistent
7  with that tradition.  In fact, the Third Circuit explained as recently as 2001 that "[t]o
8  extend public nuisance law to embrace the manufacture of handguns would be
9  unprecedented."  *Camden Cnty.*, 273 F.3d at 540–41; *see also* 15 U.S.C. §7901
10 (Congress finding the same).  Washington thus cannot "justify its regulation by
11 demonstrating that it is consistent with the Nation's historical tradition of firearm
12 regulation."  Bruen, 142 S. Ct. at 2130.

13     94.    As a result, SB 5078 violates the Second Amendment.

## COUNT FIVE

### (Due Process)

16     95.    Plaintiff re-alleges and incorporates by reference the preceding
17 allegations as though fully set out herein.

18     96.    For many of the same reasons that SB 5078 is unconstitutionally vague
19 with respect to speech protected by the First Amendment, it is also unconstitutionally
20 vague under the Due Process Clause with respect to *all* the conduct it polices.  The
21 Fourteenth Amendment prohibits a state from "depriv[ing] any person of life, liberty,
22 or property without due process of law."  U.S. Const. amend. XIV, §1.  A law that
23 forbids or requires an act "in terms so vague that men of common intelligence must
24 necessarily guess at its meaning . . . violates the first essential of due process of law."

25

COMPLAINT - 33

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1     *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926). So too does a law with

2     terms so malleable that it authorizes "arbitrary [or] discriminatory enforcement."

3     *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

4         97.     Because the text of the Fourteenth Amendment applies to all manner of

5     state-sanctioned "depriv[ations]," this anti-vagueness guarantee applies to both

6     criminal and civil laws. *See id.* at 108–09 (collecting cases); *see also Sessions v.*

7     *Dimaya*, 138 S. Ct. 1204, 1224–26 (2018) (Gorsuch, J., concurring in part and

8     concurring in the judgment).

9         98.     For all the reasons already discussed, "[t]he vice of unconstitutional

10    vagueness is further aggravated" in the First Amendment context. *Cramp v. Bd. of*

11    *Pub. Instruction of Orange Cnty.*, 368 U.S. 278, 287 (1961). But it is not just First

12    Amendment concerns that demand regulation with especial precision. A more

13    "stringent" vagueness test applies for statutes that "threaten[] to inhibit the exercise

14    of constitutionally protected rights" of any kind, as well as for statutes that impose

15    "quasi-criminal" penalties. *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,

16    455 U.S. 489, 499 (1982). The most protective vagueness standard known to law

17    thus applies here several times over. SB 5078 not only directly regulates speech, but

18    also directly restricts the activities of those engaged in the lawful business of selling

19    arms protected by the Second Amendment. And the liability SB 5078 threatens is

20    no small matter. The statute itself authorizes "punitive damages up to an amount not

21    to exceed three times the actual damages sustained by the state, reasonable attorneys'

22    fees, and costs of the action," §2(10), and the relevant chapter of Washington "public

23    nuisance" law provides for "damages and other and further relief," to "have the

24    defendant enjoined," or for an "order . . . to abate the nuisance at the expense of the

25    defendant," Wash. Rev. Code §7.48.010, .020, .030. SB 5078 thus ushers in the

COMPLAINT - 34

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1    "possibility of imposing liability on an entire industry," which, among other things,

2    "threatens the diminution of a basic constitutional right" enabled by that industry—

3    namely, individuals' Second Amendment rights to keep and bear arms.  15 U.S.C

4    §7901(a)(6).  As a result, SB 5078 is subject to a "stringent" vagueness test even

5    apart from its direct regulation of speech.

6        99.    SB 5078 flunks that test, as the prohibitions it imposes are hopelessly

7    vague.  It remains a mystery what "reasonable controls" means—especially when it

8    is defined to mean something more than complying with the law.  And the statute's

9    modest effort to supply a definition only makes matters worse:  Rather than identify

10   a firearm industry member's concrete obligations with specificity, SB 5078 issues a

11   sweeping command that industry members adopt any and all procedures "designed

12   and implemented to" "prevent" or "ensure" a litany of abstract goals including (but

13   not limited to) preventing the loss or theft of firearms, preventing illegal arms

14   trafficking, and so on.  §2(1)(f).  This is made worse by the fact that in determining

15   what qualifies as a "public nuisance," industry members are tasked with predicting

16   abstractions such as whether the act or omission "annoys . . . the comfort" or

17   "offends decency."  Wash. Rev. Code. §7.48.120.

18       100.  Moreover, when it comes to taking "reasonable precautions" in

19   ensuring that firearm industry products are not sold or distributed to non-compliant

20   downstream distributors or retailers, the statute provides absolutely no guidance on

21   what constitutes a "reasonable precaution," leaving industry members with no way

22   to know whether their precautionary steps will subsequently be deemed sufficiently

23   "reasonable."

24       101.  To be clear, "[w]hat renders [this] statute vague is not the possibility

25   that it will sometimes be difficult to determine whether the incriminating fact it

COMPLAINT - 35

1    establishes has been proved; but rather the indeterminacy of precisely *what that fact*

2    *is*." *United States v. Williams*, 553 U.S. 285, 306 (2008) (emphasis added).  The

3    problem with SB 5078 is not mere imprecision at the margins, but the failure to

4    articulate any standard whatsoever.  Determining, for example, what qualifies as

5    "reasonable precautions" invites "wholly subjective judgments without statutory

6    definitions, narrowing context, or settled legal meanings." *Id.*

7        102.  Indeed, SB 5078 is "so standardless that it invites arbitrary

8    enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). And the common

9    law is no guide, as the suits that SB 5078 contemplates are a radical departure from

10   any known concept of public nuisance or any other tort.  Given its sheer breadth, its

11   lack of any identifiable standards, and its stark departures from the common law, SB

12   5078 "impermissibly delegates basic policy matters to policemen, judges, and juries

13   for resolution on an ad hoc and subjective basis, with the attendant dangers of

14   arbitrary and discriminatory application." *Chatin v. Coombe*, 186 F.3d 82, 89 (2d

15   Cir. 1999).  The Due Process Clause demands far more.

16       103.  And that is not the only due process problem with SB 5078.  Proof that

17   the defendant caused the plaintiff's injury is and always has been a core element of

18   tort law.  *See, e.g.*, *Restatement (Second) of Torts* §430 (1965); *Bank of Am. Corp.*,

19   581 U.W. at 200–01; *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572

20   U.S. 118, 132–33 (2014).  Indeed, even strict-liability torts require proof of causation.

21   *See, e.g.*, *Restatement (Second) of Torts* §§504–05, 507, 509, 519 (1977).

22       104.  That is not just tradition; it is constitutionally mandated.  It has long

23   been settled that "a presumption that is arbitrary, or that operates to deny a fair

24   opportunity to repel it, violates the due process clause." *W. & Atl. R.R. v. Henderson*,

25   279 U.S. 639, 642 (1929).  Denying a defendant a meaningful opportunity to

COMPLAINT - 36

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1    demonstrate that it did not actually cause a plaintiff's injuries would be a paradigm

2    arbitrary deprivation of private property.

3         105.   Yet SB 5078 does just that by reimaging proximate cause to include

4    chains of events that extend not only far out of state and back in time, but through

5    the criminal acts of third parties. *See* §2(9).  The Constitution does not permit such

6    breathtaking liability.

7         106.   It makes no difference that SB 5078 labels its standard as "proximate

8    cause" rather than a presumption. A state cannot get around that bedrock

9    constitutional protection through the simple expedient of eliminating the traditional

10   elements of liability against which a defendant is entitled to defend. *See Crowell v.*

11   *Benson*, 285 U.S. 22, 53 (1932) ("[R]egard must be had, as in other cases where

12   constitutional limits are invoked, not to mere matters of form, but to the substance

13   of what is required."). In short, labeling something "proximate cause" is no

14   substitute for honoring the basic guarantees of due process.

15        107.   SB 5078's radical relaxing of the traditional requirements of causation

16   not only compounds the vagueness problem, but independently violates due process.

17                          **PRAYER FOR RELIEF**

18        Plaintiff prays for the following relief from the Court:

19        1.     A declaration, pursuant to 28 U.S.C. §2202, that SB 5078 on its face

20   violates the United States Constitution and is therefore void and unenforceable, or,

21   in the alternative, that SB 5078 is unconstitutional as applied to NSSF and its

22   members;

23        2.     A preliminary injunction enjoining Attorney General Ferguson, as well

24   as all officers, agents, and employees subject to his supervision, direction, and/or

25   control, from enforcing or otherwise bringing suit against NSSF and its members

COMPLAINT - 37

1    under SB 5078;

2        3.     A permanent injunction enjoining Attorney General Ferguson, as well

3 as all officers, agents, and employees subject to his supervision, direction, and/or

4 control, from enforcing or otherwise bringing suit against NSSF and its members

5 under SB 5078;

6        4.     Such costs and reasonable attorneys' fees to which Plaintiff may be

7 entitled by law;

8        5.     Nominal damages; and

9        6.     Any further relief the Court deems just and proper.

10        DATED this 25th day of April, 2023.

11                         CORR CRONIN LLP

12

13                         *s/ Steven W. Fogg*

14                         Steven W. Fogg, WSBA No. 23528

                             CORR CRONIN LLP

15                         1015 Second Avenue, Floor 10

                            Seattle, Washington  98104-1001

16                         Ph: (206) 625-8600 | Fax: (206) 625-0900

17                         sfogg@corrcronin.com

18                         Paul D. Clement *(pro hac vice forthcoming)*

                            Erin E. Murphy *(pro hac vice forthcoming)*

19                         Matthew D. Rowen *(pro hac vice forthcoming)*

                            CLEMENT & MURPHY, PLLC

20                         706 Duke Street

                            Alexandria, VA 22314

21                         Ph: (202) 742-8900

22                         paul.clement@clementmurphy.com

                            erin.murphy@clementmurphy.com

23                         matthew.rowen@clementmurphy.com

24                         *Attorneys for Plaintiff*

25

COMPLAINT - 38