ROBERT W. FERGUSON
*Attorney General*

EMMA GRUNBERG, WSBA 54659
*Deputy Solicitor General*
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(206) 326 5488
Emma.Grunberg@atg.wa.gov

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| NATIONAL SHOOTING SPORTS FOUNDATION, INC., | NO. 2:23-cv-00113-MKD |
| Plaintiff, | DECLARATION OF SAUL CORNELL IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION |
| v. | |
| ROBERT W. FERGUSON, Attorney General of the State of Washington, | |
| Defendant. | |

I, Saul Cornell, declare as follows:

1.      I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge.

2.      I have been asked by the Office of the Attorney General for the State of Washington to provide an expert opinion on the history of firearms regulation in the Anglo-American legal tradition, with a particular focus on the understanding of the right to bear arms at the Founding and at the time of the

DECLARATION OF SAUL CORNELL
NO. 2:23-cv-00113-MKD

1

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    ratification of the Fourteenth Amendment to the United States Constitution. In

2    *N.Y. State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the

3    U.S. Supreme Court emphasized that text, history, and tradition are the

4    foundation of modern Second Amendment jurisprudence. This modality of

5    constitutional analysis requires courts to analyze history and evaluate the

6    connections between modern gun laws and historical approaches to firearms

7    regulation. I have also been asked to evaluate SSB 5078, the law at issue in this

8    case, particularly regarding its connection to the tradition of firearms regulation

9    in American legal history.

10                   I.    BACKGROUND AND QUALIFICATIONS

11            3.    I received my B.A. from Amherst College and M.A. and Ph.D. from

12    the University of Pennsylvania. I currently hold the Paul and Diane Guenther

13    Chair in American History at Fordham University. In addition to teaching

14    constitutional history at Fordham University to undergraduates and graduate

15    students, I teach constitutional law at Fordham Law School. I have been a Senior

16    Visiting research scholar on the faculty of Yale Law School, the University of

17    Connecticut Law School, and Benjamin Cardozo Law School. I have given

18    invited lectures, presented papers at faculty workshops, and participated in

19    conferences on the topic of the Second Amendment and the history of gun

20    regulation at Yale Law School, Harvard Law School, Stanford Law School,

21    UCLA Law School, the University of Pennsylvania Law School, Columbia Law

22

1    School, Duke Law School, Pembroke College Oxford, Robinson College,

2    Cambridge, Leiden University, and McGill University.[1]

3    4.    My writings on the Second Amendment and gun regulation have

4    been widely cited by state and federal courts, including the majority and

5    dissenting opinions in *Bruen*. My scholarship on this topic has appeared in

6    leading law reviews and top peer-reviewed legal history journals. I authored the

7    chapter on the right to bear arms in *The Oxford Handbook of the U.S. Constitution*

8    and co-authored the chapter in *The Cambridge History of Law in America* on the

9    Founding era and the Marshall Court, the period that includes the adoption of the

10    Constitution and the Second Amendment.[2] Thus, my expertise not only includes

11    the history of gun regulation and the right to keep and bear arms, but also extends

12    to American legal and constitutional history broadly defined.

13

14

15    [1] For a full *curriculum vitae* listing relevant invited and scholarly

16    presentations, *see* Exhibit 1.

17

18    [2] Saul Cornell, *The Right to Bear Arms*, *in The Oxford Handbook of the*

19    *U.S. Constitution* 739–759 (Mark Tushnet, Sanford Levinson, & Mark Graber

20    eds., 2015); Saul Cornell & Gerald Leonard, *The Consolidation of the Early*

21    *Federal System 1791-1812*, *in* 1 *The Cambridge History of Law in America* 518–

22    544 (Christopher Tomlins & Michael Grossberg eds., 2008).

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1          5.      I have provided expert witness testimony in *Rocky Mountain Gun*

2  *Owners, Nonprofit Corp. v. Hickenlooper*, No. 14-cv-02850 (D. Colo. 2014);

3  *Chambers, v. City of Boulder*, No. 2018 CV 30581 (Colo. D. Ct., Boulder Cty.

4  2018), *Zeleny v. Newsom*, No. 14-cv-02850 (N.D. Cal. 2014), *Miller v. Smith*, No.

5  2018-cv-3085 (C.D. Ill. 2018); *Jones v. Bonta*, 3:19-cv-01226-L-AHG (S.D. Cal.

6  2019); *Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal. 2019); *Worth v. Harrington,*

7  No. 21-cv-1348 (D. Minn. 2021); *Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB

8  (S.D. Cal. 2019); *Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB (S.D. Cal.

9  2017); *Renna v. Bonta*, No. 20-cv-2190 (S.D. Cal. 2020); *Boland v. Bonta*, No.

10  8:22-cv-1421-CJC-ADS (C.D. Cal. 2022); *Rupp v. Bonta*, No. 8:17-cv-746JLS-

11  JDE (C.D. Cal. 2017); *B&L Productions, Inc. v. Newsom*, No. 21-cv-1718-AJB-

12  DDL (S.D. Cal. 2021); *Nat'l Assoc. for Gun Rts. v. Campbell*, No.1:22-cv-11431-

13  FDS (D. Mass. 2022); *Nat'l Assoc. for Gun Rts. v. Lamont*, No. 3:22-cv-0118 (D.

14  Conn. 2022); *Nastri v. Dykes*, No. 3:23-cv-00056 (D. Conn. 2023); and *Nat'l*

15  *Assoc. for Gun Rts. v. Lopez*, No. 1:22-cv-00404 (D. Haw. 2022).

16          6.      I am being compensated for services performed in the above-entitled

17  case at an hourly rate of $750 for reviewing materials, participating in meetings,

18  and preparing reports; $1000 per hour for depositions and court appearances. My

19  compensation is not contingent on the results of my analysis or the substance of

20  any testimony.

21

22

DECLARATION OF SAUL CORNELL                    4
NO. 2:23-cv-00113-MKD

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

## II.    SUMMARY OF OPINIONS

7.    Understanding text, history, and tradition requires a sophisticated grasp of historical context. One must canvass relevant primary sources, secondary literature, and jurisprudence to understand the scope of permissible regulation consistent with the Second Amendment's original understanding. The members of the First Congress who wrote the words of the Second Amendment and the American people who enacted the text into law were well schooled in English common law ideas. Not every feature of English common law survived the American Revolution, but there were important continuities between English law and American law.[3] And each state, either by statute or judicial decision, expressly adopted aspects of the common law into their constitutions and laws.[4]

---

[3] *See generally* William B. Stoebuck, *Reception of English Common Law in the American Colonies*, 10 Wm. & Mary L. Rev. 393 (1968); MD. Const. of 1776, Declaration of Rights, art. III, § 1; Lauren Benton & Kathryn Walker, *Law for the Empire: The Common Law in Colonial America and the Problem of Legal Diversity*, 89 Chi.-Kent L. Rev. 937 (2014).

[4] *See, e.g.*, 9 Statutes at Large of Pennsylvania 29-30 (James T. Mitchell & Henry Flanders eds., 1903); Francois Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North-Carolina 60–61 (Newbern, 1792); *Commonwealth v. Leach*, 1 Mass. 59 (1804) ("Generally when

DECLARATION OF SAUL CORNELL
NO. 2:23-cv-00113-MKD

5

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

8.      In the following paragraphs, I focus on three primary areas pertinent to the questions in this case: (1) the Anglo-American tradition of firearm regulations at and shortly after the Founding; (2) the continuation of those traditions during the Jacksonian and Reconstruction Eras, with the recognition that as firearms technology and culture evolved, regulation did as well to address the novel challenges posed by these changes; and (3) the application of those traditions to SSB 5078.

9.      First, in my opinion, there is a long Anglo-American tradition of regulating firearms in a way that is entirely consistent with the Founders' original understanding of the Second Amendment. Historical scholarship shows that, rather than believing that the right to bear arms could never be regulated, the Founders believed in a right to bear arms that was consistent with the right to live in an ordered society defined by the concept of well-regulated liberty. Thus, States may enact laws regulating firearms in a way that advances ordered liberty and promotes public health and safety in a manner entirely consistent with the Founding era's conception of the right to keep and bear arms. This includes adaptation of the common law doctrine of public nuisance to address harms specifically created by firearms, gunpowder, and other dangerous substances.

---

an *English statute* has been made in amendment of the common law of *England*, it is *here* to be considered as part of *our* common law.") (emphasis in original).

10.    Second, I offer my opinion as a historian that this tradition required flexibility to adapt to changing technology and new challenges as they arose. Thus, the tradition of regulating firearms to advance public health and safety and an ordered society expanded during the Reconstruction Era to address the new problems that arose during that time. Although the means adopted were novel, the underlying principle of applying police power jurisprudence to evaluate regulations was an inheritance from the Founding era and the Marshall Court.

11.    Finally, in my opinion, although there is no exact historical twin between the modern gun violence problem SSB 5078 intends to address, SSB 5078 is analogous to laws enacted at the Founding and during the Reconstruction Era that were intended to use states' police power to ensure public health and safety.

A.    **Early American Firearm Regulations were Premised on Common-Law Police Powers and the Desire to Create an Ordered Society Maintained by Community Controls**

12.    Although *Bruen*'s re-articulation of the test courts use to analyze Second Amendment challenges requires courts to search for historical analogues for modern-day firearm regulations, it does not require a "twin."[5] Thus, historical legal texts must be taken in their context, not detached from the meaning imbued in them by the Americans who drafted them. Similarly, a mechanical strategy of digital searching for historical gun laws would be incapable of answering the

---

[5] *Bruen*, 142 S. Ct. at 2133.

DECLARATION OF SAUL CORNELL
NO. 2:23-cv-00113-MKD

7

1    nuanced historical inquiries required by *Bruen*. Instead, understanding the

2    common meaning of constitutional texts at the time they were enacted requires a

3    grasp of the relevant historical contexts—how firearms technology has changed,

4    how consumer demand has waxed and waned, and how the people, acting through

5    their representatives, respond to societal problems created by those changes.[6] In

6    particular, the analogical reasoning central to *Bruen* requires understanding both

7    the contemporary problems that current legislation seeks to remediate, and the

8    nature of the societal ills that historical regulations sought to remediate.[7]

9    Historical scholarship has significantly expanded the understanding of the history

10

11

12

13    _____

14       [6] S*ee* Jonathan Gienapp, *Historicism and Holism: Failures of Originalist*

15    *Translation*, 84 Fordham L. Rev. 935 (2015) (discussing relationship between

16    historical inquiry and originalism).

17       [7] Joseph Blocher & Eric Ruben, *Originalism-by-Analogy and Second*

18    *Amendment Adjudication*, 133 Yale L.J. (forthcoming 2023), available at

19    https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4408228; Joseph Blocher

20    & Reva Siegel, *Guided by History: Protecting the Public Sphere from Weapons*

21    *Threats Under Bruen*, 98 N.Y.U. L. Rev. (forthcoming 2023), available at

22    https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4355024.

1     of arms regulation in the Anglo-American legal tradition.[8] However, our

2     understanding is far from complete. Indeed, research is ongoing and new

3     materials continue to emerge. Additional evidence about the history of firearm

4     regulation has surfaced even since *Bruen* was issued, and new scholarship

5     interpreting it continues to be published.[9] The key insight derived from this

6     developing scholarship is the recognition that regulation and liberty are both hard

7     wired into the Second Amendment's text.

8         13.    The power to regulate firearms and gunpowder has always been

9     central to the police power and historically was shared among states, local

---

[8] Eric M. Ruben & Darrell A. H. Miller, *Preface: The Second Generation of Second Amendment Law & Policy*, 80 L. & Contemp. Probs. 1 (2017) (discussing evolution of firearm scholarship after *District of Columbia v. Heller*, 554 U.S. 570 (2008)).

[9] *See generally* Symposium, *The 2nd Amendment at the Supreme Court: "700 Years Of History" and the Modern Effects of Guns in Public*, 55 U.C. Davis L. Rev. 2495 (2022); *New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society* (Joseph Blocher, Jacob D. Charles & Darrell A.H. Miller eds., forthcoming 2023).

DECLARATION OF SAUL CORNELL         9         ATTORNEY GENERAL OF WASHINGTON
NO. 2:23-cv-00113-MKD                                 1125 Washington Street SE
                                                      PO Box 40100
                                               Olympia, WA 98504-0100
                                                (360) 753-6200

1    municipalities, and (when federal property is involved) the federal government.[10]

2    The adoption of the Constitution and the Bill of Rights did not deprive states of

3    their police powers. To the contrary: if it had, the Constitution would not have

4    been ratified and there would be no Second Amendment today. Two rival factions

5    emerged in response to the Constitution. On the one hand, the Federalists

6    advocated for expansive federal authority. On the other were the Anti-Federalists,

7    who demanded that the rights of the individual states and the people be protected

8    from federal government overreach. Ratification was only possible because

9    Federalists offered Anti-Federalists strong assurances that nothing about the new

10   government threatened the traditional scope of the individual states' police

11   powers, including the authority to regulate guns and gun powder.[11]

12       14.    Indeed, even with the bitter disputes between the Federalists and

13   Anti-Federalists, they agreed on at least one point: States would maintain the

14   power to protect their citizens from crime and private violence. Brutus, the nom

15   de plume for a leading Anti-Federalist, emphatically declared that "[I]t ought to

---

[10] Harry N. Scheiber, *State Police Power*, in 4 *Encyclopedia of the American Constitution* 1744 2505-2512 (Leonard W. Levy, Kenneth L. Karst, & Dennis J. Mahoney eds., 1986).

[11] *See generally* Saul Cornell, *The Other Founders: Antifederalism and the Dissenting Tradition in America*, 1788-1828 (1999).

DECLARATION OF SAUL CORNELL
NO. 2:23-cv-00113-MKD

10

1   be left to the state governments to provide for the protection and defence [sic] of

2   the citizen against the hand of private violence, and the wrongs done or attempted

3   by individuals to each other  . . . ."[12] Federalist Tench Coxe concurred, asserting

4   that: "[t]he states will regulate and administer the criminal law, exclusively of

5   Congress." States, he assured the American people, would continue to legislate

6   on all matters related to the police power "such as unlicensed public houses,

7   nuisances, and many other things of the like nature."[13]  The adoption of the

8   Constitution,    and    the    subsequent    amendments,    including    the    Second

9   Amendment, was predicated on two indisputable facts: state police power would

10  not be diminished and common law doctrines such as nuisance would continue

11  to be enforced by state legislatures and courts.

12      15.    In  keeping  with  the  plain  public  meaning  of  the  Second

13  Amendment's text, early American governments enacted laws to preserve the

14  rights of law-abiding citizens to keep and bear arms and further the equally vital

---

[12] Brutus, *Essays of Brutus VII*, reprinted in 2 *The Complete Antifederalist* 358, 400–05 (Herbert J. Storing ed., 1981).

[13] Letter to James Madison from Tench Coxe, A Freeman, *Pa. Gazette*, Jan. 23, 1788, reprinted in *Friends of the Constitution: Writings of the "Other" Federalists,* 1787-1788 82 (Colleen A. Sheehan & Gary L. McDowell eds., 1998).

DECLARATION OF SAUL CORNELL
NO. 2:23-cv-00113-MKD

11

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

goals of promoting public safety, exercising the equally fundamental right to regulate their own internal police.[14] The first state constitutions clearly articulated this right — including it alongside more familiar rights like the right to bear arms.[15] For example, Pennsylvania's Constitution provided "[t]hat the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same." The term "police" encompassed more than law enforcement, but included the right of the people to legislate for the common good.[16] The plain text of the Constitution therefore not only protects the right to keep and bear arms, it acknowledges that this right is designed to encourage the

------

[14] On the transformation of the Founding era's ideas about a "police right" into the more familiar concept of "police power," *see generally* Aaron T. Knapp, *The Judicialization of Police*, 2 Critical Analysis of L. 64 (2015); Christopher Tomlins, *Necessities of State: Police, Sovereignty, and the Constitution*, 20 J. of Pol'y Hist. 47 (2008).

[15] *See, e.g.*, Pa. Const. of 1776, Declaration of Rights, art. III; MD. Declaration of Rights, art. IV (1776); Const. of N.C., Declaration of Rights, art. I, § 2 (1776); Vt. Const. of 1777, Declaration of Rights, art. IV (1777).

[16] *See generally* Markus Dirk Dubber, *The Police Power: Patriarchy and the Foundations of American Government* (2005); Gary Gerstle, *Liberty and Coercion: The Paradox of American Government From the Founding to the Present* (2015).

DECLARATION OF SAUL CORNELL
NO. 2:23-cv-00113-MKD

12

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

security of a free state. Actions that undermine public safety and security were clearly not protected by the Amendment at the time of the Founding. Indeed, states disarmed individuals who posed such a threat without any compunction about trenching on constitutionally protected rights. States imposed loyalty oaths and disarmed those who refused to take such oaths.[17] Then, as now, the Constitution was not viewed as a suicide pact.

16.    The proper metric for deciding if such laws were constitutional was and remains the same today: whether a regulation infringes on the core right protected by the Second Amendment.[18]

17.    The Founding generation did not confront a gun violence problem similar in nature or scope to the modern gun violence crisis. This is because eighteenth-century weapons were far from ideal for criminal or spontaneous use. Indeed, at the time of the Second Amendment, over 90% of the weapons owned

---

[17] Saul Cornell, *Commonplace or Anachronism: The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory*, 16 Const. Comment. 221, 228–30 (1999).

[18] Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487 (2004) (discussing evolution of Second Amendment jurisprudence and historiography).

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

by Americans were long guns, not pistols.[19] Simply put, there was not a serious homicide problem looming over debates about the Second Amendment. Nor were guns the primary weapon of choice for those with ill intent during this period.[20] The skill and time required to load and fire such weapons meant that they were less likely to be used in crimes of passion.

18.    The Founders faced a unique public policy problem when it came to firearms immediately after ratification of the Second Amendment: American reluctance to purchase the type of weapons needed to effectively arm their militias. Americans were far better armed than their British counterparts, but the guns most Americans owned and desired were those most useful for life in an agrarian society: fowling pieces and light hunting muskets.[21] However, firearm regulations increased in the years following the adoption of the Second

---

[19] *See* Kevin M. Sweeney, *Firearms Ownership and Militias in Seventeenth- and Eighteenth-Century England and America*, in *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* (Jennifer Tucker, Barton C. Hacker, & Margaret Vinning eds., 2019).

[20] *See* Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (2016).

[21] *See* Sweeney, *supra* at note 19.

DECLARATION OF SAUL CORNELL
NO. 2:23-cv-00113-MKD

14

1    Amendment, and these regulations increased and changed in lockstep with the

2    advancement of firearm technology.

3    19.    A simple list of the gun regulations in place during the Founding era

4    would not capture the many ways that arms acquisition, ownership, and use were

5    monitored by communities and government. For example, regulations addressed

6    the manufacturing, storage, and sale of gunpowder, and where firearms and other

7    dangerous weapons could be carried. The goal of these regulations was to create

8    a well-regulated society in which ordered liberty, not anarchy, prevailed.[22]

9    Similarly, mustering the militia required keeping track of who had weapons. It

10   also included the authority to inspect those weapons and fine individuals who

11   failed to store them safely or keep them in good working order.[23] Regular musters

12   required individuals to participate in collective action and subjected them and

13   their weapons to review and inspection. Even then, militiamen were prohibited

---

[22] Joseph Postell, *Regulation During the American Founding: Achieving Liberalism and Republicanism*, 5 Am. Pol. Thought 80 (2016) (examining the importance of regulation to Founding political and constitutional thought).

[23] H. Richard Uviller & William G. Merkel, *The Militia And The Right To Arms, Or, How The Second Amendment Fell Silent* 150 (2002).

DECLARATION OF SAUL CORNELL
NO. 2:23-cv-00113-MKD

15

1    from traveling to muster with a loaded weapon, and discharging a weapon

2    without permission carried stiff penalties.[24]

3        20.    Likewise, the right of self-defense protected by Anglo-American

4    law was not unlimited; it was shaped by the need to preserve human life and

5    promote the peace, as discussed above.[25] Statutory law, both in England and

6    America, similarly operated to further these goals. For example, the lawful use

7    of deadly force at the Founding was extremely limited. Indeed, the law required

8    a person to retreat from a threat before resorting to lethal force in self-defense (a

9    marked change from modern "stand your ground" laws).[26] This reflects the

10   _____

11   [24] *See generally* Robert Gross, *The Minutemen and Their World* (1976).

12   [25] Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American*

13   *Law: Preserving Liberty and Keeping the Peace*, 80 L. & Contemp. Probs. 11

14   (2017) (discussing evolution of the right to keep and bear arms in Anglo-

15   American law and its connection to Second Amendment jurisprudence).

16   [26] The three notable exceptions to this principle were the "castle doctrine,"

17   defense against threat when there was no opportunity to escape or seek help, and

18   defense against felonious assault. A good exposition of these ideas by a leading

19   lawyer of the Founding generation may be found in John Adams' defense of the

20   soldiers in the Boston Massacre, "Adams' Argument for the Defense: 3–4

21   December        1770," Founders        Online, National        Archives,

22   https://founders.archives.gov/documents/Adams/05-03-02-0001-0004-0016.

DECLARATION OF SAUL CORNELL
NO. 2:23-cv-00113-MKD

16

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    understanding that the right to keep and bear arms did not prevent the government

2    from regulating the use of firearms to promote the peace and maintain public

3    safety.[27]

4        21.    The informal ties of kin and community in early America also served

5    to regulate firearms. Most sellers and buyers of firearms in early America were

6    members of the same community. And given the nature of eighteenth-century

7    firearms technology, gun owners needed to maintain an on-going relationship

8    with their local gunsmith to keep their guns in good working order. The informal

9    ties of kin and community that defined early America meant that individuals were

10   effectively vetted and monitored by their neighbors in numerous ways that have

11   no analog in modern America. These informal community-based controls

12   therefore ensured that firearms did not fall into the hands of someone who might

13   cause harm to themselves or others.

14

15   _____

16   [Original source: *The Adams Papers, Legal Papers of John Adams,* vol. 3, Cases

17   63 and 64: The Boston Massacre Trials, ed. L. Kinvin Wroth and Hiller B. Zobel.

18   1965, pp. 242–270.]  For the modern doctrine, *see, e.g.*, Model Penal Code §

19   3.04.

20       [27] *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 785 (2010) (noting

21   "'[s]tate and local experimentation with reasonable firearms regulations will

22   continue under the Second Amendment'").

DECLARATION OF SAUL CORNELL                          17              ATTORNEY GENERAL OF WASHINGTON
NO. 2:23-cv-00113-MKD                                                      1125 Washington Street SE
                                                                                 PO Box 40100
                                                                              Olympia, WA 98504-0100
                                                                                 (360) 753-6200

1

2

**B.    State and Local Police Power-Based Regulations of Firearms Continued in the Nineteenth Century**

3
4
5
6
7
8
9
10

22.    Although the meaning of police had not yet become synonymous with modern professionalized law enforcement, by the early nineteenth century, the term "police" was a fixture in American law.[28] Indeed, an 1832 American encyclopedia confidently asserted that police, "in the common acceptation of the word, in the U. States and England, is applied to the municipal rules, institutions and officers provided for maintaining order, cleanliness &c."[29] The Founding era's conception of a basic police right located in legislatures was transmuted during the Marshall Court's era into the judicial doctrine of the police power and would become a fixture in American law.

11
12
13
14
15
16
17

23.    In the early decades of the nineteenth century, many states and localities moved beyond common law limits on arms and gun powder and enacted a variety of statutes and ordinances regulating them. Indeed, state police power was at its zenith when it came to guns or gun powder.[30] Every aspect of the manufacture, sale, and storage of gun powder was regulated due to the substance's dangerous potential to detonate if exposed to fire or heat. Firearms

18
19

[28] Ernst Freund, *The Police Power: Public Policy and Constitutional Rights* 2, n.2 (1904).

20
21

[29] 10 *Encyclopedia Americana* 214 (Francis Lieber ed., 1832).

22

[30] Cornell and DeDino, *supra* note 18, at 510-12.

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    were also subject to a wide range of regulations, including laws pertaining to the

2    manufacture, sale, and storage of weapons.[31] Without such interventions, it is

3    likely that America's burgeoning firearms industry would never have survived.

4    The danger posed by defective or poorly manufactured firearms could be

5    catastrophic. A burst barrel of a musket or fowling piece could turn a firearm into

6    a pipe bomb, maiming or killing an unfortunate user.

7         24.    Thus, Massachusetts enacted a law that prohibited storing a loaded

8    weapon in a home, a firearms safety law that recognized that the unintended

9    discharge of firearms posed a serious threat to life and limb.[32] New York City

10    likewise granted broad power to the city government to search for gun powder

11    and transfer powder to the public magazine for safe storage.[33] And New

12

13         [31] Cornell and DeDino, *supra* note 18.

14

15         [32] *See* 1783 Mass. Acts 37, An Act in Addition to the Several Acts Already

16    Made for the Prudent Storage of Gun Powder within the Town of Boston, § 2

17    (allowing seizure and forfeiture of loaded weapons or gun powder by town

18    officials.)

19         [33] An Act to Prevent the Storing of Gun Powder, within in Certain Parts of

20    New York City, reprinted in 2 *Laws Of The State Of New-York, Comprising The*

21    *Constitution, And The Acts Of The Legislature, Since The Revolution, From The*

22    *First To The Fifteenth Session, Inclusive* 191-92 (Thomas Greenleaf, ed., 1792).

1   Hampshire further enacted a law penalizing the sale or offer to sell "by retail any

2   gunpowder in any highway, or in any street, lane, or alley, or on any wharf, or on

3   parade or common."[34] Early American governments also regulated shooting

4   galleries for similar reasons.[35]

5       25.   Other examples of state laws delegating authority to local

6   governments to regulate the sale of gunpowder for public safety include but are

7   not limited to:

8           &bull;   1845 Iowa Laws 119, An Act to Incorporate and Establish the City

9             of Dubuque, chap 123, § 12 (delegating authority to cities "to

10            regulate by ordinance the keeping and sale of gunpowder within the

11  ─────────────────

12  [34] 1825 N.H. Laws 74, An Act to Regulate the Keeping and Selling and

13  Transporting of Gunpowder, ch. 61, § 5.

14  [35] *See, e.g.*, John C. White, *Digest of the Laws and Ordinances of the*

15  *Parish of East Feliciana, Adopted by the Police Jury of the Parish* 80 (1848);

16  *Ordinances and Joint Resolutions of the City of San Francisco; Together with a*

17  *List of the Officers of the City and County, and Rules and Orders of the Common*

18  *Council* (1854); Chas. Ben. Darwin, *Ordinances of the City of Burlington, with*

19  *Head Notes and an Analytic Index* 149-150 (1856); William H. Bridges*, Digest*

20  *of the Charters and Ordinances of the City of Memphis, Together with the Acts*

21  *of the Legislature Relating to the City, with an Appendix* 148-149 (1863).

22

DECLARATION OF SAUL CORNELL
NO. 2:23-cv-00113-MKD

20

city");

- An Act Incorporating the Cities of Hartford, New Haven, New London, Norwich and Middletown, 1836 Conn. Acts 105 (Reg. Sess.), chap. 1, § 20 (delegating authority to "prohibit[] and regulat[e] the bringing in, and conveying out" of gunpowder);

- An Act to Reduce the Law Incorporating the City of Madison, and the Several Acts Amendatory thereto Into One Act, and to Amend the Same, 1847 Ind. Acts 93, chap 61, § 8, pt. 4 (delegating authority "[t]o regulate and license, or provide by ordinance for regulating and licensing . . . the keepers of gunpowder").

26.    No jurisdiction enumerated the full contours of its police power in a single text, statute, or ordinance. Rather, it was well understood that the exercise of police power adapted to changing circumstances and new challenges as they emerged.[36] This conception of law was familiar to most early American lawyers and judges educated in common law legal practice.[37] Thus, governments' use of police powers were marked by flexibility that allowed local communities to adapt

---

[36] *License Cases* (*Thurlow v. Massachusetts; Fletcher v. Rhode Island; Peirce v. New Hampshire*)*, 5 How. (46 U.S.) 504, 592 (1847).

[37] *See* Kunal M. Parker, *Common Law History, And Democracy In America, 1790-1900: Legal Thought Before Modernism* (2013).

DECLARATION OF SAUL CORNELL
NO. 2:23-cv-00113-MKD                    21                    ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1   to changing circumstances and craft appropriate legislation to deal with the

2   shifting challenges they faced.[38]

3         27.      One of the most important early American gun-related cases,

4   *State v. Reid*, illustrates how police power jurisprudence was used in the

5   antebellum era to adjudicate claims about gun rights and the right of the people

6   to regulate.[39] In *Reid*, a sheriff challenged his prosecution for carrying a

7   concealed weapon. The Supreme Court of Alabama evaluated the statute by

8   focusing on the scope of state police power authority over guns. "The terms in

9   which this provision is phrased," the court noted, "leave with the Legislature the

10  authority to adopt such regulations of police, as may be dictated by the safety of

11  the people and the advancement of public morals."[40] In the court's view, the

12

13

14      [38] William J. Novak, *A State of Legislatures*, 40 Polity 340 (2008).

15

16      [39] *See State* v. *Reid,* 1 Ala. 612, 621,622 (1840).  Although it would strike

17  many modern Americans as odd that a sheriff could be prosecuted for carrying

18  firearms, peace officers, including sheriffs, did not typically carry firearms in

19  antebellum America.  As the court observed, "in the case at bar, the defendant

20  needed no arms for his protection, his official authority furnished him an ample

21  shield."

22      [40] *Id.* at 616.

DECLARATION OF SAUL CORNELL
NO. 2:23-cv-00113-MKD

22

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1  regulation of arms was at the very core of state police power.[41] The judicial

2  determination was straightforward: was the challenged law a legitimate exercise

3  of the police power or not? The court easily concluded that it was.[42]

4  **C.**      **States Developed Public Nuisance Doctrines to Regulate Firearms**

5       28.    The potential reach of common law regulation of guns and gun

6  powder was considerable and offered early American legislatures and courts

7  ample tools to deal with the threats posed by firearms. A pivotal way in which

8  early American states and courts regulated firearms was the doctrine of public

9  nuisance. At common law, nuisance was defined in capacious terms. Blackstone

10  defined nuisance as "anything that worketh hurt, inconvenience, or damage."[43]

11  By the middle of the nineteenth century, James Bouvier, author of an influential

12  law dictionary, quoted Blackstone approvingly, and expressly noted that anything

13  "tending to a breach of the peace" was also considered a nuisance under

14  American law.

15  ——————————

16  [41] Apart from rare outlier decisions, such as *Bliss v. Commonwealth*, 12

17  Ky. 90, (1822), courts employed a police power framework to adjudicate claims

18  about the scope of state power to regulate arms. For a useful discussion of *Bliss*

19  in terms of the police power, *see* Ernst Freund, *The Police Power: Public Policy*

20  *and Constitutional Rights* at 91.

21  [42] *Reid*, 1 Ala. at 616.

22  [43] James Wilson, *Works* 3: 109.

1    29.    A prime example of the use of this authority was the response to the

2  Philadelphia Kensington Riots of 1844, a pivotal, but now largely forgotten

3  moment in the history of arms regulation.[44] Although this watershed moment

4  gradually faded into historical obscurity, it was well known to antebellum legal

5  commentators and figured prominently in the writings of influential

6  commentators on criminal law.[45] Mob violence was on the rise in the Jacksonian

7  era, and states and localities struggled to contain the violence these actions

8  inflicted on communities. Conflicts over slavery, immigration of Catholics from

9  Ireland and Germany, and the emergence of new radical religious sects with non-

10  traditional practices prompted angry crowds to wreak havoc on cities and towns.

11  Despite the increase of violence, these mob actions and riots generally adhered

12  to a traditional script inherited from the American Revolution: crowds attacked

13  property and brutalized individuals, but generally refrained from the use of

14  deadly force and generally eschewed the use of firearms.[46]

15  _____

16    [44] Saul Cornell, *A Well-regulated Militia: The Founding Fathers and the*

17  *Origins of Gun Control in America* 162-164 (2006).

18    [45] Francis Wharton, *Precedents of Indictments and Pleas: Adapted to the*

19  *Use Both of the Courts of the United States and Those of All the Several States*

20  488 (1849); Francis Wharton, *A Treatise on the Law of Homicide in the United*

21  *States* 347, 386  (1855).

22    [46] Paul A. Gilje, *Rioting in America* 63 (1999).

1       30.     The trajectory of American legal responses to mobs changed after

2   Philadelphia's Kensington Riots in 1844. Before the Kensington Riots, firearms

3   were conspicuously absent from urban unrest in early America. Neither the mobs

4   who gathered to vent their anger and frustration, nor the constables and justices

5   of the peace who gathered to put down these riots, were typically armed with

6   guns. But the Kensington rioters used firearms, cannons, and gunpowder to assail

7   Catholic churches in a nativist attack on Irish immigrants. As one contemporary

8   noted: "now that firearms have been once used & become familiar to the minds

9   of the mob, we may expect to see them employed on all occasions."[47]  To quell

10  the riots, the militia was mobilized, and city authorities invoked the common law

11  doctrine of nuisance to deal with a novel issue: stockpiling arms for use in private

12  violence.[48]

13  ──────────────

14      [47] Cornell, *A Well Regulated Militia* at 162-63.

15      [48]*Judge Jones and the Grand Jury*, Philadelphia Public Ledger, July 16,

16  1844.  Grand jury charges were not simply ceremonial occasions in antebellum

17  America. Nor were they understood to be of little legal value by early American

18  lawyers, jurists, and the educated public. Rather these occasions were important

19  civic occasions, so much so that many grand jury charges, including the one by

20  Judge Jones, were reprinted in the press. On the role of grand jury charges in this

21  period of American legal history, see David Lynch, *The Role of Circuit Courts*

22  *in the Formation of United States Law in the Early Republic: Following Supreme*

DECLARATION OF SAUL CORNELL                    25                 ATTORNEY GENERAL OF WASHINGTON
NO. 2:23-cv-00113-MKD                                                      1125 Washington Street SE
                                                                                  PO Box 40100
                                                                             Olympia, WA 98504-0100
                                                                                  (360) 753-6200

1    31.    Two of the grand jury charges issued in trials arising from the

2    Kensington Riots were reprinted in the press and made clear that the

3    constitutional right to keep and bear arms had not diminished the considerable

4    authority the people retained to preserve the peace, including the common law

5    tools of sureties of the peace and nuisance.[49] In his grand jury charge, Judge Jones

6    explained the connections between the constitutional right to bear arms and the

7    common law doctrine of nuisance. Stockpiling arms was a public nuisance and

8    "was calculated to excite fear and distrust, and was, therefore, an illegal

9    stretching of the right of a man to have arms, without question." The judge further

10    recommended that "all depots of concealed arms, be brought to light, and the

11    persons, implicated exposed, and the authors, aiders, and abettors, of the late

12    deposit of arms be presented and punished."[50] Thus, nuisance doctrine gave

13    magistrates a powerful set of tools to deal with the dangers posed by guns.

14

15    _____

16    *Court Justices Washington, Livingston, Story and Thompson* 32-37 (2018);

17    Dennis Hale, *The Jury in America: Triumph and Decline* 93-98 (2016); Joshua

18    Glick, *On the Road: The Supreme Court and the History of Circuit Riding*, 24

19    Cardozo L. Rev. 1753, 1754 (2003).

20    [49] *See* Penn. L.J. 29 (1844).

21    [50] *Judge Jones and the Grand Jury*, Philadelphia Public Ledger, July 16,

22    1844.

32.    What makes this text especially helpful in reconstructing the historical understanding of nuisance and its relevance to firearms regulation is that Judge Jones expressly discussed and reaffirmed that the constitutional right to keep and bear arms *co-existed* with robust state power to regulate arms. Stockpiling arms was, in his view, a clear instance of a public nuisance that the law could remediate.[51]

## D.    Reconstruction and the Expansion of State Police Power to Regulate Firearms

33.    As discussed above, the original Constitution and Bill of Rights, as well as contemporary state constitutions, treated the right of the people to regulate their internal police and the right of the people to bear arms as separate but mutually reinforcing: both rights were exercised in a manner that furthered the goal of ordered liberty. Reconstruction-era state constitutions adopted a new textual formulation between these two formerly distinct rights, fusing the two together as one single constitutional principle. This change reflected two profound transformations in American politics and law between 1776 and 1868. First, the judicial concept of police power discussed above gradually usurped the older notion of a police right grounded in popular sovereignty. As a result, state

_____

[51] *Judge Jones's Charge to the Grand Jury*, Washington D.C. Daily Madisonian, July 19, 1844; *Unlawful Assembly*, Philadelphia Public Ledger, July 24, 1844.

DECLARATION OF SAUL CORNELL                    27
NO. 2:23-cv-00113-MKD

constitutions no longer included general affirmations of a police right. Second, the constitutional "mischief to be remedied" in the era of the Fourteenth Amendment had changed as well.[52] Constitution drafters in the Founding era feared centralized government and powerful standing armies, and sought to entrench civilian control of the military and state power over the militia.[53] By contrast, constitution writers during the Reconstruction era were no longer

---

[52] The mischief rule was first advanced in *Heydon's Case*, 76 Eng. Rep. 637 (1584) — the legal principle that the meaning of a legal text was shaped by an understanding of the state of the common law prior to its enactment and the mischief that the common law had failed to address and legislation had intended to remedy — and continued to shape Anglo-American views of statutory construction, and legal interpretation more generally, well into the nineteenth century. For Blackstone's articulation of the rule, *see* 1 Blackstone, Commentaries on the Laws of England 61 (1st ed. 1765). The relevance of common law modes of statutory construction to interpreting antebellum law, including the mischief rule, is clearly articulated in 1 Zephaniah Swift, *A Digest of the Laws of the State of Connecticut*, 11 (1822). For a modern scholarly discussion of the rule, *see* Samuel L. Bray, *The Mischief Rule*, 109 Geo. L.J. 967, 970 (2021).

[53] Noah Shusterman, *Armed Citizens: The Road from Ancient Rome to the Second Amendment* (2020).

DECLARATION OF SAUL CORNELL
NO. 2:23-cv-00113-MKD                    28                    ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1   worried about tyrannical monarchs. In place of these older fears, a new

2   apprehension stalked Americans: the proliferation of especially dangerous

3   weapons and the societal harms they caused.[54]

4        34.    The new language state constitutions employed to describe the right

5   to bear arms enacted during Reconstruction responded to these changed

6   circumstances. Thus, newer constitutions linked the right to bear arms

7   inextricably with the states' broad police power to regulate conduct to promote

8   health and public safety.[55] For example, the 1868 Texas Constitution included

9   new language that underscored the indissoluble connection that Anglo-American

10  law had long recognized between the right to keep and bear arms and regulation

11  of guns: "Every person shall have the right to keep and bear arms, in the lawful

12  defence of himself or the government, under such regulations as the Legislature

13  may prescribe."[56] Texas was not an outlier—sixteen state constitutions, primarily

14

15      [54] *See McDonald*, 561 U.S. at 767–68.

16

17      [55] Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth*

18  *Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War*

19  *America*, 55 U.C. Davis L. Rev. ONLINE 65 (2021).

20      [56] Tex. Const. of 1868, Art. I, § 13; for similarly expansive constitutional

21  provision enacted after the Civil War, *see* Idaho Const. of 1889, art. I, § 11 ("The

22  people have the right to bear arms for their security and defense; but the

1    in the South and the West, adopted during the Reconstruction Era employed

2    similarly expansive language.[57] Thus, millions of Americans were living under

3    constitutional regimes that acknowledged that the individual states' police power

4    authority over firearms was at its apogee when regulating guns.[58]

5        35.    This expansion of regulation was entirely consistent with the

6    Fourteenth Amendment's emphasis on the protection of rights and the need to

7    regulate conduct that threatened the hard-won freedoms of formerly enslaved

8    people in the South and their Republican allies. The goals of Reconstruction were

9    therefore intimately tied to the passage and enforcement of racially neutral gun

10   regulations.[59] In fact, the Republicans who wrote the Fourteenth Amendment

11   ───────────────

12   legislature shall regulate the exercise of this right by law."); Utah Const of 1896,

13   art. I, § 6 ("[T]he people have the right to bear arms for their security and defense,

14   but the legislature may regulate the exercise of this right by law.").

15   [57] Cornell, *The Right to Regulate Arms in the Era of the Fourteenth*

16   *Amendment* at 75–76.

17   [58] *Id.*

18

19   [59] Eric Foner, *The Second Founding: How the Civil War and*

20   *Reconstruction Remade the Constitution* (2019); Brennan Gardner Rivas,

21   *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 U.C. Davis

22   L. Rev. 2603 (2022).

were among the most ardent champions of an expansive view of state police power. As heirs to the antebellum vision of a well-regulated society, Reconstruction-era Republicans used government power aggressively to protect the rights of recently freed slaves and promote their vision of ordered liberty.[60]

36.    The passage of the Fourteenth Amendment reiterated the notion that the individual states held primary police power authority to protect citizens and maintain peace and order. The author of Section One of the Fourteenth Amendment, John Bingham, reassured voters that the states would continue to bear the primary responsibility for "local administration and personal security."[61] As long as state and local laws were racially neutral and favored no person over any other, the people themselves, acting through their representatives, were free

---

[60] Robert J. Kaczorowski, *Congress's Power to Enforce Fourteenth Amendment Rights: Lessons from Federal Remedies the Framers Enacted*, 42 Harv. J. On Legis. 187 (2005); Christopher Tomlins, *To Improve the State and Condition of Man: The Power to Police and the History of American Governance* 53 Buffalo L. Rev. 1215 (2006).

[61] John Bingham, *Speech*, Cincinnati Daily Gazette, Sept. 2, 1867, as quoted in Saul Cornell and Justin Florence, *The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation*, 50 Santa Clara L. Rev. 1043, 1058 (2010).

DECLARATION OF SAUL CORNELL
NO. 2:23-cv-00113-MKD

31

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    to enact reasonable measures necessary to promote public safety and further the

2    common good.[62]

3        37.    Across the nation, legislatures took advantage of the new

4    formulation of the right to bear arms included in state constitutions and enacted

5    a staggering range of new laws to regulate arms in response to a range of novel

6    problems and heightened anxiety over some traditional concerns. Indeed, the

7    number of laws enacted skyrocketed, increasing by over four hundred percent

8    from antebellum levels.[63] Not only did the number of laws increase, but the

9    number of states and localities passing such laws also expanded.[64] In keeping

10   with the larger goals of Reconstruction, Republicans sought to protect the rights

11   of African Americans to bear arms but were equally insistent on enacting strong

12   racially neutral regulations aimed at public safety. Violence directed against

13   African Americans, particularly the campaign of terror orchestrated by white

14   supremacist para-military groups, prompted Republican dominated legislatures

15

16       [62] For a discussion of how the courts wrestled with the meaning of the

17   Amendment, *see* William E. Nelson, *The Fourteenth Amendment: From Political*

18   *Principle to Judicial Doctrine* (1998).

19

20       [63] *See* Robert J. Spitzer, *Gun Law History in the United States and Second*

21   *Amendment Rights,* 80 L. & Contemp. Probs. 55 at 59-61, tbl. 1 (2017).

22       [64] *Id.*

in the Reconstruction South to pass a range of racially neutral gun regulations.[65] The wave of firearms legislation passed by Republican-controlled state legislatures in the South were consciously crafted to honor the Second Amendment and protect individuals from gun violence.[66]

38.    The laws enacted during Reconstruction underscore the fact that robust regulation of firearms during Reconstruction was not a novel application of the police power, but a continuation of Founding era and antebellum legal doctrines. Moreover, these efforts illustrated the flexibility inherent in police power regulations of guns. As discussed above, American colonies and states had regulated firearms pursuant to their police powers to protect citizens from the dawn of colonial settlement. Neither the American Revolution nor the adoption

---

[65] Mark Anthony Frassetto, *The Law and Politics of Firearms Regulation in Reconstruction Texas*, 4 Tex. A&M L. Rev. 95, 113–17 (2016); Brennan G. Rivas, *An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-1900*, 121 Sw. Quarterly 284 (2020).

[66] *See* Darrell A. H. Miller*, Peruta, The Home-Bound Second Amendment, and Fractal Originalism,* 127 Harv. L. Rev. 238, 241 (2014); *see also* Robert J. Kaczorowski, *Congress's Power to Enforce Fourteenth Amendment Rights: Lessons from Federal Remedies the Framers Enacted*, 42 Harv. J. on Legis. 187, 205 (2005) (discussing Republican use of federal power to further their aims, including to enforce the Fourteenth Amendment).

DECLARATION OF SAUL CORNELL
NO. 2:23-cv-00113-MKD                    33                    ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    of the Constitution and its amendments changed this basic fact about American

2    law.

3        39.    The Reconstruction Era also witnessed enormous growth in the

4    number of gun regulations at the local level. Developments at the local level have

5    drawn relatively little scholarly or judicial notice, but this was one of the areas in

6    which governments were most active.[67] A local ordinance adopted by Huntsville,

7    Missouri, offers a glimpse of the sweeping scope of such regulations.[68] It

8    contained multiple provisions, including:

9    • A ban on concealed carry in public;

10   • A ban on public carry in public places where people assembled for

11      religious, "educational, literary, or social purposes";

12   • A ban on carry in courthouses;

13   • A ban on carry into a "public assemblage of persons met for any lawful

14      purpose" except militia-related activities;

15   • A ban on open public carry and public display of a weapon in a rude or

16      threatening manner;

17   • A ban on carry while intoxicated; and

18   _____

19   [67] The most notable exception to this lack of attention is Joseph Blocher.

20   *See* Joseph Blocher, *Firearm Localism*, 123 Yale L.J. 82 (2013).

21   [68] Mayor & Board of Aldermen of the City of Huntsville, *The Revised*

22   *Ordinances of the City of Huntsville, Missouri of 1894* 58-59 at (1894).

DECLARATION OF SAUL CORNELL
NO. 2:23-cv-00113-MKD                    34                    ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1       • An exception for travelers passing through town.

2       40.     States and localities also continued to use the legal concept of

3   nuisance to regulate guns and gun powder throughout Reconstruction.[69] The

4   Territory of Washington, for example, enacted a sweeping nuisance statute

5   regulating gun powder as part of its first laws, shortly before it received

6   statehood. Washington declared the manufacturing of gunpowder, nitroglycerine,

7   or other explosive substances in any valuable building to be a public nuisance

8   due to the risk of harm it posed.[70] Multiple localities within the state also enacted

9   statutes of a similar nature.[71] The use of nuisance law to promote the goal of

10  _____

11      [69] "Ordinances of the City of Memphis, Nuisance and Abatement Thereof,

12  It is a public nuisance. — § 5 ," William H. Bridges, *Digest of the Charters and*

13  *Ordinances of the City of Memphis, From 1826 to 1867* 52 (1867); 1869 Neb.

14  Laws 53, An Act to Incorporate Cities of the First Class in the State of Nebraska,

15  § 47; 1874 Ky. Acts 327, An Act to Revise and Amend the Charter of the City of

16  Newport, § 6; Egbert Jamieson, The Municipal Code of Chicago: Comprising the

17  Laws of Illinois Relating to the City of Chicago, and the Ordinances of the City

18  Council; Codified and Revised Page 301-304, (1881); 1883 Cal. Stat. 156, § 153;

19      [70] Edward D. McLaughlin, *The Revised Statutes and Codes of the State of*

20  *Washington* 686 (1896)

21      [71] 1883 Wash. Sess. Laws 139-40, An Act to Incorporate the City of

22  Whatcom, ch. 2, § 8; 1867 Wash. Sess. Laws 116, An Act to Incorporate the City

DECLARATION OF SAUL CORNELL
NO. 2:23-cv-00113-MKD                    35                    ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1   preserving the security of a free state, rooted in both common law and the police

2   power, flourished in the era of the Fourteenth Amendment.

3                          **III.    CONCLUSION**

4          41.    The power to regulate firearms has always been central to the police

5   power authority of states and localities.[72] Political scientist Robert Spitzer's

6   overview of the history of firearms regulation underscores a basic point about

7   American law: "The lesson of gun regulation history here is that new

8   technologies bred new laws when circumstances warranted."[73] Although SSB

9   5078 addresses an issue unfathomable at the Founding—a gun violence epidemic

10

11  ———————————

12  of Vancouver, ch. 1, § 32, pt. 16;1881 Wash. Sess. Laws 76, An Act to Confer a

    City Govt. on New Tacoma, ch. 6, § 34, pt. 15;1881 Wash. Sess. Laws 93, An

13  Act to Incorporate the City of Dayton, chap. 2, § 20; Del Cary Smith, Ordinances

14  of the City of Port Townsend, Washington, Comprising the General Ordinances

15  of the City, Together with the Private Ordinances Now in Force Page 27 (1890);

16  Charter and Ordinances of the City of Olympia; *see also* General Laws of

17  Washington Territory, Relative to the Government of Incorporated Cities and

18  Towns Page 90 (1886).

19         [72] Harry N. Scheiber, *State Police Power*, in 4 Encyclopedia of the

20  American Constitution 1744 (Leonard W. Levy et al. eds., 1986).

21

22         [73] *Id.*

1    of massive proportions—the law's use of a state's inherent police power and the

2    public nuisance doctrine is analogous to a long-established tradition of firearms

3    regulation in America. The adaptability of state and local police power provides

4    the flexibility governments need to deal with the problems created by changes in

5    firearms technology and gun culture.

6

7          I declare under penalty of perjury under the laws of the State of

8    Washington and the United States of America that the foregoing is true and

9    correct.

10    DATED this **29** day of May, 2023, at _Redding, CT_.

11

12    _____

13    SAUL CORNELL, PhD.

14

15

16

17

18

19

20

21

22

DECLARATION OF SAUL CORNELL                    37
NO. 2:23-cv-00113-MKD

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    **CERTIFICATE OF SERVICE**

2        I hereby certify that on this day I caused the foregoing document to be

3    electronically filed with the Clerk of the Court using the Court's CM/ECF System

4    which will serve a copy of this document upon all counsel of record.

5

6        I declare under penalty of perjury under the laws of the State of

7    Washington and the United States of America that the foregoing is true and

8    correct.

9        DATED this 1st day of June, 2023, at Olympia, Washington.

10

11            *s/ Leena Vanderwood*
        LEENA VANDERWOOD

12        *Legal Assistant*
        1125 Washington Street SE
        PO Box 40100

13        Olympia, WA 98504-0100
        (360) 570-3411

14        Leena.Vanderwood@atg.wa.gov

15

16

17

18

19

20

21

22

DECLARATION OF SAUL CORNELL                    38            ATTORNEY GENERAL OF WASHINGTON
NO. 2:23-cv-00113-MKD                                        1125 Washington Street SE
                                                            PO Box 40100
                                                            Olympia, WA 98504-0100
                                                            (360) 753-6200