1    ROBERT W. FERGUSON
       *Attorney General*
2
     EMMA GRUNBERG, WSBA 54659
3      *Deputy Solicitor General*
     1125 Washington Street SE
4    PO Box 40100
     Olympia, WA  98504-0100
5    (206) 326 5488
     Emma.Grunberg@atg.wa.gov
6

7
                    **UNITED STATES DISTRICT COURT**
8                   **EASTERN DISTRICT OF WASHINGTON**

9    NATIONAL SHOOTING              NO. 2:23-cv-00113-MKD
     SPORTS FOUNDATION, INC.,
10                                  DECLARATION OF GREGORY
                    Plaintiff,      T. GUNDLACH IN SUPPORT
11                                  OF DEFENDANT'S OPPOTION
             v.                     TO PLAINTIFF'S MOTION
12                                  FOR PRELIMINARY
     ROBERT W. FERGUSON,            INJUNCTION
13   Attorney General of the State of
     Washington,
14
                    Defendant.
15

16        I, Gregory T. Gundlach, declare as follows:

17        1.    I am over the age of 18, competent to testify as to the matters herein,

18   and make this declaration based on my personal knowledge.

19        2.    I have been asked by the Washington State Attorney General's

20   Office to provide my opinions on reasonable controls available to the firearms

21   industry to combat the problems of firearms diversion and unwholesome demand.

22

DECLARATION OF                      1          ATTORNEY GENERAL OF WASHINGTON
GREGORY T. GUNDLACH                                    1125 Washington Street SE
                                                             PO Box 40100
NO. 2:23-cv-00113-MKD                                  Olympia, WA 98504-0100
                                                          (360) 753-6200

## I.    BACKGROUND AND QUALIFICATIONS

3.    I am the Coggin Distinguished Professor of Marketing in the Department of Marketing and Logistics at the Coggin School of Business, University of North Florida. I was previously the John Berry, Sr. Professor of Business at the University of Notre Dame from 1987 to 2003. I have a Ph.D., a J.D., and an M.B.A. in Marketing from the University of Tennessee, Knoxville. I have taught undergraduate and MBA courses in marketing at the University of Notre Dame and the University of North Florida, as well as numerous courses for business executives.

4.    My specialty is in the field of marketing. I am the Past Vice President of Marketing for the Academic Council of the American Marketing Association, Past Chair of the American Marketing Association's Special Interest Group on Marketing and Society and Past Associate Editor for the Journal of Public Policies & Marketing. I have served as a member of Editorial or Advisory Boards for the leading publications in the field of marketing. My areas of concentration, research, and expertise include marketing strategy and the public policy issues that attend marketing and marketing strategy.

5.    I have extensive marketing experience by virtue of my professional work, teaching, and consultations with branches and agencies of the United States and state governments, large and small companies, professional and trade associations, public and private institutions, and members of the legal community. I have also conducted forensic investigations of marketing and

DECLARATION OF
GREGORY T. GUNDLACH
NO. 2:23-cv-00113-MKD

2

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    marketing strategy, including analysis of the marketing and distribution practices

2    of members of the firearms industry.

3         6.    I have published books and numerous articles about marketing,

4    marketing channel management, and retail trade practices, including articles

5    about marketing, marketing channel management, and retail trade practices found

6    in the firearms industry. A copy of my current curriculum vitae is attached to this

7    declaration as Exhibit 1. My curriculum vitae also lists prior cases in which I

8    have offered expert opinion or testimony.

9         7.    I am being compensated for services performed at an hourly rate of

10   $500. The compensation I receive is not in any way dependent on the outcome of

11   this or any related proceeding, or on the substance of my opinions.

12              **II.    SUMMARY OF OPINIONS**

13        8.    Based on my study, expertise, and experience, I have reached the

14   following conclusions. First, there are widely acknowledged concrete steps that

15   firearm industry members can take to reduce gun diversion through gun

16   trafficking, straw purchasing, and theft, and research demonstrates the

17   effectiveness of such steps. Second, the firearm industry, including the National

18   Shooting Sports Foundation (NSSF), has long understood what these steps are

19   and that they are necessary to protect public safety. Finally, other industries

20   involving dangerous products have long adopted similar types of reasonable

21   controls to those at issue here.

22

DECLARATION OF
GREGORY T. GUNDLACH
NO. 2:23-cv-00113-MKD

3

**A.      Background on Firearm Diversion and the Role of Federal Firearm Licensees**

9.      "Firearm diversion" is any movement of firearms from the legal to the illegal marketplace through an illegal method or for an illegal purpose.[1] Some distinguish "trafficking" as more limited than "diversion," where trafficking is the illegal diversion of legally owned firearms from lawful commerce into unlawful commerce often for profit.[2] Under this definition, a criminal who steals a firearm from a licensee for his own personal use is participating in diversion but not trafficking.

10.      Individuals not legally allowed to purchase or possess firearms, and those who use firearms in the commission of a crime, obtain their firearms through a variety of sources. This may include federal firearms licensed (FFL) retailers who are willing to sell under the counter; strawman purchasers who buy

---

[1] Bureau of Alcohol, Tobacco and Firearms & U.S. Dep't of the Treasury, *Following the Gun: Enforcing Federal Laws Against Firearms Traffickers* (June 2000); Bureau of Alcohol, Tobacco and Firearms & U.S. Dep't of the Treasury, *Crime Gun Trace Reports (1999) National Report*, Nov. 2000, at 41, https://www.atf.gov/resource-center/docs/ycgii-report-1999-highlightspdf-0/download.

[2] Bureau of Alcohol, Tobacco and Firearms & U.S. Dep't of the Treasury, *Following the Gun: Enforcing Federal Laws Against Firearms Traffickers* (Nov. 2000).

DECLARATION OF
GREGORY T. GUNDLACH
NO. 2:23-cv-00113-MKD

4

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

guns on behalf of others; guns stolen from commercial places, common carriers (like FedEx or USPS), vehicles, and homes; firearm traffickers who buy firearms in loosely regulated jurisdictions and resell them elsewhere; and unlicensed sellers who buy and resell firearms.[3] Gun shows are another source.[4] Multiple purchases of firearms over a short period, or single transactions involving multiple firearms (i.e., multiple sales), have also been associated with use in crime.[5]

11.    Before laws prohibited public release of ATF data,[6] an early study and published report by the Bureau of Alcohol, Tobacco, and Firearms (now the

---

[3] *Id.*

[4] *Id.*

[5] *Federal Firearms Act of 1976*, H.R. Rep. No. 94-1103, at 28 (1976); U.S. Dep't of Justice & Bureau of Alcohol, Tobacco, Firearms and Explosives, *National Firearms Commerce and Trafficking Assessment (NFCTA): Firearms in Commerce – Volume Two*: *Crime Gun Intelligence and Analysis* (Jan 11, 2023), https://www.atf.gov/firearms/national-firearms-commerce-and-trafficking-assessment-nfcta-crime-guns-volume-two.

[6] Samantha Raphelson, *How The NRA Worked To Stifle Gun Violence Research*, NATIONAL PUBLIC RADIO (April 5, 2018), https://www.npr.org/2018/04/05/599773911/how-the-nra-worked-to-stifle-gun-violence-research;

DECLARATION OF
GREGORY T. GUNDLACH
NO. 2:23-cv-00113-MKD

5

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    Bureau of Alcohol, Tobacco, Firearms and Explosives) (ATF) found that, of

2    1,530 trafficking investigations from 1996 to 1998 involving 84,128 diverted

3    firearms, FFLs were associated with the largest number of diverted firearms—

4    over 40,000 firearms.[7] This includes unscrupulous and corrupt FFLs that do not

5    follow existing laws and engage in illegal sales.[8] It also includes

6    nonstorefront/nonstocking "kitchen table" FFLs who conduct sales out their

7    homes,[9] their automobiles,[10] or through businesses that do not stock firearms or

8    take precautions against theft.[11] The study also found that gun shows were

9    

10   Nidhi Subbaraman, *United States to Fund Gun-Violence Research After 20-Year*

11   *Freeze* (Dec. 17, 2019), https://www.nature.com/articles/d41586-019-03882-w.

12   [7] *Following the Gun: Enforcing Federal Laws Against Firearms*

13   *Traffickers*, *supra* note 2.

14   [8] *Id*.

15   [9] Julius Wachtel, *Sources of Crime Guns in Los Angeles, California*,

16   21 POLICING: AN INT'L J. POLICE STRATEGIES & MGMT. 220, 222 (1998),

17   https://www.policeissues.org/Sources.pdf.

18   [10] U.S. General Accounting Office, *Federal Firearms Licensees: Various*

19   *Factors Have Contributed to the Decline in the Number of Dealers*, at 28

20   (Mar. 29, 1996), https://www.gao.gov/assets/ggd-96-78.pdf.

21   [11] Steven Brill, *Firearm Abuse – A Research and Policy Report*, at 108

22   (1977), https://www.ojp.gov/pdffiles1/Photocopy/40042NCJRS.pdf.

1    responsible for 26,000 diverted firearms, and straw purchasers were responsible

2    for another 26,000. Unlicensed sellers were also a source of diverted firearms,

3    accounting for 23,000.[12] Unlicensed sellers range from individuals who

4    knowingly sell guns to criminals from their personal collections, to interstate gun

5    runners that purchase guns to sell to gangs and drug organizations.[13] Firearms

6    stolen (i.e., thefts) from FFLs, residences, and common carriers involved almost

7    9000 firearms.[14] Sales transactions involving multiple firearms (i.e., multiple

8    sales) were also found to be associated with diverted firearms.[15] In most of the

9    investigations, ATF agents uncovered only one pathway through which guns

10   were diverted or trafficked 80.8 percent of the time.[16]

---

17   [12] *Following the Gun: Enforcing Federal Laws Against Firearms*

18   *Traffickers*, *supra* note 2.

19   [13] *Id.*

20   [14] *Id.*

21   [15] *Id.*

22   [16] *Id.*

DECLARATION OF                                      7                    ATTORNEY GENERAL OF WASHINGTON
GREGORY T. GUNDLACH                                                        1125 Washington Street SE
NO. 2:23-cv-00113-MKD                                                           PO Box 40100
                                                                          Olympia, WA 98504-0100
                                                                             (360) 753-6200

1     12.    A summary description of key sources of firearm diversion is

2  included below. These channels have persisted over time[17] and continue to be

3  major sources of firearm diversion today.[18]

4

5

6

7

8

9  ──────────────────

10     [17] Anthony A. Braga, et al., *Interpreting the Empirical Evidence on Illegal*

11  *Gun Market Dynamics*, 89 J. URBAN HEALTH: BULLETIN NEW YORK ACADEMY

12  MEDICINE 779 (June 2012).

13     [18] U.S. Dep't of Justice & Bureau of Alcohol, Tobacco, Firearms and

14  Explosives, *National Firearms Commerce and Trafficking Assessment (NFCTA):*

15  *Firearms in Commerce – Volume Two*: *Crime Gun Intelligence and Analysis*

16  (Jan 11, 2023), https://www.atf.gov/firearms/national-firearms-commerce-and-

17  trafficking-assessment-nfcta-crime-guns-volume-two; U.S. Dep't of Justice &

18  Bureau of Alcohol, Tobacco, Firearms and Explosives, *National Firearms*

19  *Commerce and Trafficking Assessment: Firearms in Commerce – Volume One*:

20  *Firearms in Commerce* (May 5, 2022), https://www.atf.gov/firearms/docs/repor

21  t/national-firearms-commerce-and-trafficking-assessment-firearms-commerce-

22  volume/download.

| Key Sources of Firearm Diversion[19] | |
|---|---|
| **Source** | **Description** |
| **Gun shows** | Temporary and informal gathering of purchasers and sellers for the purpose of conducting firearms transactions. |
| **Straw purchases** | Purchasers who buy guns on behalf of those who are prohibited because of their age, criminal record, or other status. |
| **Multiple sales** | Two or more firearms purchased by an unlicensed person within a five-day period. |
| **Theft** | Firearms stolen from commercial places, common carriers, and other locations. |
| **Nonstore/ nonstocking FFL dealers** | Licensed firearms marketers known as "basement bandits," "kitchen table" dealers, and "car trunk" dealers who operate out of their residences, vehicles, and other noncommercial premises to sell firearms to prohibited persons, through an illegal method, or for an illegal purpose. |
| **Unscrupulous or corrupt FFLs and unlicensed sellers** | Licensed firearms marketers (FFLs) who are allied with the criminal element and unlicensed "street" dealers who buy firearms with the purpose of reselling them to prohibited persons, through an illegal method, or for an illegal purpose. |

---

[19] Kevin D. Bradford, et al., *Countermarketing in the Courts: The Case of Marketing Channels and Firearm Diversion*, 24 J. PUB. POLICY & MKTG. 284 (2005), https://www.jstor.org/stable/30000666.

DECLARATION OF
GREGORY T. GUNDLACH
NO. 2:23-cv-00113-MKD

9

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    13.    Virtually all guns used in crime originate with a licensed dealer[20]

2    and first pass through the "primary," or legal, market distribution system.[21] One

3    early study found that 94% of the total number of surveyed handguns used in

4    serious crime were sold initially by retail dealers.[22] Today, FFLs remain the

5    primary source of diverted firearms.[23]

6    14.    Because federal firearms licensees have access to a large volume of

7    firearms, they are associated with and can influence the number of firearms

8

9

10    _____

11    [20] *Federal Firearms Licensing: Hearing Before the Subcommittee on*

12    *Crime and Criminal Justice of the House Committee on the Judiciary, June 17,*

13    *1993*, 103d Cong. 69 (1994), https://www.ojp.gov/pdffiles1/Digitization/15079

14    0NCJRS.pdf .

15    [21] U.S. Dep't of the Treasury, Office of Enforcement & Bureau of Alcohol,

16    Tobacco and Firearms, *A Progress Report: Gun Dealer Licensing and Illegal*

17    *Gun Trafficking*, at intro (Jan. 1997).

18    [22] *Federal Firearms Act of 1976*, H.R. Rep. No. 94-1103, at 26 (1976).

19    [23] *National Firearms Commerce and Trafficking Assessment (NFCTA):*

20    *Firearms in Commerce – Volume Two*: *Crime Gun Intelligence and Analysis*;

21    *National Firearms Commerce and Trafficking Assessment: Firearms in*

22    *Commerce – Volume One*: *Firearms in Commerce*, *supra* note 18.

DECLARATION OF
GREGORY T. GUNDLACH
NO. 2:23-cv-00113-MKD

10

1     illegally diverted.[24] For example, although FFLs were involved in just under 10%

2     of trafficking investigations, they were associated with the largest number of

3     diverted firearms — suggesting their significant role in diversion and that

4     prevention efforts on their part can also disproportionally reduce overall

5     diversion.[25]

6        15.    FFL dealers have been identified as a key point of control to limit

7     the risk of diversion.[26] The Gun Control Act of 1968 recognizes this as the basis

8     for setting up a system in which only licensed dealers can sell firearms, and

9     subjecting dealers to certain rules.[27]

10       16.    As described, FFL dealers may contribute to diversion in many

11     ways. This includes retailers becoming allied with criminals to engage in illegal

12     sales.[28] They may also sell guns to illegal purchasers, as in the case of

13

---

14       [24] *Following the Gun: Enforcing Federal Laws Against Firearms*

15     *Traffickers*, s*upra* note 2, at 15.

16       [25] *Id.* at xi.

17       [26] 103d Cong. 69 (1994), *supra* note 20, at 5.

18       [27] *Id.* at 1.

19       [28] Jeffrey Spiegler & John Sweeney, *Gun Abuse in Ohio*, ADMINISTRATION

20     OF JUSTICE COMM., AFFILIATE OF GOVERNMENTAL RESEARCH INSTITUTE ( June

21     1975) (included in appendix to 1975 Congressional hearings Part 4 (Cleveland),

22     pp. 1510, 1584).

DECLARATION OF
GREGORY T. GUNDLACH
NO. 2:23-cv-00113-MKD

11

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    nonstorefront "kitchen table" gun dealers who conduct sales out their homes,[29]

2    their automobiles,[30] through businesses that do not stock firearms or take

3    precautions against theft,[31] and at gun shows.[32]

4           17.    FFL dealers may also contribute to diversion through failing to take

5    precautions to avert straw-purchase transactions,[33] not being cognizant of the

6    association of multiple purchases of sales occurring in a single transaction or over

7    a short period and their criminal use,[34] and not being sensitive to other factors

8    related to diversion *e.g.*, differences in regulations across states,[35] geographical

---

10    [29] Julius Wachtel, *supra* note 9, at 222.

11    [30] *Federal Firearms Licensees: Various Factors Have Contributed to the*

12    *Decline in the Number of Dealers*, *supra* note 10, at 28.

13    [31] Steven Brill, *supra* note 11, at 108.

14    [32] U.S. Dep't of the Treasury & U.S. Dep't of Justice, *Gun Shows: Brady*

15    *Checks and Crime Gun Traces*, at 8 (Jan. 1999).

16    [33] U.S. Dep't of Justice, *Gun Violence Reduction: National Integrated*

17    *Firearms Violence Reduction Strategy*, at 30 (2001), https://www.justice.gov/ar

18    chive/opd/gunviolence.htm.

19    [34] H.R. Rep. No. 94-1103, *supra* note 22, at 28.'

20    [35] Brian J. Siebel, *City Lawsuits Against the Gun Industry: A Roadmap for*

21    *Reforming Gun Industry Misconduct*, 18 ST. LOUIS PUB. L. REV. 247, 269 (1999),

22    https://scholarship.law.slu.edu/plr/vol18/iss1/12.

DECLARATION OF                12       ATTORNEY GENERAL OF WASHINGTON
GREGORY T. GUNDLACH                       1125 Washington Street SE
NO. 2:23-cv-00113-MKD                         PO Box 40100
                                                    Olympia, WA 98504-0100
                                                    (360) 753-6200

1    influences,[36] and such phenomena as the "time to crime" (i.e., an unusually short

2    sale-to-crime interval is considered an indicator of firearm diversion).[37]

3        18.    Finally, among other factors, FFL dealers may also contribute to

4    diversion through ignoring ATF regulations,[38] failing to maintain records, or

5    refusing to cooperate in providing records helpful to others interested in limiting

6    its risk.[39]

7    **B.    Concrete Steps for the Firearm Industry to Limit Firearm Diversion
       Have Long Been Publically Advanced**

8

9        19.    As early as 1976, members of Congress recognized the problem of

10   firearm diversion and the sources from which criminals acquire their guns.[40]

11

12   _____

13       [36] *Following the Gun: Enforcing Federal Laws Against Firearms*

14   *Traffickers*, s*upra* note 2, at 42.

15       [37] Julius Wachtel, *supra* note 9, at 224.

16       [38] Glenn L. Pierce, et al., THE IDENTIFICATION OF PATTERNS IN FIREARMS

17   TRAFFICKING: IMPLICATIONS FOR FOCUSED ENFORCEMENT STRATEGIES – A

18   REPORT TO THE U.S. DEP'T OF TREASURY BUREAU OF ALCOHOL, TOBACCO AND

19   FIREARMS OFFICE OF ENFORCEMENT, WASHINGTON, DC 5 (Jan. 1995).

20       [39] *Gun Violence Reduction: National Integrated Firearms Violence*

21   *Reduction Strategy*, *supra* note 33, at 9.

22       [40] H.R. Rep. No. 94-1103, s*upra* note 22.

DECLARATION OF
GREGORY T. GUNDLACH
NO. 2:23-cv-00113-MKD                        13                ATTORNEY GENERAL OF WASHINGTON
                                                              1125 Washington Street SE
                                                              PO Box 40100
                                                              Olympia, WA 98504-0100
                                                              (360) 753-6200

20.     In 1997, then President Bill Clinton identified the ease with which children and others legally prohibited from possessing firearms can acquire firearms as a "major national problem."[41] In response, he established the specific goal of making it more difficult for firearms to pass into the illegal market.[42]

21.     Early reports from ATF confirm that firearm diversion is a significant aspect of gun crime.[43] The United States Department of Justice (DOJ) also recognized that members of the industry must do much more to design and distribute their products to reduce the problem of crime guns.[44]

22.     A basic and straightforward approach for addressing the problem of firearm diversion was identified as early as 1975 by then ATF Director Rex Davis: "It is my opinion that handgun control must be approached by looking first at the source of the guns and how they enter into and remain in circulation."[45]

---

[41] *A Progress Report: Gun Dealer Licensing and Illegal Gun Trafficking*, *supra* note 21.

[42] *Id.*

[43] *Gun Shows: Brady Checks and Crime Gun Traces*, s*upra* note 32.

[44] *Gun Violence Reduction: National Integrated Firearms Violence Reduction Strategy*, *supra* note 33, at 39.

[45] *Firearms Legislation: Hearings Before the Subcommittee on Crime of the House Committee on the Judiciary*, 94th Cong. 150 (1975).

DECLARATION OF
GREGORY T. GUNDLACH
NO. 2:23-cv-00113-MKD

14

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

23.    In 2001, the U.S. Department of Justice outlined steps that gun manufacturers and importers could take to limit the risk of diversion.[46] These include to "identify and refuse to supply dealers and distributors that have a pattern of selling guns to criminals and straw purchases; develop a continual training program for dealers and distributors covering compliance with firearm laws, identifying straw-purchase scenarios and securing inventory; and develop a code of conduct for dealers and distributors, requiring them to implement inventory, store security, policy and record keeping measures to keep guns out of the wrong hands, including policies and postpone all gun transfers until NICS [background] checks are completed."[47]

24.    Researchers have also identified concrete steps that firearm industry members can take to reduce the rate and risks of firearm diversion for each of the primary pathways of firearm diversion.[48]   These categories of safeguarding strategies and tactics are shown in the table attached as Exhibit 2, and further discussed below.

25.    ***Gun Shows***. To reduce firearm diversion that occurs through gun shows, firearm industry members can require full background checks for all gun

---

[46] *Gun Violence Reduction: National Integrated Firearms Violence Reduction Strategy*, *supra* note 33, at 39.

[47] *Id.* at 34.

[48] *See* Kevin D. Bradford, et al., *supra* note 19.

DECLARATION OF
GREGORY T. GUNDLACH
NO. 2:23-cv-00113-MKD

15

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1   show sales, and can maintain records about all gun show purchases. Firearm

2   industry members can also require that any of their firearms sold at gun shows

3   occur through licensed FFLs. They can enact strict controls of firearms at gun

4   shows, including tracking inventory and displays. Members can also monitor

5   such shows and have random compliance inspections.

6       26.    Other potential precautionary measures include prohibiting sales to

7   distributors or dealers who sell firearms at gun shows, or to limit downstream

8   distribution to only authorized distributors and dealers. Another option is to

9   require distribution agreements and codes of conduct by distributors and dealers

10  to raise awareness of the dangers of firearm diversion through gun shows and to

11  encourage reasonable precautions to prevent their occurrence. Such agreements

12  can also be used to impose consequences on distributors and dealers who fail to

13  comply with such codes of conduct.

14      27.    ***Straw Purchases and Multiple Sales***. To reduce firearm diversion

15  occurring through straw purchases and multiple sales (which have been

16  associated with the occurrence of firearm diversion), firearm industry members

17  can ensure their employees are trained on identifying and deterring straw

18  purchases and multiple purchase scenarios. Members can also require mandatory

19  recordkeeping and sharing of purchases sufficient to monitor the occurrence of

20  multiple sales. Members can also impose restrictions on multiple sales by limiting

21  sales to just one firearm per month per buyer, which can guard against their

22  occurrence. Upstream firearm industry members can provide straw purchase

DECLARATION OF
GREGORY T. GUNDLACH
NO. 2:23-cv-00113-MKD

16

1    detection and deterrence training and can institute monitoring and compliance

2    inspections to ensure that these limitations are being followed.

3        28.    To exert influence and aid in the adoption of these efforts, upstream

4    firearm industry members can reduce the number of intermediaries in their sales

5    channels and permit sales only through direct channels, or through retailers

6    dedicated to their brand (i.e., exclusive channels) or to brands like theirs (i.e.,

7    selective channels). As with gun shows, distribution agreements and codes of

8    conduct can also be relied upon to encourage and impose consequences on

9    dealers who fail to comply and thereby provide an effective deterrent measure to

10    reduce straw purchases and multiple purchases.

11        29.    ***Theft***. To deter and safeguard against diversion occurring through

12    thefts, firearm industry members can require mandatory recordkeeping of

13    purchases to track missing firearms. Distributors and dealers can adopt inventory

14    tracking and security plans, run background checks on employees, institute

15    guidelines and training on inventory management and safe storage, require

16    mandatory liability insurance coverage, use secure carriers and no discerning

17    shipment labels, and monitor and conduct compliance inspections. And upstream

18    firearm industry members can also require downstream partners (i.e., distributors,

19    buying groups, retailers, etc.) to adopt these measures and to provide information

20    regarding their inventory tracking systems, and can institute mandatory reporting

21    protocols for inventory shortages or lost or stolen firearms.

22

DECLARATION OF
GREGORY T. GUNDLACH
NO. 2:23-cv-00113-MKD

17

30.     To exert influence and aid in adoption of these efforts, upstream firearm industry members can reduce the number of intermediaries (e.g., distributors, buying groups, wholesalers, etc.) in their sales chains and permit sales only directly to retailers, through approved intermediaries, and/or through exclusive and selective channels. As with gun shows and other sources of firearm diversion, distribution agreements and codes of conduct can be an effective tool to encourage and impose consequences on distributors and dealers who fail to comply.

31.     ***Nonstore and Nonstocking Dealers***. To reduce firearm diversion through nonstore and nonstocking dealers (i.e., dealers who do not operate out of a storefront), upstream firearm industry members can require information about the nature of the premise, location, hours of operation, and merchandizing confirmation of such dealers, and also require photographs of distributor and dealer premises to verify that firearms are only being sold at brick-and-mortar retailers. Members can also require distributors and dealers to have firearms as their primary business and require a retail place of business to become a retailer.

32.     Upstream firearm industry members can also require nonstore and nonstocking dealers to carry a full line of products and invest in minimum levels of merchandising and promotion to qualify as a distributor or dealer, thereby establishing standards and creating financial incentives for limiting diversion. As with the other channels for firearm diversion, members can monitor and conduct compliance inspections as well. Additionally, members can refuse to deal with

DECLARATION OF
GREGORY T. GUNDLACH
NO. 2:23-cv-00113-MKD

18

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    Internet dealers and limit distribution channels to only authorized distributors and

2    dealers. As with the other channels for diversion, distributor agreements and

3    codes of conduct can also be an effective precautionary measure to encourage

4    and impose consequences on distributors and dealers who fail to comply.

5        33.    ***Unscrupulous FFLs***. To reduce firearm diversion through

6    unscrupulous FFLs, upstream firearm industry members can require confirmation

7    of distributor and dealer licenses and permits. They can maintain information

8    about the nature of the dealer's or distributor's hiring practices, employee

9    qualifications, and training for employees. They can also require mandatory

10    retention and reporting of ATF "trace" requests, which are requests from ATF

11    used to track where and how a gun used in a crime was obtained.

12        34.    Members can also require certification of compliance with state and

13    local law and licensing provisions and verify the FFL status of a distributor or

14    dealer before agreeing to sell to them. Members can require dealers or distributors

15    to conduct background checks on their employees, and provide mandatory

16    training on laws and regulations. As with the other channels for firearm diversion,

17    members can monitor and have compliance inspections, and terminate

18    relationships with those who violate the law or fail to comply with safeguard

19    requirements.

20        35.    Additionally, where the information is available, members can

21    refuse to sell firearms to people with known criminal indictments or high levels

22    of crime guns. They can also require that any sales be made directly to the retailer

DECLARATION OF
GREGORY T. GUNDLACH
NO. 2:23-cv-00113-MKD

19

1    (versus through a distributor or other intermediary) and by disallowing transfers

2    or sales from dealer-to-dealer, thereby permitting the manufacturer or distributor

3    more oversight of the retailer. They can also establish corporate-owned

4    distributors and dealers to enable them to exert more direct control. Distribution

5    agreements and codes of conduct can also be used to encourage and impose

6    consequences on distributors and dealers who fail to comply.

7         36.    Many, if not all, of the aforementioned strategies for limiting the

8    various sources of firearm diversion can be applied to limit firearm diversion

9    occurring through unlicensed sellers.

10   **C.    The Firearm Industry Itself Has Long Understood the Necessary
         Steps to Limit Firearm Diversion**

11

12        37.    Members of the industry have been aware of the problem of firearm

13   diversion for some time. They have also discussed the need to limit its occurrence

     and the steps needed to do so.

14

15        38.    In July 1993, for example, an NSSF memo prepared by then NSSF

16   Marketing Director, Doug Painter, offers a scathing critique of gun

17   manufacturers' distribution systems and calls for a "proactive industry strategy"

18   to: (1) address the "potential for illegal firearms transactions through ostensibly

19

20

21

22

1  'legal' FFL channels," and (2) "minimiz[e] the possibility of illegal transactions

2  through unscrupulous FFL holders."[49]

3      39.   Similarly, in February of 1996, former Senior Vice President of

4  Marketing and Sales for Smith & Wesson, Robert Hass, stated in a sworn

5  affidavit that members of the gun "industry as a whole are fully aware of the

6  criminal misuse of handguns."[50]

7      40.   Many members of the firearm industry have previously been found

8  in a federal district court to have been aware of the different forms of firearm

9  diversion or to have received trace requests suggesting their awareness.[51]

10  Empirical research also offers evidence of their knowledge of the different forms

11  of firearm diversion.[52]

12      41.   As early as 1993, NSSF and other firearm industry members

13  understood that focusing on the sources of diversion and taking steps to limit

14  ――――――――――――――

15     [49] *See* Report of Gregory T. Gundlach, *N.A.A.C.P. v. A.A. Arms Inc.*,

16  No. 1:99-cv-03999 (JBW) (E.D.N.Y. July 16, 1999); *N.A.A.C.P. v. Accusport*

17  *Corp.*, No. 1:99-cv-07037 (E.D.N.Y. Oct. 29, 1999).

18     [50] *Id.*

19     [51] *Id.*

20     [52] Gregory T. Gundlach, et al., *Marketers' Knowledge and Actions Against*

21  *Illegal Demand Withing the U.S. Firearms Industry: A Framework and Evidence*

22  *for Addressing Gun Violence* (2023) (unpublished manuscript).

DECLARATION OF
GREGORY T. GUNDLACH
NO. 2:23-cv-00113-MKD

21

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1   these sources offered a "thesis" and "framework" through which they could

2   address firearm diversion.[53]

3        42.    In 1994, the Sporting Arms and Ammunition Manufacturers'

4   Institute (SAAMI) decided to "take the initiative" and set "the agenda, defining

5   the issues and leading the discussion not allowing others to do so for us." [54]

6   Recommendations for limiting firearm diversion were developed, including a

7   proposal to establish a "Safety Board" and to develop a retailers' "Code of

8   Ethics" that called for firearm retailers to "go beyond" existing regulations and

9   adhere to "standards of responsible" retailing, including to not knowingly sell

10  firearms suspected to being "purchased for delivery to another individual

11  (strawpurchase)." [55]

12       43.    In January 1995, Art Wheaton of Remington Arms Co., a member

13  of the NSSF Board of Governors, suggested that SAAMI "may have an

14

15  _____

16       [53] *See* Report of Gregory T. Gundlach, *supra* note 49 (Discussing the ATF

17  report Operation Snapshot (1993), Mr. Painter writes that, "In our opinion, the

18  new study 'Operation Snapshot' can provide not only the thesis for a constructive

19  proactive position, but also an appropriate and timely framework for industry

20  response.").

21       [54] *Id.*

22       [55] *Id.*

DECLARATION OF
GREGORY T. GUNDLACH
NO. 2:23-cv-00113-MKD

22

1    opportunity to take a chapter from the Alcohol and ATV industries to put forth a

2    major safety campaign" to address firearm diversion.[56]

3        44.    In November 1996, after Mr. Painter of NSSF attended an American

4    Association of Suicidology Conference on Youth Suicide by Firearms, he

5    recommended that the SAAMI Safety Committee "research . . . the effectiveness

6    of specific safety programs," "[r]eview and assess technical and other product

7    developments," and "[s]erve as a clearinghouse for industry safety information

8    and developments."[57]

9        45.    A March 17, 2000 agreement signed by Smith & Wesson offers

10   further evidence of industry members' knowledge of how to limit firearm

11   diversion. The agreement's provisions included sales and distribution controls to

12   help keep guns out of the hands of criminals, help law enforcement solve gun

13   crimes, and reduce firearms accidents, including through required background

14   checks at gun shows. Other safeguards included manufacturers instituting a

15   standard of conduct for dealers with whom they worked to make every effort to

16   eliminate sales of firearms that might lead to illegal possession and/or misuse by

17   criminals, juveniles, and other prohibited persons, including through recognized

18   sources of diversion. Provisions also contemplated actions against dealers who

19

20   _____

21      [56] *Id.*

22      [57] *Id.*

DECLARATION OF                    23         ATTORNEY GENERAL OF WASHINGTON
GREGORY T. GUNDLACH                                    1125 Washington Street SE
                                                            PO Box 40100
NO. 2:23-cv-00113-MKD                               Olympia, WA 98504-0100
                                                          (360) 753-6200

violated the standard and steps to limit such violations.[58] According to the U.S. Department of Justice, the agreement represented commonsense, practical measures that could be embraced by the gun industry as a matter of responsible business practices.[59]

### 1. NSSF's guidance for the firearm industry for safeguarding against diversion

46.    For some time, NSSF specifically has offered information, programs, and materials to members of the firearm industry for safeguarding against firearm diversion and the misuse of firearms.

47.    ***Project ChildSafe***. Started around 1999, Project Homesafe (now "Project Childsafe")[60] involves a partnership by the NSSF with law enforcement agencies nationwide to distribute free firearm safety kits, including free locking devices for inclusion by manufacturers with the sale of new firearms. According to the NSSF, more than 70 million free locking devices have been included with the sale of new firearms since 1998.

---

[58] *Id.*

[59] *Id.*

[60]    National Shooting Sports Foundation, *Project ChildSafe*, https://www.nssfrealsolutions.org/programs/project-childsafe/ (last visited May 23, 2023).

DECLARATION OF
GREGORY T. GUNDLACH
NO. 2:23-cv-00113-MKD

24

1    48.    ***Don't Lie for the Other Guy***. Started in 2000, "Don't Lie for the

2    Other Guy"[61] involves a partnership by NSSF with the ATF to reduce firearm

3    diversion resulting from straw purchases through an educational program to

4    assist firearm retailers in detecting and preventing straw purchases. The goal of

5    the program is to reduce firearm straw purchases at the retail level and to educate

6    would-be straw purchasers of the penalties of knowingly participating in an

7    illegal firearm purchase. The program includes a kit that contains education

8    information and online resources, including numerous videos about how dealers

9    can detect and prevent straw purchasing of guns.

10    49.    ***Suicide Prevention***. Begun in 2016, the NSSF's suicide prevention

11    initiative and program[62] involves a partnership with the American Foundation for

12    Suicide Prevention to develop a suicide prevention toolkit to help firearms

13    retailers and others understand risk factors and warning signs related to suicide,

14    and to understand where to find help and encourage secure firearms storage

15    options.

16    _____

17    [61] National Shooting Sports Foundation, *Don't Lie for the Other Guy*,

18    https://www.nssfrealsolutions.org/programs/dont-lie/ (last visited May 23,

19    2023).

20    [62]    National    Shooting    Sports    Foundation,    *Suicide    Prevention*,

21    https://www.nssfrealsolutions.org/programs/suicide-prevention/ (last visited

22    May 23, 2023).

DECLARATION OF
GREGORY T. GUNDLACH
NO. 2:23-cv-00113-MKD

25

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

50.     The program includes a toolkit, documents, podcasts, and other education materials. The toolkit is free to order and contains a poster, counter cards, window signs, a brochure for customers, and a brochure providing guidance in the event a business experiences a suicide. As part of the educational aspects of the program, dealers are asked to educate their staff about warning signs, risk factors, and intervention techniques by having them watch the NSSF's "SHOT" University e-learning module.

51.     ***Operation Secure Store***. Launched in 2017, "Operation Secure Store"[63] involves a partnership by the NSSF with the ATF to reduce firearm diversion resulting from firearm thefts and burglaries through educational programming, including an ongoing series of regional seminars hosted by ATF. Additionally, NSSF matches ATF reward offers for information regarding firearm burglary and theft.

52.     The program also includes numerous videos, research and data, a security toolkit, and other resources. The program focuses on five areas: "Education and Awareness," "Assessment and Risk Analysis," "Planning and Strategy," "Engagement," and "Response," with a focus on providing a wide

---

[63] National Shooting Sports Foundation, *Operation Secure Store*, https://www.nssfrealsolutions.org/programs/operation-secure-store/ (last visited May 23, 2023).

DECLARATION OF
GREGORY T. GUNDLACH
NO. 2:23-cv-00113-MKD

26

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

array of solutions to mitigate risks and protect FFLs against firearm thefts and burglaries.[64]

### 2. Steps taken by firearm industry members, including Smith & Wesson and Beretta USA, to address diversion

53. Past research has shown that members of the firearm industry have engaged in steps to limit firearm diversion.

54. A large-scale industry study of manufacturers and distributors published in 2010[65] found, for example, that while safeguarding practices were on average very low in the firearm industry, some manufacturers and distributors participated in safeguards designed to reduce diversion through unscrupulous and corrupt dealers, nonstore/nonstocking dealers, gun shows, straw purchases, and thefts. According to the researchers, a hallmark of the studied safeguards was their previous identification, articulation, and advancement by stakeholders from the firearms industry.

55. As reported in the study, the more heavily adopted safeguards involved diversion occurring through nonstore/nonstocking dealers, straw purchases, gun shows, and unscrupulous/corrupt dealers. For diversion involving

---

[64] *Id.*

[65] Gregory T. Gundlach, et al., *Countermarketing and Demarketing Against Product Diversion: Forensic Research in the Gun Industry*, 29 J. Pub. Policy & Mktg, 103 (2010), https://www.jstor.org/stable/20798401.

DECLARATION OF
GREGORY T. GUNDLACH
NO. 2:23-cv-00113-MKD

27

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1   nonstore/nonstocking dealers, the safeguards included requiring direct dealers or

2   program dealers to have a storefront place of business and requiring that

3   distributors sell to dealers who, in turn, only sell to storefront places of business.

4   For diversion involving straw purchases, the safeguards included disseminating

5   materials on straw purchases to others in their distribution system. For diversion

6   involving gun shows, the safeguards included restricting their distributors from

7   selling at gun shows. For diversion involving unscrupulous/corrupt dealers, the

8   safeguards included refusing to sell to indicted dealers.

9       56.    Both Smith & Wesson, Inc. and Beretta USA Corp. (or previously

10  affiliated entities) have previously been found in a federal district court to have

11  been aware of the different forms of firearm diversion and to have engaged in

12  safeguards to limit in various ways their occurrence.[66]

13      57.    Smith & Wesson, Inc. was previously found to have been aware of

14  the different forms of firearm diversion or to have received trace requests

15  suggesting their awareness, and to have engaged in safeguards to limit the

16  occurrence of firearm diversion. Smith & Wesson, Inc. engaged in safeguards to

17  limit diversion occurring through non-storefront dealers by requiring direct

18  dealers or program dealers to have a storefront place of business. Smith &

19  Wesson, Inc. was also found to have engaged in safeguards to limit diversion

20

21  _____

22      [66] Report of Gregory T. Gundlach, *supra* note 49.

DECLARATION OF
GREGORY T. GUNDLACH
NO. 2:23-cv-00113-MKD

28

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    occurring through gun shows by restricting their distributors from selling at gun

2    shows or from selling to dealers who, in turn, sell at gun shows.

3    58.    According to Smith & Wesson Inc.'s current Vice President of

4    Sales, Smith & Wesson continues to sell to independent, federally licensed

5    distributors and buying groups who, in turn, sell the products throughout the

6    United States to independent, federally licensed retailers.[67]

7    59.    Beretta USA was similarly previously found by a federal district

8    court to have been aware and/or knowledgeable of the different forms of firearm

9    diversion or to have received trace requests suggesting their awareness, and to

10    have engaged in safeguards to limit the occurrence of firearm diversion. Beretta

11    USA engaged in safeguards to limit diversion occurring through illegal sales by

12    ceasing sales to indicted distributors or dealers and by analyzing trace

13    information to identify problematic distributors or dealers. Beretta USA was also

14    found to have engaged in safeguards to limit diversion occurring through non-

15    storefront dealers by requiring direct dealers or program dealers to have a

16    storefront place of business, and to have engaged in safeguards to limit diversion

17    occurring through straw purchases by training others in their distribution system

18    on straw purchases.

19    60.    According to Beretta USA's General Counsel, Beretta USA

20    continues to sell to independent, federally licensed distributors, who in turn sell

21    _____

22    [67] *See* ECF No. 20.

DECLARATION OF
GREGORY T. GUNDLACH
NO. 2:23-cv-00113-MKD

29

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    to independent, federally licensed retailers located throughout the United States

2    and Beretta USA continues to sell directly to dealers located throughout the

3    United States.[68]

4    **D.    Research Demonstrates that Safeguards Against Firearm Diversion
         Help Limit Its Occurrence and Resulting Harms**

5    61.    Studies of the effects of safeguards against firearm diversion show

6    that safeguards can limit the occurrence of firearm diversion and reduce its

7    harmful effects.

8    62.    ***Limiting "Saturday Night Specials"***. One study from 2006 offers

9    evidence that reforms to the sales practices of licensed gun dealers reduced the

10   supply of new guns to criminals.[69] According to the study, reforms to the sales

11   practices of just one licensed gun store—which, before May 1999, sold more than

12   half of the guns recovered from criminals in Milwaukee—resulted in a 44 percent

13   decrease in the flow of new guns to criminals in the city.

14   63.    The changes in practice occurred after a highly publicized

15   government study in May 1999 revealed that a single Milwaukee-area gun shop

16   was the nation's leading seller of guns that were later recovered from criminals.

17

18   ――――――――――――

19   [68] *See* ECF No. 19.

20   [69] Daniel W. Webster, et al., *Effects of a Gun Dealer's Change in Sales*

21   *Practices on the Supply of Guns to Criminals*, 83 J. URBAN HEALTH 778

22   (May 2006), https://doi.org/10.1007/s11524-006-9073-2.

DECLARATION OF
GREGORY T. GUNDLACH
NO. 2:23-cv-00113-MKD

30

1    Two days after the study was publicized, the dealer announced that his store

2    would no longer sell small, inexpensive handguns, sometimes known as Saturday

3    Night Specials, that are commonly used in crime.

4        64.    After the change in the retailer's sales practices, researchers tracked

5    the number of guns that police recovered from criminals within one year of retail

6    sale. An unusually short sale-to-crime interval is considered an indicator of illegal

7    gun trafficking (i.e, diversion).

8        65.    According to the study, the store's change in sales policy was

9    associated with a 96 percent decrease in the number of small, inexpensive

10   handguns that were recovered from criminals in Milwaukee that were recently

11   sold by the store. There was also a 42 percent reduction in other types of guns

12   sold by the gun dealer and soon recovered from a criminal.

13       66.    The reductions in Milwaukee occurred abruptly after the change in

14   the dealer's sales practice and appear to be directly attributable to those

15   reforms—a finding supported by the fact that the study authors saw no change in

16   gun trafficking in three comparison cities in the Midwest.

17       67.    According to the study's lead researcher, "Our study shows that

18   changes in a single gun dealer's sales practices led to a dramatic reduction in the

19   supply of new guns to criminals in Milwaukee. Increased scrutiny of the few gun

20

21

22

DECLARATION OF
GREGORY T. GUNDLACH
NO. 2:23-cv-00113-MKD

31

1    dealers linked to the most crime guns has the potential to significantly reduce the

2    supply of new guns to criminals in many other U.S. cities."[70]

3    68.    ***Strong Retailer Oversight***. Another study from 2009 examined the

4    effects of gun policies on gun trafficking by estimating the effects of key

5    components—both individually and jointly—of a regulatory scheme designed to

6    prevent diversion of firearms into the illicit market.[71] These components

7    included: (1) regulation and oversight of gun retailers, (2) private sales

8    regulations requiring potential buyers to undergo a background check prior to

9    purchasing a gun from private individuals, and (3) permit-to-purchase licensing

10    laws that provide law enforcement agencies some discretion to deny purchase

11    applications to those who might pose some risk.

12    69.    The cross-sectional study of 54 US cities employed data on state

13    laws governing gun sales, a survey of law enforcement agencies' practices to

14    promote compliance with gun sales laws, and crime gun trace data to examine

15    associations between these policies and practices with gun trafficking indicators.

16    _____

17    [70] John Hopkins, Bloomberg School of Public Health, *Reforms to Sales*

18    *Practices of Licensed Gun Dealer Reduced Supply of New Guns to Criminals*,

19    (Sept. 27, 2006), https://publichealth.jhu.edu/2006/webster-gun-dealer.

20    [71] Daniel W. Webster, et al., *Effects of State-Level Firearm Seller*

21    *Accountability Policies on Firearm Trafficking*, 86 J. URBAN HEALTH 525

22    (May 29, 2009), https://doi.org/10.1007/s11524-009-9351-x .

1      70.    Regulations demonstrate strong oversight of firearm dealers if the

2   state law required: (1) a state or local dealer license, (2) record keeping of firearm

3   sales, (3) dealers' records and premises to be available to law enforcement for

4   inspections, and (4) prompt reporting of thefts of firearms from dealers.

5   Regulation of private handgun sales were operationalized based upon the

6   presence of sales regulations requiring potential buyers to undergo a background

7   check prior to purchasing a gun from private individuals.

8      71.    According to the results of the study, comprehensive regulation and

9   stronger oversight of gun dealers and state regulation of private sales of handguns

10  were each associated with significantly lower levels of intrastate gun trafficking.

11     72.    ***Nonstore/Nonstocking FFLs, Gun Shows, and Straw Purchases***.

12  A large-scale industry study published in 2010 studied the effects of marketing

13  and distribution safeguards directed at the six primary pathways of firearm

14  diversion – diversion occurring through (1) unscrupulous/corrupt dealers, (2)

15  nonstore/nonstocking FFLs, (3) guns shows, (4) straw purchases, (5) multiple

16  sales, and (6) thefts.[72] According to the researchers, safeguards directed at

17  diversion through nonstorefront/nonstocking dealers, gun shows, and straw

18  purchases were found to significantly reduce diversion. A hallmark of each the

19  studied safeguards were their previous identification, articulation, and

20  advancement by stakeholders within the firearms industry.

21  _____

22      [72] Gregory T. Gundlach, et al., *supra* note 65.

DECLARATION OF                                      33          ATTORNEY GENERAL OF WASHINGTON
GREGORY T. GUNDLACH                                                     1125 Washington Street SE
NO. 2:23-cv-00113-MKD                                                          PO Box 40100
                                                                         Olympia, WA 98504-0100
                                                                              (360) 753-6200

73.    The study examined an array of safeguards for each of the different pathways of diversion. For example, safeguards against diversion occurring through nonstore/nonstocking retailers included whether a manufacturer analyzed trace information to identify problem distributors or dealers, and whether a manufacturer had stopped, would not sell, or would stop selling to indicted dealers.

74.    Safeguards against diversion occurring through guns shows included whether a manufacturer restricted their distributors from selling at guns shows, restricted their distributors from selling to dealers who, in turn, sell at gun shows, and restricted their direct or program dealers from selling at gun shows.

75.    Safeguards against diversion occurring through straw purchases included whether a manufacturer had disseminated materials on straw purchases to others in their distribution system and trained others in their distribution system on straw purchases.

76.    As concluded by the researchers, the safeguarding efforts engaged in were found to be associated with a reduction in firearm diversion.[73]

77.    ***Permitting, Background Checks, and Oversight of Gun Retailers***. A review, published in 2015, of available evidence from studies published

---

[73] *Id.* at abstract.

DECLARATION OF
GREGORY T. GUNDLACH
NO. 2:23-cv-00113-MKD

34

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    between 1999 and August 2014 examined the effects of policies designed to keep

2    firearms from high-risk individuals in the United States.[74]

3          78.    According to the results, certain laws intended to prevent prohibited

4    persons from accessing firearms—including strong regulation and oversight of

5    gun dealers—are associated with reductions in diversion of guns to criminals.

6          79.    As concluded by the researchers, "[m]ounting evidence indicates

7    that certain laws intended to increase the accountability of firearm sellers to avoid

8    risky transfers of firearms are effective in curtailing the diversion of guns to

9    criminals . . . ."[75]

10         80.    ***Multiprong Retail Firearm Inventory Security***. An NSSF 2023

11   publication reports that firearms stolen during FFL burglaries dropped by nearly

12   65 percent over 5 years (2017-2021) and that a multipronged approach to retail

13   firearm inventory security was associated with this reduction in stolen firearms.[76]

14   _____

15        [74] Daniel W. Webster & Garen J. Wintemute, *Effects of Policies Designed*

16   *to Keep Firearms from High-Risk Individuals*, 36 ANN. REV. PUB. HEALTH 21

17   (Mar. 2015), https://www.annualreviews.org/doi/10.1146/annurev-publhealth-

18   031914-122516.

19        [75] *Id.* at 34.

20        [76] Larry Keane, *AFT Data Confirms 'Operation Secure Store' Has Positive*

21   *Impact*, NATIONAL SHOOTING SPORTS FOUNDATION (Mar. 17, 2023)

22   https://www.nssf.org/articles/atf-data-confirms-operation-secure-store-has-

1    81.   The multi-prong approach involved "Education and Awareness,"

2    "Assessment and Risk Analysis," "Planning and Strategy," "Engagement" and

3    "Response" to help retailers enhance the security of their retail firearm

4    inventory.[77] The approach was developed as part of the NSSF's Operation Secure

5    Store, a partnership by NSSF with ATF and DOJ to provide brick-and-mortar

6    firearm retailers with educational resources and services to better secure their

7    inventory and reduce robberies and burglaries.

8    82.   According to NSSF President and CEO Joe Bartozzi in testimony to

9    the Connecticut state legislature's Joint Judiciary Committee: "Retailers are the

10   first line of defense against criminals and would-be criminals."[78] Referring to

11   NSSF's Operation Secure Store, as described by Mr. Bartozzi, when

12   neighborhood firearm retailers use industry tools and resources to improve their

13   inventory security, they are backstopping against possible criminal behavior that

14   could endanger their communities.[79]

15

16   _____

17   positive-impact/#:~:text=New%20ATF%20Data%20on%20FFL,criminals%20

18   takes%20a%20monumental%20effort (Special note: The publication does not

19   report the methodology employed to determine the reported results.).

20   [77] *Id.*

21   [78] *Id.*

22   [79] *Id.*

DECLARATION OF                                          36                ATTORNEY GENERAL OF WASHINGTON
GREGORY T. GUNDLACH                                                              1125 Washington Street SE
NO. 2:23-cv-00113-MKD                                                                  PO Box 40100
                                                                                Olympia, WA 98504-0100
                                                                                    (360) 753-6200

83.   ***Informational Campaigns***. A recent study from 2023 examined the effects of manufacturers' awareness and knowledge of the different pathways through which firearms are diverted, and their likelihood of taking precautionary measures to limit the occurrence of firearm diversion.[80] The research shows that increasing awareness and knowledge of the pathways for firearm diversion increases the likelihood that manufacturers will take precautionary measures to safeguard against diversion of their firearms.

84.   As reported by the researchers, manufacturers' awareness and knowledge of specific sources of diversion significantly increased the probability that the manufacturer would use a safeguard to limit its occurrence. This result was found for manufacturers that possessed knowledge of diversion occurring through nonstore/nonstocking firearm dealers, straw purchases, unscrupulous firearm dealers, gun shows, and diversion occurring due to thefts.

85.   According to the researchers, the results support the view that actions like informational and educational campaigns to improve firearm marketers' awareness and knowledge of illegal demand for their firearms can help to reduce gun violence.

---

[80] Gregory T. Gundlach, et al., *supra* note 52.

DECLARATION OF
GREGORY T. GUNDLACH
NO. 2:23-cv-00113-MKD

37

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

**E.    Limiting the Distribution Risks Associated with Firearms is Consistent With Broader Concepts of Countermarketing and Demarketing**

86.    Efforts to safeguard against firearm diversion are consistent with, and follow from, more basic principles of marketing and marketing management known as "countermarketing" and "demarketing."

87.    First advanced over 50 years ago, conceptions of marketing management as "demand management" provide the foundation for these concepts (i.e., countermarketing and demarketing) and their application to circumstances involving unwanted demand for a good or service.[81]

88.    ***Unwholesome Demand***. In addition to creating and maintaining demand for a good or service, at times, marketers may also be confronted with unwanted demand.[82] This can include too much demand for a firm's capacity (e.g., a sold-out hotel or overbooked airplane, etc.), but also unwholesome demand. Unwholesome demand is the desire for goods, services, or activities that reduce individual and social welfare. Classic examples of industries with significant unwholesome demand include many of the so-called vice products: alcohol and related products, tobacco and related products, illicit and prescription

---

[81] Philip P. Kotler & Sidney Levy, *Demarketing, Yes, Demarketing*, 49 HARV. BUS. REV. 74 (1971).

[82] Philip P. Kotler, *The Major Tasks of Marketing Management*, 37 J. MKTG. MGMT. 42 (Oct. 1973), https://doi.org/10.2307/1250357 .

DECLARATION OF
GREGORY T. GUNDLACH
NO. 2:23-cv-00113-MKD

38

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

drugs, and other products for which safety or other societal concerns exist.[83] In the firearms context, this would include the purchase and use of firearms by unauthorized and at-risk persons and for use in crime.

89.     Following basic principles of marketing management, when confronted with unwholesome demand, the marketer's "task" is to engage in countermarketing or demarketing to counter or limit the demand. Demarketing involves discouraging demand in general or on the part of a certain class of customers, either temporarily or on a continuing basis.[84] Countermarketing, a stronger strategy, involves total repudiation of the relevant demand, such as by getting rid of undesirable customers, or preventing certain types of transactions.[85]

90.     Many strategies for countermarketing and demarketing a good or service are available to marketers -- prices may be raised, product quality may be altered, service and promotion can be reduced and/or convenience altered.[86]

---

[83] Thomas C. Kinnear & Cynthia J. Frey, *Demarketing of Potentially Hazardous Products: General Framework and Case Studies*, 7 J. CONTEMP. BUS. 57 (1979).

[84] Kevin D. Bradford, et al., *supra* note 19.

[85] *Id.*

[86] *Id.*

DECLARATION OF
GREGORY T. GUNDLACH
NO. 2:23-cv-00113-MKD

39

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    Indeed, the concepts of countermarketing and demarketing extend to all aspects

2    of marketing management.[87]

3        91.    Accounts of the application of countermarketing and demarketing

4    are widely documented in the marketing literature. This includes, for example,

5    countermarketing and demarketing to encourage conservation during energy

6    shortages through reduction in the number of retail outlets sold to, retail product

7    allocation systems, requirements for reduced hours of retail operation, and

8    discontinuance of promotional incentives. It also includes countermarketing and

9    demarketing to manage tourism and preserve natural resources through increased

10   prices, restrictive access permits, and persuasive promotional campaigns.[88] It

11   further includes countermarketing and demarketing to discourage dysfunctional

12   demand for night-time emergency healthcare services through persuasive

13   communications and information.[89]

14

15   ————————————

16       [87] *Id.*

17       [88] Sue Beeton & Richard Benefield, *Demand Control: The Case for*

18   *Demarketing as a Visitor and Environmental Management Tool*,

19   10 J. SUSTAINABLE TOURISM 497 (2002),

20       [89] Annabelle Mark & Richard Elliott, *Demarketing Dysfunctional Demand*

21   *in the UK National Health Service*, 12 INT'L J. HEALTH PLANNING & MGMT. 297

22   (Dec. 4, 1998).

DECLARATION OF
GREGORY T. GUNDLACH
NO. 2:23-cv-00113-MKD

40

92.    Applied to the problem of firearm diversion, countermarketing and demarketing encompasses not only the design and management of a manufacturer's or distributor's retail distribution system and strategy, but also their design and management of other marketing strategies. This includes promotional strategies (e.g., advertising campaigns, sales practices, etc.), product strategies (e.g., product design, accessories, etc.), and pricing strategies (e.g., initial price, price management, etc.). Thus, countermarketing and demarketing applied to firearm diversion contemplates a comprehensive approach to reducing its occurrence.

93.    The previously described "Strategies to Limit Firearm Diversion" (*see* Exhibit 2) reflect the application of countermarketing and demarketing strategies to reduce firearm diversion for each of the primary pathways of firearm diversion.[90]

## F.    Other Industries Involving Dangerous Products Regularly Adopt Safeguards to Limit Marketing and Distribution Risks

94.    Many companies that market products which have the potential for harm adopt safeguards to limit the marketing and distribution risks associated with their products, specifically with regard to selling to unauthorized persons or selling for persons who will divert the product to illegal use.

---

[90] *See also* Kevin D. Bradford, et al., *supra* note 19.

DECLARATION OF
GREGORY T. GUNDLACH
NO. 2:23-cv-00113-MKD

41

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

95.  **_Tobacco_**. The "We Card" [91] program is a manufacturer advised and supported organization serving the nation's tobacco retailers (and other age-restricted products). Under the program, retailers are considered to play a "critical role in preventing the sale of age-restricted products to underage customers."[92] Participants in the program receive access to a wide array of educational and training programs and materials to limit the purchase of tobacco products by minors.

96.  Among other materials, the program includes a "Retailer Pledge"; an e-learning center; a template for developing retailer product sales policies; a "Guide to Best Practices;" a catalog containing point-of-purchase materials such as age-of-purchase calendars, signage, stickers, decals, guides and tip sheets; access to ID scanner and age verification tools and technology; initial, refresher, and booster training courses for employees and managers; and monetary incentives, among other materials.

97.  Under the program, participating retailers utilize door and window decals, counter signs, employee pins, minimum age calendars, and hand-outs to educate and answer customer questions.  A detailed employee guide and training

------

[91] We Card Web Center, http://www.wecard.org (last visited May 26, 2023).

[92] We Card Web Center, *Dear Retailer Letter*, https://www.wecard.org/dear-retailer (last visited May 27, 2023).

DECLARATION OF
GREGORY T. GUNDLACH
NO. 2:23-cv-00113-MKD

42

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

videos are also provided along with access to an e-learning center.  The guide and training videos offer information on how to ask for an ID, how to say "no," how to spot a fake ID, state law information and information on federal laws.

98.     Professional trainers teach proven techniques that clerks can use to reject attempts to buy tobacco and vaping products illegally. Retailers are also offered self-assessment surveys to assist in the identification of best practices suited for their individual stores. The program also includes the termination of benefits and incentives to retailers who are fined or convicted of selling tobacco to minors.

99.     ***Alcoholic Beverages***. Distillers, producers, and suppliers of alcohol products offer training and other programs to retailers for the identification of strawman transactions and monitoring for illegal transactions.

100.   One such program is the "Training in Intervention Procedures for Servers of Alcohol" [93] (TIPS) program that offers servers and sellers of alcohol products skills for serving responsibly and avoiding selling to minors, including checking IDs, managing intoxication levels, and reducing incidents of drunk driving.

---

[93] Training in Intervention Procedures for Servers of Alcohol Training, https://www.tipsalcohol.com/ (last visited May 26, 2023).

DECLARATION OF
GREGORY T. GUNDLACH
NO. 2:23-cv-00113-MKD

43

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1      101.   Another program, the "Being a Responsible Server"[94] (BARS)

2   program, is a secret shopper program that helps keep servers and sellers vigilant

3   about checking IDs.   Participating establishments pay the BARS program to be

4   monitored by BARS checkers who make random visits to their stores and

5   purchase alcohol beverages.

6      102.   ***Chemical Products***.  The International Council of Chemical

7   Associations (ICCA) created the "Responsible Care"[95] program, which includes

8   a signatory "Global Charter,"[96] formal "Commitment,"[97] and a voluntary

9   "Stewardship Code," [98] to "prevent the misuse and diversion of . . . chemicals for

10

11   _____

12      [94] Being a Responsible Server Program https://www.barsprogram.com/ho

13   witworks.htm (last visited May 26, 2023).

14      [95] International Council of Chemical Associations, *Responsible Care*,

15   https://icca-chem.org/focus/responsible-care/ (last visited May 24, 2023).

16      [96] International Council of Chemical Associations, *Responsible Care*

17   *Global    Charter*    May    29,    2014),    https://icca-chem.org/wp-

18   content/uploads/2020/06/RC-Global-Charter-FINAL.pdf.

19      [97] International Council of Chemical Associations, *Responsible Care*,

20   *supra* note 95.

21      [98] International Council of Chemical Associations, *Responsible Care*,

22   *Voluntary Product Stewardship Practices to Prevent Diversion of 1,4-Butanediol*

1  unlawful purposes." The code requires adherence to extensive distribution and

2  customer requirements to ensure the legitimate use of dangerous chemicals.

3      103.  The American Chemistry Council "Responsible Care Program"[99]

4  actively participates, offers guidance, and encourages its members (1) in how to

5  evaluate the risks associated with chemical distribution and employ methods to

6  reduce those risks, (2) to meet or exceed all regulations and industry standards

7  governing chemical distribution, (3) to provide emergency advice and/or

8  assistance to people on the scene in the event of a chemical distribution

9  emergency, and (4) to develop new technologies and methods to improve

10  chemical distribution safety. Participating members that participate and follow

11  their guidelines and achieve a reduction in their incident rates are given awards.

12

13

14  ————————————

15  *and Gamma Butyrolactone* (Apr. 5, 2017), https://icca-chem.org/wp-

16  content/uploads/2021/12/voluntary-product-stewardship-code.pdf.

17  [99] American Chemistry Council, *Responsible Care: Driving Safety &*

18  *Industry Performance*, https://www.americanchemistry.com/chemistry-in-

19  america/responsible-care-driving-safety-industry-

20  performance?gclid=CjwKCAjw67ajBhAVEiwA2g_jEHNKFFxVDz5zw7F7_f

21  wceA5PGWR1VO1QsvBguUxOvqFboYy1H-TisRoCjFgQAvD_BwE   (last

22  visited May 26, 2023).

DECLARATION OF
GREGORY T. GUNDLACH
NO. 2:23-cv-00113-MKD

45

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1        I declare under penalty of perjury under the laws of the State of

2    Washington and the United States of America that the foregoing is true and

3    correct.

4        DATED this 30th day of May, 2023, at Jacksonville Beach, Florida

5

6

7

8        GREGORY T. GUNDLACH, J.D., PhD.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

DECLARATION OF
GREGORY T. GUNDLACH
NO. 2:23-cv-00113-MKD

46

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1

**CERTIFICATE OF SERVICE**

2          I hereby certify that on this day I caused the foregoing document to be

3    electronically filed with the Clerk of the Court using the Court's CM/ECF System

4    which will serve a copy of this document upon all counsel of record.

5

6          I declare under penalty of perjury under the laws of the State of

7    Washington and the United States of America that the foregoing is true and

8    correct.

9          DATED this 1st day of June, 2023, at Olympia, Washington.

10

11                              *s/ Leena Vanderwood*
                                LEENA VANDERWOOD
12                              *Legal Assistant*
                                1125 Washington Street SE
13                              PO Box 40100
                                Olympia, WA  98504-0100
14                              (360) 570-3411
                                Leena.Vanderwood@atg.wa.gov

15

16

17

18

19

20

21

22

DECLARATION OF                          47          ATTORNEY GENERAL OF WASHINGTON
GREGORY T. GUNDLACH                                         1125 Washington Street SE
NO. 2:23-cv-00113-MKD                                              PO Box 40100
                                                             Olympia, WA 98504-0100
                                                                 (360) 753-6200