ROBERT W. FERGUSON
  *Attorney General*

EMMA GRUNBERG, WSBA 54659
  *Deputy Solicitor General*
1125 Washington Street SE
PO Box 40100
Olympia, WA  98504-0100
(206) 326 5488
Emma.Grunberg@atg.wa.gov

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| NATIONAL SHOOTING SPORTS FOUNDATION, INC., | 2:23-cv-00113-MKD |
| Plaintiff, | DECLARATION OF DANIEL W. WEBSTER IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION |
| v. | |
| ROBERT W. FERGUSON, Attorney General of the State of Washington, | |
| Defendant. | |

I, Daniel W. Webster, declare as follows:

1.    I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge.

2.    I have been asked by the Washington State Attorney General's Office to provide information about current research on the role of corrupt or negligent licensed gun dealers in facilitating the diversion of guns for use in crime and effective measures to prevent such diversions.

1

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

## I.    BACKGROUND AND QUALIFICATIONS

3.    I am Bloomberg Professor of American Health in Violence Prevention in the Department of Health Policy and Management at the Johns Hopkins Bloomberg School of Public Health. I am currently a Distinguished Scholar at the Johns Hopkins Center for Gun Violence Solutions, which was founded in 1995. I served as either Director or Co-Director of the Center from 2001 through 2022 (during that time, the Center was known under various names, but remained the same entity). I also previously served as Co-Director of the Johns Hopkins Center for the Prevention of Youth Violence.

4.    I began my career in public safety research in 1985 as a Research Associate at the University of Michigan's School of Public Health, and I have devoted most of my research since then to gun-related violence and its prevention. I have a Master of Public Health degree from the University of Michigan and a doctorate in Health Policy and Management from the Johns Hopkins School of Public Health. This graduate training included many advanced courses in epidemiology, research methods, and statistical analysis.

5.    Immediately prior to joining the faculty at Johns Hopkins, I directed a program on violence research at the Washington (D.C.) Hospital Center. I joined the faculty of the Johns Hopkins School of Public Health in 1992, and since 2010 have been a tenured Professor of Health Policy and Management. I teach graduate courses on violence prevention. Previously, I taught courses in research and evaluation methods at Johns Hopkins, directed the Ph.D. program

DECLARATION OF DANIEL W. WEBSTER
NO. 2:23-cv-00113-MKD

2

1  in Health and Public Policy, and served on the steering committee of a pre- and

2  post-doctoral training program in violence prevention research funded by the

3  National Institutes of Health.

4        6.     I have directed numerous studies related to gun violence and its

5  prevention. I have published 149 scientific articles and nine invited commentaries

6  in academic peer-reviewed journals. The vast majority of these articles addressed

7  violence and/or firearm injuries and their prevention. I am the lead editor of a

8  book entitled *Reducing Gun Violence in America: Informing Policy with*

9  *Evidence and Analysis* by Johns Hopkins University Press (2013) and I am the

10  lead author for two chapters and co-author on three other chapters in this book.

11  In addition, I have served as special editor or co-editor of three special issues on

12  gun violence for top tier public health journals. My curriculum vitae, detailing

13  these publications, is attached as Exhibit 1 to this Declaration.

14        7.     I am being compensated at $600 per hour for case review, research,

15  preparation of declarations and written reports, and testimony. My compensation

16  is not in any way contingent on the results of my reports or my testimony.

17  **A.    The Role of Licensed Firearms Dealers in the Diversion of Guns into**
**Underground Gun Markets**

18

19        8.     There is no single best source of data on how guns make their way

20  into the hands of individuals who use them to commit violent crimes. Surveys of

21  criminals provide information on the most proximate source and method of

22  firearm acquisition, but usually do not shed light on the point at which a gun

DECLARATION OF DANIEL W. WEBSTER      3      ATTORNEY GENERAL OF WASHINGTON
NO. 2:23-cv-00113-MKD                               1125 Washington Street SE
                                                  PO Box 40100
                                         Olympia, WA 98504-0100
                                         (360) 753-6200

1    enters the underground gun market. A survey of state and federal prisoners

2    conducted by the U.S. Bureau of Justice Statistics in 2016 asked those who used

3    a firearm in their crime of conviction how they obtained the firearm.[1] The most

4    common sources of guns used by these individuals was "off the

5    street/underground market" (43.2 percent) and "obtained from an individual"

6    (e.g., friend or family member, 25.3 percent). The survey data indicated that 10.1

7    percent purchased the gun directly at a retail firearm dealer; another 10.8 percent

8    said the firearm was either a gift or purchased by someone else on behalf of the

9    convicted person.[1]

10        9.    Of course, there is no information from inmate surveys on how the

11    firearms they used initially transitioned from the legal market to the underground

12    market or to individuals known by the persons who used the firearm to commit a

13    crime. Privately made firearms (sometimes referred to as "ghost guns" because

14    they cannot be traced) are a growing source of firearms in the underground

15    market, especially in states with the most robust regulations on firearm sales; but

16    the most recent data available (2021) from the U.S. Bureau of Alcohol, Tobacco,

17    Firearms and Explosives (ATF) indicate that privately made firearms accounted

18    _____

19        [1] Mariel Apler & Lauren Glaze, *Source and Use of Firearms Involved in*

20    *Crimes: Survey of Prison Inmates, 2016*, U.S. Department of Justice, Office of

21    Justice Programs, Bureau of Justice Statistics (January 2019), https://bjs.ojp.gov

22    /content/pub/pdf/suficspi16.pdf.

DECLARATION OF DANIEL W. WEBSTER      4      ATTORNEY GENERAL OF WASHINGTON
NO. 2:23-cv-00113-MKD                             1125 Washington Street SE
                                             PO Box 40100
                                         Olympia, WA 98504-0100
                                         (360) 753-6200

1   for less than five percent of firearms traced by the agency (19,273 of 404,024).[2]

2   Theft was a direct method of firearm acquisition by only 6.4 percent of the

3   inmates in the 2016 nationally representative survey of prison inmates who used

4   guns.[3]

5       10.    It is safe to assume, therefore, that a large majority of firearms in the

6   underground market were diverted via transfers after a retail sale. Data from all

7   firearms recovered by law enforcement and traced by the ATF in 2021 indicate

8   that about one-third (115,540 of 356,936) had been purchased from a retail seller

9   less than 12 months before the firearm was linked to crime.[4] In a seminal study

10

11   _____

12   [2] ATF, *Part III: Crime Guns Recovered and Traced Within the United*

13   *States and Its Territories* (Jan 11, 2023), at 1, https://www.atf.gov/firearms/doc

14   s/report/nfcta-volume-ii-part-iii-crime-guns-recovered-and-traced-

15   us/download#:~:text=The%20total%20number%20of%20annual,)%20to%2020

16   21%20(460%2C024.

17   [3] Apler & Glaze, *supra*, n.1.

18   [4] ATF, *Firearms Trace Data – 2021*, https://www.atf.gov/resource-

19   center/firearms-trace-data-2021 (last visited May 26, 2023); ATF, *Firearms*

20   *Trace Data – 2021* (Time-to-Crime – Firearms Recovered and Tracked in the

21   United States and Territories), https://www.atf.gov/resource-center/firearms-

22   trace-data-2021#:~:text=Time%2Dto%2DCrime%20%2D%20Firearms%20

DECLARATION OF DANIEL W. WEBSTER          5       ATTORNEY GENERAL OF WASHINGTON
NO. 2:23-cv-00113-MKD                                      1125 Washington Street SE
                                                           PO Box 40100
                                                           Olympia, WA 98504-0100
                                                           (360) 753-6200

1    published by some of the leading researchers studying gun violence, Anthony

2    Braga and colleagues demonstrated that the "age" of firearms used in crime,

3    based on the interval between retail sale and crime involvement, is much less than

4    the age of firearms in civilian hands, suggesting that most guns used in crime

5    were not stolen from gun owners but were diverted for criminal use relatively

6    soon after retail sale.[5]

7         11.    This same study by Braga and colleagues also analyzed detailed data

8    from federal firearms trafficking investigations involving 117,138 firearms. The

9    most common trafficking pathway identified in these investigations was illegal

10   straw purchases, which accounted for 41.3 percent of all firearms trafficking

11   investigations. The investigations involved officers conducting undercover stings

12   of retail firearm sellers that were linked to many crime guns. The officers

13   orchestrated straw purchase scenarios that were blatantly illegal, in which the

14

15

16

17   _____

18   Recovered%20and%20Traced%20in%20the%20United%20States%20and%20

19   Territories (last visited May 26, 2023).

20        [5] Anthony Braga, et al., *Interpreting the Empirical Evidence on Illegal Gun*

21   *Market Dynamics*, 89 J. URBAN HEALTH 779–93 (2012). https://doi.org/10.1007/

22   s11524-012-9681-y.

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1  firearm dealer or employee nonetheless went ahead with the sale.[6,7] Indeed, straw

2  purchase investigations often start with a retail firearm dealer notifying law

3  enforcement of an attempted illegal straw purchase.

4      12.    One relevant study involved researchers calling a random sample of

5  licensed firearm dealers in large U.S. cities and pretending to ask about their

6  willingness to sell a firearm to someone who said it was for his or her girlfriend

7  or boyfriend, who "needed" a gun. Over half (52.5 percent) indicated that they

8  would make what would be an illegal sale.[8] The Braga and colleagues' study of

9  —————————————

10     [6] Daniel W. Webster, et al., *Effects of a Gun Dealer's Change in Sales*

11  *Practices on the Supply of Guns to Criminals*, 83 J. URBAN HEALTH 778–87

12  (May 6, 2006), https://doi.org/10.1007/s11524-006-9073-2.

13     [7] Daniel W. Webster & Jon S. Vernick, *Spurring Responsible Firearms*

14  *Sales Practices through Litigation: The Impact of New York City's Lawsuits*

15  *Against Gun Dealers on Interstate Gun Trafficking*, at 123–32, Johns Hopkins

16  University, Bloomberg School of Public Health (2013); Johns Hopkins

17  University Press, Reducing Gun Violence in America: Informing Policy with

18  Evidence and Analysis 123–32 (Daniel W. Webster & Jon S. Vernick, eds.,

19  2013).

20     [8] Susan B. Sorenson & Katherine A. Vittes, *Buying a Handgun for*

21  *Someone Else: Firearm Dealer Willingness to Sel*, 9 INJURY PREVENTION 147–

22  50 (2003), https://doi.org/10.1136/ip.9.2.147.

1    federal gun trafficking investigations also revealed that the most firearms

2    trafficked by any specific category of trafficking channel was "Firearms diverted

3    by a licensed firearms dealer, including pawnbrokers," accounting for 47 percent

4    (55,088 of 117,138) of all firearms trafficked. Based on the available evidence,

5    my expert opinion is that some retail firearm dealers directly or indirectly

6    facilitate the diversion of many firearms into the hands of criminals or those who

7    supply criminals with firearms.

**B.**     **Accountability Measures for Licensed Firearm Dealers Significantly Reduce the Diversions of Guns for Use in Crime**

13.    Research demonstrates the role of a relatively small percentage of licensed firearm dealers selling the majority of guns used in crime. In May 1999, ATF publicly released information about guns recovered from criminals revealing that a Milwaukee-area gun dealer, Badger Guns and Ammo (Badger), led the nation in the number of guns sold which were later traced to crimes. Within days of this release, Badger's owner announced that the store would no longer sell small, inexpensive, poorly made handguns sometimes referred to as "junk guns" that were most commonly used in crime at that time.[9] I led a study using crime gun trace data that showed that, following this announcement of changes in sales practices, the flow of new guns sold by the dealer that were

_____

[9] J. McBride, *Local Store Leads U.S. in 'Crime Guns'*, Milwaukee Journal Sentinel (May 9, 1999).

DECLARATION OF DANIEL W. WEBSTER    8
NO. 2:23-cv-00113-MKD

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    subsequently recovered by police within 1 year of retail sale dropped by a

2    statistically significant 73 percent.[10]

3        14.    Publication of this study in 2006 prompted Milwaukee law

4    enforcement officials to assemble additional crime gun trace data to assess

5    whether the large reductions in the flow of new guns to criminals from Badger

6    had continued. This additional data covered a period during which new federal

7    policies were adopted restricting ATF's ability to disseminate gun trace data and

8    to regulate firearms dealers. Specifically, on February 20, 2003, the Tiahrt

9    amendment (named for its sponsor, U.S. Representative Todd Tiahrt) to the

10    consolidated appropriations resolution for FY 2003 was signed into law. This

11    legislation prohibited ATF from responding to Freedom of Information Act

12    requests for data from crime gun traces, including the number of crime guns

13    traced to specific gun dealers. The Tiahrt amendment was broadened in October

14    2003 to prohibit ATF from requiring gun dealers to do a physical inventory of

15    their firearms as part of a compliance inspection, eliminating a key means of

16    holding gun sellers accountable for abiding by gun sales laws. It also required the

17    FBI to destroy data from background checks for firearm purchase applications

18    within 24 hours, limiting law enforcement's ability to investigate the legality of

19    sales made by licensed gun dealers. In 2004, the Tiahrt amendment further

20    restricted crime gun trace data, including limiting access by government officials

21    _____

22        [10] Webster, *Effects of a Gun Dealer's Change in Sales*, *supra*, note 6.

1    and prohibiting use of crime gun data in proceedings pertinent to firearms dealer

2    license revocations and civil lawsuits.

3        15.    I led a subsequent study using the crime gun data from the prior

4    Milwaukee study and the crime gun trace data provided by Milwaukee Police

5    Department to determine whether 1) the reduction in guns diverted for use in

6    crime shortly after a retail sale by someone other than the purchaser of record

7    after Badger changed its sales practices, and 2) the new protections for firearm

8    dealers afforded by the Tiahrt amendments, impacted crime gun recoveries of

9    guns sold by Badger.[11] This study documented that the number of likely

10   trafficked guns shortly after retail sale had started to gradually rise as time passed

11   following ATF's 1999 release of information—but then surged by 203 percent

12   following the changes in federal law protecting firearm dealers who sold

13   substantial numbers of guns diverted for criminal use from any accountability.

14       16.    I conclude from this research that a single scofflaw firearm dealer

15   can greatly impact the availability of guns used for crime in a major city and that

16   external accountability measures can substantially impact business practices and

17   influence the diversion of guns for use in crime.

18

19   _____

20   [11] Daniel W. Webster, et al., *Temporal Association Between Federal Gun*

21   *Laws and the Diversion of Guns to Criminals in Milwaukee*, 89 J. URBAN HEALTH

22   87–97 (2012), https://doi.org/10.1007/s11524-011-9639-5.

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

17.    Federal laws regulating retail firearms dealers have long been weak, providing those dealers with advantages over ATF, the agency responsible for compliance with federal firearm sales laws and regulations. Furthermore, ATF has not been staffed to regularly check on firearm dealers' compliance with laws. I led a study published in 2009 to assess the association between state firearm laws and the diversion of guns for use in crime shortly after retail sale by someone other than the purchaser of record.[12] Included among the laws examined was whether state law required firearm dealers to be licensed by state or local law enforcement officials and face compliance inspections. We also surveyed law enforcement in places where state law required local or state law enforcement to inquire about retailers' policies and practices when issuing licenses. Data for our outcome measure were drawn from crime gun traces conducted by ATF of guns recovered by police from 2000 through 2002 in 54 cities that were participating in the Youth Crime Gun Interdiction Initiative (YCGII). Cities that participated in the YCGII agreed to submit information to ATF for all crime guns recovered by local law enforcement agencies. We used the same metric for approximating guns diverted to crime shortly after retail sale described above and used in prior

---

[12] Daniel W. Webster, et al., *Effects of State-Level Firearm Seller Accountability Policies on Firearms Trafficking*, 86 J. URBAN HEALTH 525–537 (May 29, 2009). https://doi.org/10.1007/s11524-009-9351-x.

DECLARATION OF DANIEL W. WEBSTER
NO. 2:23-cv-00113-MKD

11

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    published research, and focused on guns that originated from retail sellers within

2    the same state where the gun was recovered in crime.

3        18.    That study found that strong gun dealer regulation and oversight,

4    regulation of private handgun sales, and discretionary permit-to-purchase

5    licensing were each associated with statistically significant lower levels of

6    intrastate trafficking. Intrastate gun trafficking was 64 percent lower in places

7    with strong firearm dealer regulations and oversight compared with places that

8    lacked such regulations, even without controlling for local gun ownership. This

9    association was only slightly reduced when we controlled for estimated levels of

10    gun ownership. I conclude from the evidence in this study that policies that allow

11    for strong regulation and oversight of firearm dealers reduces the diversion of

12    guns for use in crime.

13    **C.    Evidence that Lawsuits or the Threat of Lawsuits Against Negligent
14        or Illegal Licensed Firearm Dealers Reduces the Diversion of Guns for
        Use in Crime**

15        19.    I have led two studies that provide strong evidence that undercover

16    stings and litigation against dealers linked to a large number of crime guns, and

17    facilitation of blatantly illegal straw purchases, reduce the diversion of guns

18    for use in crime. The first study analyzed crime gun trace data from ATF from

19    firearms recovered by law enforcement agencies in three cities – Chicago,

20    Detroit, and Gary, Indiana – for the time period July 1, 1996 through

21

22

December 31, 2001.[13] In the late 1990s, each city's law enforcement agencies undertook undercover stings of firearm dealers in their respective jurisdictions who were suspected of contributing to the diversion of guns for use in crime. Those who "took the bait" and facilitated illegal sales were sued by the cities, some faced prosecutions as well, and other firearms dealers in the metropolitan areas were put on notice through news accounts. Our study's outcome measure was a proxy for illegal diversion proximate to retail sales (guns recovered less than 12 months following a retail sale where the criminal gun possessor was not the retail purchaser of record).

20.    We found that Chicago's stings and lawsuits against scofflaw firearms dealers was associated with an overall 46.4 percent reduction in guns diverted soon after retail sale and a 61.8 percent reduction in our trafficking indicator when the analyses were limited to guns sold by within-state (Illinois) firearms dealers. These changes in our measure of diverted guns soon after retail sale were highly statistically significant and very unlikely due to chance. In Detroit (Wayne County), the undercover stings and lawsuits against scofflaw firearms dealers were associated with a 35.9 percent reduction in likely diverted firearms soon after retail sale by in-state firearm dealers when the statistical model assumed an abrupt change connected to the announced stings and lawsuits. Smaller sample size and more volatile trends in our measure of diversion made it

_____

[13] Webster, *Effects of a Gun Dealer's Change in Sales*, *supra*, note 6.

1    difficult to assess the effects of the stings and lawsuits in Gary, Indiana. Our

2    models found an increase in diverted guns that was not statistically significant.

3    We analyzed the same indicators for three Midwest cities with comprehensive

4    crime gun tracing practices that did not undertake stings or lawsuits against

5    scofflaw gun dealers (Cleveland and Cincinnati, Ohio and St. Louis, Missouri)

6    and found no changes in crime gun diversions coincident with the timing of the

7    lawsuits in Chicago, Detroit, and Gary.

8        21.    The second study analyzed trends in New York City before and after

9    lawsuits against scofflaw dealers. Officials in New York City followed a similar

10    approach as Chicago, Detroit, and Gary and conducted undercover stings against

11    licensed firearm dealers suspected of facilitating illegal sales, suing those who

12    facilitated blatantly illegal straw sale transactions. Because more than 80 percent

13    of New York City's crime guns originate from retail sales in states with weaker

14    gun laws than New York's, the gun dealers who were sued were from other states.

15    Twenty-four licensed firearms dealers settled lawsuits brought by New York City

16    by agreeing to change specific business practices to reduce diversions with a

17    court-appointed monitor to ensure compliance.

18        22.    I was able to obtain electronic sales records from ten of the dealers

19    who settled lawsuits with New York City for the period January 1, 2003 through

20    June 30, 2007, and data from the New York City Police Department on the

21    firearms they recovered in crime from January 1, 2003 through June 30, 2008.

22    To ascertain whether any of the guns sold by these 10 dealers were subsequently

1    recovered by NYPD, we obtained NYPD's database for firearms it recovered

2    from criminals, crime scenes, and other settings from January 1, 2003 through

3    June 30, 2008. The NYPD database contained data on manufacturer/make,

4    model, caliber, and serial number for each, gun as well as the date on which it

5    was recovered. The gun sales and police recovery databases were subsequently

6    merged. To identify guns that were sold by the ten gun dealers of interest and

7    later recovered by NYPD, we looked for matches based on make, caliber, and

8    serial number. We contrasted the ratio of guns sold by each dealer that were later

9    recovered by NYPD during pre-lawsuit periods - 25 to 66 months (mean of 43

10   months) of follow-up time, whereas guns sold after the lawsuits had 13 to 25

11   months (mean = 18 months). We were only provided sales data for 13.5 months

12   following the announcement of the lawsuits and had between 12 and 25.5 months

13   of follow-up time for police recovery data for post-lawsuit sales. As with our

14   prior studies, we focused on guns that went from retail sale to recovery by law

15   enforcement within a 12-month period.

16        23.    Only 5 of the 6,186 (0.008 percent) guns sold after the lawsuit were

17   subsequently recovered by NYPD, compared with 31 of the 6,081 (0.005%) guns

18   sold during the period immediately before the lawsuit. The odds of a NYPD

19   recovery were 84 percent lower during the post-lawsuit sales period than the pre-

20   lawsuit sales period.

21        24.    The adjusted odds ratio for NYPD recovery for post-lawsuits guns

22   versus pre-lawsuits guns, estimated from the logistic regression models which

1   controlled for follow-up time and dealer-specific effects, were an 82 percent

2   lower rate of crime involvement per guns sold following the lawsuit versus prior

3   to the lawsuit.[14] These differences were highly statistically significant. Based on

4   the evidence from my two studies of the effects of lawsuits against scofflaw

5   firearm dealers, I conclude that lawsuits and the threat of lawsuits significantly

6   deter the diversion of firearms for use in crime.

7          25.    Based on the evidence described above, and my expertise based on

8   more than 30 years of leading research on gun policy and gun violence, I believe

9   that Washington's law allowing firearm dealers to face lawsuits for practices that

10  contribute to gun crime and violence would lead to fewer guns diverted for use

11  in crime. Greater accountability resulting from the threat of lawsuits will impose

12  constraints on the supply of guns to the underground market where criminals

13  often acquire guns, and will, in my expert opinion, lead to less gun violence in

14  Washington.

15

16

17

18

19

20

21  _____

22          [14] Webster, *Spurring Responsible Firearms Sales Practices*, *supra*, note 7.

1    I declare under penalty of perjury under the laws of the State of

2   Washington and the United States of America that the foregoing is true and

3   correct.

4

5    DATED this 29th day of May, 2023, at *Betheda, MD*              .

6

7                                    _Daniel W Webster_

8                                    DANIEL W. WEBSTER

9

10

11

12

13

14

15

16

17

18

19

20

21

22

DECLARATION OF DANIEL W. WEBSTER              17
NO. 2:23-cv-00113-MKD

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

**CERTIFICATE OF SERVICE**

I hereby certify that on this day I caused the foregoing document to be electronically filed with the Clerk of the Court using the Court's CM/ECF System which will serve a copy of this document upon all counsel of record.

I declare under penalty of perjury under the laws of the State of Washington and the United States of America that the foregoing is true and correct.

DATED this 1st day of June, 2023, at Olympia, Washington.

*s/ Leena Vanderwood*
LEENA VANDERWOOD
*Legal Assistant*
1125 Washington Street SE
PO Box 40100
Olympia, WA  98504-0100
(360) 570-3411
Leena.Vanderwood@atg.wa.gov

DECLARATION OF DANIEL W. WEBSTER
NO. 2:23-cv-00113-MKD

18

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200