Steven W. Fogg, WSBA No. 23528
CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, WA 98104-1001
Ph: (206) 625-8600

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| NATIONAL SHOOTING SPORTS FOUNDATION,<br><br>        Plaintiff,<br><br>v.<br><br>ROBERT W. FERGUSON, ATTORNEY GENERAL OF THE STATE OF WASHINGTON,<br><br>        Defendant. | No. 2:23-cv-00113-MKD<br><br>PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS |

PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS

## INTRODUCTION

In 2005, Congress enacted the Protection of Lawful Commerce in Arms Act to put an end to state efforts to use nebulous "reasonableness" standards to impose crushing liability on licensed manufacturers and sellers of firearms who comply with all the myriad concrete rules and regulations to which they are subject. That is not a matter of speculation. Congress declared in the text that the PLCAA's core aim is to prevent suits seeking redress from industry members "for the harm caused by those who criminally or unlawfully misuse firearm products … that function as designed and intended." 15 U.S.C. §7901(a)(5). To that end, the PLCAA broadly preempts any "civil action" "against a manufacturer or seller of a [firearm or related product]" that seeks to make the industry member pay for downstream injuries "resulting from the … misuse of [such a product] by … a third party." *Id.* §§7902(a), 7903(5)(A).

In 2023, Washington enacted Senate Bill 5078 to end-run the PLCAA. That too is undebatable. Attorney General Ferguson ("the AG") has hailed SB 5078 as an effort "to right th[e] wrong" the state feels Congress inflicted upon it "[i]n 2005" via the PLCAA. Office of the AG, *AG Ferguson, Gov. Inslee bill to hold the gun industry responsible passes Legislature* (Apr. 14, 2023), bit.ly/42O0lsZ ("Press Release"). And consistent with that stated aim, SB 5078 revives the very same nebulous liability theories that Congress enacted the PLCAA to inter. Under SB 5078, a "firearm industry member" can be made to pay damages (and more) if a Washington court decides that the industry member's "sale, manufacturing, … or marketing" of its lawful products "contribute[d] to a public nuisance," *even if nothing the industry*

CORR CRONIN LLP

1015 Second Avenue, Floor 10

Seattle, Washington 98104-1001

*member did was unlawful*.   §§1(1), 2(2)-(3).   SB 5078 further imposes liability anytime an industry member fails to "establish, implement, and enforce *reasonable* controls regarding its manufacture, sale, … and marketing of firearm industry products"—which SB 5078 (unhelpfully) defines to mean "*reasonable* procedures, safeguards, and business practices" that are designed to "[p]revent the loss … or theft of a firearm industry product" and "[p]revent the sale or distribution of a firearm industry product to … a person prohibited from possessing a firearm"—again even if the industry member complied with all existing legal obligations.   §§2(1)(f), (4) (emphases added).   SB 5078 thus allows the state to hold industry members liable under nebulous "reasonableness" standards and make them pay for harms caused by third parties who misuse their products—which is exactly what the PLCAA forbids.

As NSSF explained in its PI briefing, SB 5078 is squarely preempted under binding precedent and riddled with constitutional defects.   So perhaps it is no surprise that the AG seeks to shield it from review.   Despite the text of the statute and what he himself has said about it, the AG avers that the industry has nothing to fear from SB 5078.   That bold claim fails the straight-face test.   SB 5078 empowers the AG and private parties "to seek appropriate justice and fair remedies" from industry members for any conduct later deemed "unreasonable."   §1(5).   One need not look far to find the sort of suits it promises:   NSSF members have already been sued just for making and selling their lawful products—in suits the AG has held up as exemplars under a "New York law" he has described as "similar to SB 5078."   Press Release, *supra*.

Against that backdrop, the flaws in the AG's motion to dismiss are crystalline. The AG contends that the Court lacks Article III jurisdiction because NSSF "does not allege any plan to violate the statute," Dkt.31 (MTD) at 1, but "the Supreme Court has instructed that plaintiffs need not do that" to satisfy Article III. *Arizona v. Yellen*, 34 F.4th 841, 850 (9th Cir. 2022). The AG argues that because he has not yet issued "any specific threat of enforcement," this suit is premature, MTD at 1, but that gets things backwards. To be sure, pre-enforcement plaintiffs need a "sufficiently realistic and credible" "feared future injury" to satisfy Article III. *Arizona*, 34 F.4th at 851. But the very fact "[t]hat the [AG] has not disavowed enforcement of" SB 5078 in the manner that NSSF and its members fear "is evidence of an intent to enforce it." *Id.* at 850. And it is hardly the only such evidence. The press release cited above touts suits seeking to hold NSSF members liable for purportedly "unreasonably" selling their lawful (and constitutionally protected) products simply because they do things like truthfully advertise features of those products that the AG apparently does not like. *See* Notice of Removal, Ex. B ¶¶505-30, *City of Buffalo v. Smith & Wesson Brands, Inc.*, No. 1:23-cv-66 (W.D.N.Y. Jan. 23, 2023), Dkt.1-1. All indications are that the AG plans to do the same—unless he is enjoined first.

Setting standing aside, the AG argues that "the Court should dismiss NSSF's preemption claim" under Rule 12(b)(6) because (he says) "neither the Supremacy Clause nor the [PLCAA] provide a cause of action." MTD at 1. The AG apparently does not understand how federal civil-rights litigation works. NSSF is seeking

injunctive and declaratory relief.  It is black-letter law that plaintiffs "seeking only declaratory and injunctive relief" against state officials "*do not need a statutory cause of action*."  *Moore v. Urquhart*, 899 F.3d 1094, 1103 (9th Cir. 2018) (emphasis added).  In all events, NSSF *does* have a statutory cause of action here.  NSSF filed this suit under 42 U.S.C. §1983, "which, since the 1870s, has provided an express cause of action to any person deprived (by someone acting under color of state law) of 'any rights … secured by the Constitution and laws'" of the United States.  Slip op. 1, *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, No. 21-806 (U.S. June 8, 2023) (ellipsis in original) (quoting §1983); *see id.* at 1-2 ("§1983's unqualified reference to 'laws' 'means what it says'").  Section 1983 allows private parties to enforce in federal court "*individual* entitlement[s]" conferred on them "by federal statutes."  *Blessing v. Freestone*, 520 U.S. 329, 340, 343 (1997).  That includes the PLCAA, which grants firearm industry members a substantive federal right to be free from the types of unreasonableness suits SB 5078 authorizes.  The fact that neither the Supremacy Clause nor the PLCAA provides its own cause of action is thus irrelevant.  Section 1983 does, and that is (more than) enough.

The Court should deny the AG's motion to dismiss and enjoin SB 5078.

## LEGAL STANDARD

In reviewing a motion to dismiss for lack of standing, courts must "take as true all material allegations in the complaint," legal allegations included, "and construe the complaint in favor of the plaintiff."  *Arizona*, 34 F.4th at 849; *see id.* ("[W]e must

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001

accept—for standing purposes—[the] allegations that [the law] is unconstitutionally ambiguous and coercive.").  In reviewing a 12(b)(6) motion, courts must "accept as true all well pleaded facts in the complaint and construe them in the light most favorable to the [plaintiff]."  *ASW v. Oregon*, 424 F.3d 970, 974 (9th Cir. 2005).

## ARGUMENT

## I.    Article III Is Plainly Satisfied.

In the pre-enforcement context, Article III requires that [1] a plaintiff have "an intention to engage in a course of conduct arguably affected with a constitutional interest," [2] the intended conduct "is 'arguably … proscribed by [the] statute,'" and [3] "the plaintiff['s] fear of prosecution [i]s not 'imaginary or wholly speculative.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 160-61 (2014) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 302 (1979)); *see Tingley v. Ferguson*, 47 F.4th 1055, 1067 (9th Cir. 2022) ("*Driehaus* set the general standard for pre-enforcement standing.").  All three factors are amply satisfied here.[1]

First, the manufacture, sale, and marketing of firearms and related products is not just "arguably," but *obviously* "affected with a constitutional interest."  Even before *Heller*, Congress recognized that allowing the sort of suits SB 5078 authorizes "threatens the diminution of a basic constitutional right."  15 U.S.C. §7901(6).  Since then, the Ninth Circuit has held that restrictions "on the sale of ammunition do not

---

[1] The AG bizarrely asserts that "NSSF has not asserted associational standing." MTD at 7.  Yes, it has.  *See, e.g.*, Compl. ¶8, Dkt.1; *id.*, Prayer for Relief ¶¶ 1-3.

Corr Cronin llp
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001

fall outside 'the historical understanding of the scope of the [Second Amendment] right.'" *Jackson v. City & Cnty. of S.F.*, 746 F.3d 953, 968 (9th Cir. 2014) (alteration in original).  And it is not just the Second Amendment that is implicated here; NSSF members' speech promoting their lawful products—the "marketing" that SB 5078 unduly restricts—is protected by the First Amendment.  *See* Dkt.17 (MPI) at 20-25.

Second, SB 5078 (more than) "arguably" proscribes NSSF members' intended conduct, namely their continued manufacture, sale, and marketing of their products. The AG has never denied that SB 5078 imposes liability for commercial firearms activity that is *not unlawful anywhere*, not to mention for non-misleading advertising about lawful products.  *See* MPI at 17-24.  That is more than enough to satisfy the second factor.  "Arguably proscribed is not a stringent test.  In *Susan B. Anthony List*, the Supreme Court deemed it sufficient that a statute appeared broad enough to cover the intended conduct."  *N.J. Bankers Ass'n v. Att'y Gen.*, 49 F.4th 849, 855 (3d Cir. 2022).  SB 5078 is "broad enough" and then some, proscribing lawful manufacturing, selling, and marketing of lawful firearms anytime the AG (or a state court in a private-party suit) deems it "unreasonable."  In that context, it is not NSSF's burden to guess which lawful practices the AG will later decide are "unreasonable."  Nor must NSSF plead its members into liability, *see MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007), particularly given that SB 5078 sweeps so broadly.

Before moving on to the third factor, it is important to note that the AG does not contest either of the first two.  That is presumably because the first two factors

CORR CRONIN LLP

1015 Second Avenue, Floor 10

Seattle, Washington 98104-1001

are indisputable.  *See NSSF v. Platkin*, 2023 WL 1380388, at *2 (D.N.J. Jan. 31, 2023) (first two factors "clearly met" in challenge to similar statute).  That said, the AG puzzlingly fails to cite the relevant standard, instead relying on cases that long predate *Driehaus*.  But as the Ninth Circuit has clarified repeatedly in recent years, *Driehaus* supplies the test for "determining when the threat of enforcement creates a sufficient injury for a party to have standing to bring a pre-enforcement challenge." *Tingley*, 47 F.4th at 1067; *accord Arizona*, 34 F.4th at 849.  The AG's theory that NSSF must do more than satisfy *Driehaus*, *see* MTD at 7-9, is wrong.  In a pre-enforcement case, satisfying *Driehaus* is both necessary *and sufficient* for Article III.

The rubber thus hits the road with the third *Driehaus* factor: whether NSSF's members face a threat of enforcement that is "not 'imaginary or wholly speculative.'" 573 U.S. at 161 (quoting *Babbitt*, 442 U.S. at 302).  To answer that question, courts in this circuit "consider (1) 'whether the plaintiff[] ha[s] a "concrete plan" to violate the law in question,' (2) 'whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings,' and (3) 'the history of past prosecution or enforcement under the challenged statute." *Arizona*, 34 F.4th at 850 (quoting *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc)).  "Where the challenged statute is new, as here, the history of past enforcement carries little, if any weight."  *Id.*; *accord Cal. Trucking Ass'n v. Bonta*,

996 F.3d 644, 652 (9th Cir. 2021).  It is thus the first two considerations that matter.[2]

NSSF's members have more than sufficient plans to engage in conduct for which the AG could sue them under SB 5078.  As explained, SB 5078 subjects industry members to liability for manufacturing, selling, and marketing of lawful firearm products anytime the AG deems it "[un]reasonable," *even if the conduct is not otherwise unlawful*.  SB 5078 §2.  NSSF's members thus face a very real threat of being sued for no reason other than continuing to lawfully make, sell, and market lawful products the AG does not like.  *E.g.*, Dkt.18 (Lee Decl.) ¶¶6-10; Dkt.19 (Reh Decl.) ¶¶3-6; Dkt.20 (Cupero Decl.) ¶¶4-8.  Indeed, one need look no further than the two sweeping suits brought under New York's version of SB 5078 that have been filed against NSSF members—and praised by the AG—to see that.  Those suits seek to impose liability for such perceived sins as marketing firearms based on traits as common and lawful as "high capacity" and "ease of concealment" and manufacturing and selling more firearms than the plaintiff thinks is "reasonable."  *Buffalo*, Dkt.1-1, Ex. B, ¶¶1, 32, 505-30.  If merely making and selling more (or more effective) arms

---

[2] The point of the third inquiry is to ensure that the relevant law has not "fallen into desuetude."  *Italian Colors v. Becerra*, 878 F.3d 1165, 1173 (9th Cir. 2018).  That is obviously not the case here.  The AG does not deny this; instead, he retreats to arguing that NSSF lacks a "concrete plan."  MTD at 13.  That is wrong, *see infra* pp.8-10, and irrelevant to the "past enforcement" inquiry.  In all events, the state passed a new law that it intends to enforce against NSSF's members.  Article III requires no more.

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS - 8

than the AG thinks is "reasonable" counts as acting "irresponsibly," then the bare fact that members intend to continue operating suffices to show that they have a "concrete plan" to engage in conduct that exposes them to the threat of lawsuits under SB 5078.

The AG protests that the complaint "fails to specify 'when, to whom, where, or under what circumstances' [NSSF or any members] intends to violate SSB 5078." MTD at 10. But NSSF has clearly identified the conduct in which its members seek to continue to engage—namely, the lawful manufacture, sale, and marketing of their lawful products. To be sure, NSSF and its members do not believe that there is anything "unreasonable" about how they are presently engaging in those activities. But the Supreme Court has been clear: "Nothing in [its] decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law." *Driehaus*, 573 U.S. at 163. The Ninth Circuit, too, has held that a plaintiff need not "explicitly confess to intended future conduct that is violative of the law it seeks to challenge." *Arizona*, 34 F.4th at 849-50. The question is simply whether a plaintiff (or members) has a concrete plan to engage in conduct that "more than … hypothetical[ly]" could be said to violate the challenged law. *Id.* at 850 (quoting *Thomas*, 220 F.3d at 1139). NSSF and its members have plainly do so here.

Indeed, the principal case on which the AG relies proves the point. *See* MTD at 8-10. *Unified Data Services, LLC v. FTC*, 39 F.4th 1200 (9th Cir. 2022), involved a challenge to a regulation of soundboard technology; the plaintiffs lacked standing because they "fail[ed] to state to what extent [they] currently use soundboard

technology … and whether they plan to use it in the future." *Id.* at 1210-11.  In other words, they had no concrete plan *to engage in conduct that the law regulated at all*.  Here, by contrast, there is no dispute that NSSF members intend to continue making, selling, and marketing their lawful products—precisely the (constitutionally protected) conduct they reasonably fear the AG will sue them for under SB 5078.

Demanding a confession of specific *violative* conduct would be especially inappropriate here, moreover, given that NSSF challenges SB 5078 on vagueness grounds as to both its speech restrictions and its broader restrictions.  It would be nonsensical to require NSSF to identify exactly which conduct it fears the AG will dub "unreasonable" when part of the problem is that SB 5078 fails to identify what constitutes "unreasonable" manufacturing, selling, and marketing that "contributes" to unwanted conditions.  *See* MPI at 24-26.  Under the AG's view, a state that enacts a vague law gets not only to chill constitutionally protected activity, but to eliminate pre-enforcement review entirely.  That is decidedly not the law.  *Bankshot Billiards, Inc. v. City of Ocala*, 634 F.3d 1340, 1350 (11th Cir. 2011) (collecting cases).

It is equally clear that NSSF's members face a real "threat of enforcement." *See Tingley*, 47 F.4th at 1068.  The AG has promised that "manufacturers and sellers will face liability if they fail to establish, implement and enforce reasonable controls in the manufacture, sale, distribution and marketing of firearms" (whatever that means), even if their products and conduct are lawful.  Press Release, *supra*.  The only thing missing from that declaration is clarity on what, exactly, the AG thinks

they are doing that is "unreasonable." And therein lies the problem. The state enacted an amorphous law that restricts constitutionally protected activity but says little more than, "Act reasonably." The AG wants to keep industry members in the dark about what he thinks that means so he can prevent them from challenging SB 5078 until he sues them for violating its vague terms in his chosen forum and on his chosen terms. Article III does not require leaving regulated entities subject to this sort of Catch-22.

That is precisely why "the government's failure to disavow enforcement of the [challenged] law" is treated "as weighing in favor of standing." *Tingley*, 47 F.4th at 1068; *accord, e.g.*, *Arizona*, 34 F.4th at 850; *Italian Colors*, 878 F.3d at 1173. And here, the AG not only has refused to disavow enforcement, but has given every indication that he intends to enforce it vigorously—and in precisely the way NSSF and its members fear. Indeed, there is no other way to explain his express touting of the two New York suits alleging that all of the major firearms manufacturers in this country are engaged in "unreasonable" practices. *See Buffalo*, Dkt.1-1, Ex. B ¶¶1, 32, 505-30; Press Release, *supra*. The AG cannot laud such suits as an appropriate use of the statutory power he has just been given and then turn around and claim that the very same NSSF members have nothing to fear in Washington.

Finally, wholly apart from the AG's manifest intent to pursue suits against NSSF's members under SB 5078, a serious threat of enforcement exists because SB 5078 allows for private suits. §2(12). The state tries to sidestep this issue by invoking the "fairly traceable" prong of standing. MTD at 12. But traceability is not

an element of the "threat of enforcement" test, which is why the Supreme Court in *Driehaus* had no difficulty finding that "[t]he credibility of that [enforcement] threat is bolstered by the fact that authority to file a complaint … is not limited to a prosecutor or an agency." 573 U.S. at 164. The Ninth Circuit has likewise held that "even if the Attorney General would not enforce the law," a statute that "gives private citizens a right of action to sue for damages" can give rise to a legitimate "fear of an enforcement action." *Italian Colors*, 878 F.3d at 1173. NSSF's members are under threat of being saddled with the very sort of unmoored nuisance litigation that Congress enacted the PLCAA to stamp out. That is more than enough for Article III.

* * *

For the reasons just explained, Article III is satisfied for all of NSSF's claims. At the very least, it is satisfied for NSSF's First Amendment and vagueness claims.

In the First Amendment context, "a threat of enforcement may be inherent in the challenged statute, sufficient to meet the constitutional component of the ripeness inquiry," because "[s]elf-censorship is a constitutionally recognized injury." *Wolfson v. Brammer*, 616 F.3d 1045, 1059 (9th Cir. 2010). Ripeness requirements apply "less stringently" to First Amendment claims, *id.* at 1058, where "the inquiry tilts dramatically toward a finding of standing," *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000). Here, NSSF has filed sworn declarations from its members that not only explain how SB 5078 chills industry speech generally, *see* Lee Decl. ¶10; Reh Decl. ¶11; Cupero Decl. ¶10, but include concrete examples of specific types of

PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS - 12

1
2
3
4
5
6
7
8
9
10
11

speech that SB 5078 unconstitutionally proscribes, *see, e.g.*, Reh Decl. ¶14 (marketing "youth-model firearms"); Cupero Decl. ¶13 (same).  The AG ignores these declarations and retreats to the truism that a plaintiff cannot "nakedly assert[] that his or her speech was chilled."  MTD at 11 (quoting *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1095 (9th Cir. 2003)).  Fair enough—but *Getman* makes clear that a "fear of prosecution" exists so long as "the plaintiff's intended speech arguably falls within the statute's reach," 328 F.3d at 1095, and there is no question that the declarants' discussed conduct comes within SB 5078's broad terms.  That is more than enough to sustain NSSF's First Amendment claim (Count III).

12
13
14
15
16
17
18
19
20
21
22
23
24
25

The same is true for NSSF's vagueness claim involving constitutionally protected conduct other than speech (Count V).  "A plaintiff has standing to bring a pre-enforcement challenge to a vague law on due process grounds where 'the litigant is chilled from engaging in constitutionally protected activity.'"  *Montclair Police Officers' Ass'n v. City of Montclair*, 2012 WL 12888427, at *4 (C.D. Cal. Oct. 24, 2012) (quoting *Bankshot Billiards*, 634 F.3d at 1350)).  SB 5078's vague provisions chill the engagement of industry members in the lawful commerce of constitutionally protected arms.  *See* Compl. ¶¶98-107, Dkt.1.  Accordingly, even without "any threat or warning of impending proceedings against them," NSSF's members "suffer injury by being 'forced to modify [their] speech and behavior to comply with the statute.'"  *Italian Colors*, 878 F.3d at 1173.  In sum, Article III is satisfied for all of NSSF's claims, but especially so for its First Amendment and vagueness claims.

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS - 13

## II.     Prudential Concerns Do Not And Cannot Compel A Different Conclusion.

Unable to deny that Article III is satisfied, the AG shifts to arguing that NSSF's claims are prudentially unripe.  This argument fails right out of the gate.  *Driehaus* highlighted the impropriety of dismissing a case on prudential grounds when (as here) the plaintiff alleges an Article III injury.  573 U.S. at 167.  Consistent with that aviso, the Ninth Circuit has not only "cast doubt on the prudential component of ripeness," *Clark v. City of Seattle*, 899 F.3d 802, 809 n.4 (9th Cir. 2018), but "declined to reach prudential ripeness when constitutional ripeness is satisfied," *State ex rel. Becerra v. Sessions*, 284 F.Supp.3d 1015, 1031 (N.D. Cal. 2018).  And even where it *has* applied the doctrine, the Ninth Circuit has indicated that prudential ripeness is best understood as "a standard unique to cases involving administrative agencies." *Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 670 (9th Cir. 2005); *accord Bugarin v. All Nippon Airways Co.*, 513 F.Supp.3d 1172, 1184 (N.D. Cal. 2021) ("The Ninth Circuit has determined that there is no basis for a prudential ripeness inquiry where the dispute does not involve administrative agencies[.]"); *Alfalfa Solar I LLC v. Portland Gen. Elec. Co.*, 2018 WL 2452947, at *3 (D. Or. May 31, 2018).

"Prudential ripeness" simply has no role to play here.  In all events, prudence is firmly on NSSF's side:  This case is "fit[] for judicial decision," and members will suffer "hardship" from "withh[eld] court consideration." *Thomas*, 220 F.3d at 1141.

1. A case is fit for judicial decision when "the issues raised are primarily legal, do not require further factual development, and the challenged action is final." *Tingley*, 47 F.4th at 1070.  SB 5078 is obviously final, and the AG wisely does not

PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS - 14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

dispute that the issues raised by NSSF are primarily legal; as NSSF has explained, "the constitutional defects are apparent in the text of SB 5078." Dkt.55 (MPI Reply) at 2. Moreover, the Ninth Circuit has described an action as fit for judicial decision if it "has a direct and immediate effect on the complaining parties; … the action has the status of law; and … the action requires immediate compliance with its terms." *Tingley*, 47 F.4th at 1070. SB 5078 clearly "has the status of law" (it is a statute, after all); it demands immediate compliance (its effective date is July 23, 2023); and that compliance immediately affects NSSF's members. The AG nonetheless insists the Court needs more facts, MTD at 14-15, but he is notably silent on what additional facts are necessary to resolve the relevant issues. The reason for that is obvious: "[F]urther factual development … would do little to aid the court's decision" on NSSF's purely legal challenges. *In re Coleman*, 560 F.3d 1000, 1009 (9th Cir. 2009).

The AG retreats to his "facial challenge" mantra. MTD at 14; *see* Dkt.32 at 4, 6, 9, 14. But the AG is still confused. To be sure, SB 5078's defects are apparent in the text, i.e., "on its face." But NSSF is not claiming that all applications are necessarily invalid. *See* MPI Reply at 1. NSSF alleges that SB 5078 cannot lawfully be applied to hold its members liable for specific conduct it proscribes. "If [NSSF] can show that [SB 5078] is unconstitutional as to the [members] on whose behalf [it has] sue[d], then [NSSF] ha[s] met [its] burden *for an as-applied challenge*," even though "the statute has not yet been applied." *Isaacson v. Horne*, 716 F.3d 1213, 1230 n.15 (9th Cir. 2013) (emphasis added). The type of facial challenge the AG

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS - 15

seems to have in mind, over which courts may have reason to wait for more concrete developments, *see* MTD at 14-15, is simply not what NSSF has brought.

Ultimately, the AG's position is that challenges to SB 5078 will not be fit for review until he chooses to sue an NSSF member for violating it, in his preferred venue, on his preferred timeline, and on his preferred facts. That radical view of ripeness is exactly backwards. The only thing that would make NSSF's claims *un*ripe would be if the AG promised not to bring suits under SB 5078 that are barred by the PLCAA or the Constitution—i.e., suits for lawfully manufacturing, selling, or marketing lawful products in ways that the AG deems "unreasonable" or for failing to implement "reasonable controls" beyond what the myriad federal, state, and local laws governing their conduct demand. Unless and until that happens, NSSF's purely legal claims are fit for judicial decision. This Court can decide what kinds of suits can and cannot be brought, and that rule can then be easily applied in future cases.

2. SB 5078 subjects NSSF's members to the hardship of immediate liability. Indeed, SB 5078 presents members "with the immediate dilemma to choose between complying with newly imposed, disadvantageous restrictions and risking serious penalties for violation." *Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 57 (1993). That is the definition of an immediate hardship that warrants immediate review.

It is no answer to say that a court can wait for a "future lawsuit against NSSF or one of its members." MTD at 15. The very act of being subjected to an amorphous "nuisance" suit under SB 5078 would cause NSSF members irreparable injury. That

is because the PLCAA does not just provide a defense to liability; it "creates a substantive rule of law granting [industry members] immunity" against the suits it bars. *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1142 (9th Cir. 2009); *see* 15 U.S.C. §7902(a) ("A qualified civil liability action may not be brought in any Federal or State court."). Requiring members to wait to be sued before they can obtain judicial protection would subject them to the very injury that the PLCAA specifically immunizes them against, which distinguishes this case from the AG's cases (MTD at 15). "[D]enying prompt judicial review would impose a substantial hardship on [NSSF members], forcing them to choose between refraining from [constitutionally protected activity], or … risking costly [state-court] proceedings." *Driehaus*, 573 U.S. at 167-68.

In sum, the issues this case raises are purely legal, and the immediate need to comply with SB 5078's expansive (but vague) restrictions creates concrete hardship. NSSF satisfies whatever "prudential" aspects of ripeness remain.

## III.    NSSF Plainly Has A Valid Cause Of Action For Its Preemption Claim.

In arguing that NSSF lacks a cognizable legal theory, the state ignores black-letter-law and attacks irrelevant theories NSSF has never asserted. NSSF has never claimed that the Supremacy Clause, the PLCAA, or the Declaratory Judgment Act creates a right of action. What supply the cause of action for NSSF's preemption claim are (1) federal courts' inherent equity powers and (2) 42 U.S.C. §1983.

1. Plaintiffs "seeking only declaratory and injunctive relief" against state officials "do not need a statutory cause of action." *Moore*, 899 F.3d at 1103. "They

can rely on the judge-made cause of action recognized in *Ex parte Young*, 209 U.S. 123 (1908), which permits courts of equity to enjoin enforcement of state statutes that violate the Constitution or conflict with other federal laws." *Id.* This is true generally. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015). And it is true for preemption claims in particular. *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983) (explaining that it is "beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights … on the ground that [the challenged state action] is pre-empted by a federal statute").

To be sure, Congress *can* foreclose equitable relief—but only if it "enact[s] statutes with a detailed remedial scheme that explicitly or implicitly displaces the judge-made equitable remedy available under *Ex parte Young*," in which case "a plaintiff must rely on a statutory cause of action in order to bring suit." *Moore*, 899 F.3d at 1103. There is no such "detailed remedial scheme" here. The only provision the AG invokes is 15 U.S.C. §7903(5)(C), *see* MTD at 17-18, but that provision does not provide for *any* remedies against states, let alone comprehensive remedies. All it does is make clear that the PLCAA does not itself supply a federal cause of action to sue firearm industry members. The mere failure to *create* a right of action hardly constitutes the kind of "comprehensive remedial scheme" that could displace a *Young* action. *See, e.g.*, *Miranda B. v. Kitzhaber*, 328 F.3d 1181, 1186-89 (9th Cir. 2003) (Title II's detailed remedial scheme not enough); *Sofamor Danek Grp., Inc. v. Brown*, 124 F.3d 1179, 1185 (9th Cir. 1997) (same for Lanham Act); *NRDC v. Cal. Dep't of*

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS - 18

*Transp.*, 96 F.3d 420, 423-24 (9th Cir. 1996) (same for Clean Water Act).[3]

2. NSSF also has a cause of action under 42 U.S.C. §1983, which allows private parties to enforce individual entitlements conferred on them by federal statutes. *Blessing*, 520 U.S. at 340, 343. That is exactly what NSSF is doing here.

As the Supreme Court just recently reiterated, a federal statute creates §1983-enforceable rights when it "is 'phrased in terms of the persons benefited' and contains 'rights-creating,' individual-centric language with an 'unmistakable focus on the benefited class.'" *Talevski*, slip op. 14 (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284, 287 (2002)). The PLCAA is unambiguous in terms of benefiting manufacturers and sellers of firearms and related products. It provides that "[a] qualified civil liability action may not be brought" and defines "qualified civil liability" to mean *only* civil actions brought "*against a manufacturer or seller of* [*a firearm or related product*]." 15 U.S.C. §§7902(a), 7903(5)(A) (emphasis added). And the PLCAA's "unmistakable focus on the benefited class," *Talevski*, slip op. 14, goes even deeper. Its codified findings repeatedly refer to firearm industry members and the liability they face, *see, e.g.*, 15 U.S.C. §7901(a)(3), (5)-(8), and its very first codified purpose is "[t]o prohibit causes of action against manufacturers, distributors, dealers, and

---

[3] The AG misreads §7903(5)(C). That provision is not meant to prevent industry members from securing the very immunity the PLCAA grants them, but to disclaim the creation of a federal cause of action *to sue them*. That is clear on its face; the first clause of §7903(5)(C) concerns the exceptions to the PLCAA's preemptive scope.

PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS - 19

importers of firearms or ammunition products," *id.* §7901(b)(1). Legislative history also confirms the point, underscoring that "provid[ing] protections for those in the firearms industry" is the Act's *raison d'être*. H.R. Rep. No. 109-124, at 40 (2005).

Unable to deny that the PLCAA was intended to benefit the firearm industry, the AG asserts that "Congress did not intend for PLCAA to be affirmatively enforced through §1983 actions." MTD at 19. In reality, the PLCAA "creates a substantive rule of law granting [industry members] immunity," as the Ninth Circuit made explicit in *Ileto*. 565 F.3d at 1142. That affirmative right does not just "operate[] as a *defense* to liability," *contra* MTD at 19. Congress knows the difference between a prohibition against imposing liability (an affirmative defense) and a prohibition against bringing suit at all (a substantive right). In the PLCAA, it chose the latter. Notably, "Congress did *not* say that 'no liability may be imposed in a qualified civil liability action' or that 'a manufacturer or seller of a qualified product may not be held liable in a qualified civil liability action'; it said that such an action 'may not be brought.'" *In re Acad., Ltd.*, 625 S.W.3d 19, 33 (Tex. 2021); *see* 15 U.S.C. §7902(a).

Congress conferred an affirmative right upon firearm industry members to engage in lawful manufacturing, sale, and marketing of firearms free from amorphous public-nuisance suits, and §1983 provides a cause of action to enforce that right. This Court is bound to honor Congress' considered judgments.

## CONCLUSION

For the foregoing reasons, the Court should deny the AG's motion to dismiss.

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS - 20

1

2

3    DATED this 30th day of June, 2023.

4                                 CORR CRONIN LLP

5                                 s/ *Steven W. Fogg*
                                  Steven W. Fogg, WSBA No. 23528
6                                 CORR CRONIN LLP
                                  1015 Second Avenue, Floor 10
7                                 Seattle, Washington  98104-1001
                                  Ph: (206) 625-8600 | Fax: (206) 625-0900
8                                 sfogg@corrcronin.com
9
                                  Paul D. Clement, admitted *pro hac vice*
10                                Erin E. Murphy, admitted *pro hac vice*
                                  Matthew D. Rowen, admitted *pro hac vice*
11                                Mariel A. Brookins, admitted *pro hac vice*
                                  CLEMENT & MURPHY, PLLC
12                                706 Duke Street
                                  Alexandria, VA 22314
13                                Ph: (202) 742-8900
14                                paul.clement@clementmurphy.com
                                  erin.murphy@clementmurphy.com
15                                matthew.rowen@clementmurphy.com
                                  mariel.brookins@clementmurphy.com
16
17                                *Attorneys for Plaintiff*

18

19

20

21

22

23

24

25

PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS - 21

1

2

## CERTIFICATE OF SERVICE

3

I hereby certify that on (Date), I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which in turn automatically generated a Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the CM/ECF system. The NEF for the foregoing specifically identifies recipients of electronic notice.

4

5

6

7

DATED at Seattle, Washington, on 30th day of June, 2023.

8

9

/s *Megan Johnston*

10

Megan Johnston, Legal Assistant
Corr Cronin LLP

11

1015 Second Avenue, 10th Floor

12

Seattle, WA 98104
Phone: (206) 625-8600

13

Email: mjohnston@corrcronin.com

14

15

16

17

18

19

20

21

22

23

24

25

PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS - 22