**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-1214
_____

NATIONAL SHOOTING SPORTS FOUNDATION

v.

ATTORNEY GENERAL OF NEW JERSEY,
                        Appellant
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 3:22-cv-06646)
District Judge: Honorable Zahid N. Quraishi
_____

Argued: June 7, 2023

Before: HARDIMAN, BIBAS, and FREEMAN, *Circuit Judges*

(Filed: August 17, 2023)

Timothy Sheehan
Michael L. Zuckerman    **[ARGUED]**
OFFICE OF ATTORNEY GENERAL OF NEW JERSEY
25 Market Street
Richard J. Hughes Justice Complex
Box 080

Trenton, NJ 08625
    *Counsel for Appellant*

Eric A. Tirschwell
EVERYTOWN LAW
450 Lexington Avenue
P.O. Box 4148
New York, NY 10017
    *Counsel for Amici Everytown for Gun Safety Support Fund, Brady Center to Prevent Gun Violence, and Giffords Law Center to Prevent Gun Violence*

Sarah A. Hunger
OFFICE OF ATTORNEY GENERAL OF ILLINOIS
100 W. Randolph Street
12th Floor
Chicago, IL 60601
    *Counsel for Amici Illinois, California, Connecticut, Delaware, District of Columbia, Hawai'i, Maryland, Massachusetts, Michigan, Minnesota, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Washington, and Wisconsin*

Timothy M. Haggerty
Rupita Chakraborty
Alexandra G. Elenowitz-Hess
FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS
7 Times Square
28th Floor
New York, NY 10036
    *Counsel for Amicus Legal Scholars*

James P. Davy
ALL RISE LAW
P.O. Box 15216
Philadelphia, PA 19125
    *Counsel for Amicus Ryan Busse*

Gretchen A. Pickering
CAPE MAY COUNTY OFFICE OF PROSECUTOR
4 Moore Road
DN-110
Cape May Court House, NJ 08210
    *Counsel for Amicus County Prosecutor's Association of New Jersey*

Paul D. Clement
Erin E. Murphy    **[ARGUED]**
CLEMENT & MURPHY
706 Duke Street
Alexandria, VA 22314
    *Counsel for Appellee*

Joshua N. Turner
OFFICE OF ATTORNEY GENERAL OF IDAHO
514 W. Jefferson Street
P.O. Box 83720
Boise, ID 83720
    *Counsel for Amici Idaho, Alabama, Alaska, Arkansas, Georgia, Indiana, Iowa, Kansas, Kentucky, Mississippi, Montana, Nebraska, North Dakota, Ohio, South Carolina, South Dakota, Texas, West Virginia, and Wyoming*

---

OPINION OF THE COURT

---

BIBAS, *Circuit Judge*.

Federal courts are not forecasters. The Constitution limits our jurisdiction to disputes that have ripened fully. We may not prejudge hypothetical cases or offer legal advice. Instead, parties must first be injured before coming to us for redress. Only then do we react. When constitutional rights are at stake, we accelerate that timeline—but only slightly. We may hear a case before a person's rights are violated only if the threat is imminent.

The National Shooting Sports Foundation challenges a new state gun law as violating its members' constitutional rights. But we see little evidence that enforcement is looming. Because the Foundation has jumped the gun, its challenge must be dismissed.

## I. NEW JERSEY'S LAW AND THE FOUNDATION'S LAWSUIT

Last year, New Jersey passed a law to combat "bad actors in the gun industry." N.J. Stat. § 2C:58-33(a). The Law empowers the state's Attorney General—and only the Attorney General—to sue gun-industry members whose "unlawful … or unreasonable" conduct "contribute[s] to a public nuisance in [New Jersey] through the sale, manufacturing, distribution, importing, or marketing of a gun-related product." § 2C:58-35(a)(1). It also requires industry members to "establish, implement, and enforce reasonable controls" on these activities.

4

§ 2C:58-35(a)(2). The Attorney General has not yet tried to enforce the Law against anyone.

Four months after the Law was passed, the Foundation filed this pre-enforcement lawsuit. The Foundation is a trade group of gun makers, retailers, and other industry members. It claims that the Law is preempted by a federal statute (the Protection of Lawful Commerce in Arms Act, 15 U.S.C. §§ 7901–7903) and violates due process, the First and Second Amendments, and the dormant Commerce Clause. Its complaint asserts that the "interests of its members … are impaired by the threat of sweeping liability under" the Law. App. 27 ¶ 10. But it says little more about those members, their interests, or their plans.

Soon after filing its complaint, the Foundation moved for a preliminary injunction. With that motion, the Foundation attached two declarations: one from Beretta's general counsel and one from SIG Sauer's chief legal officer. Both men declared that those gunmakers "will continually be at risk of litigation and potential liability unless [they] cease[ ] doing business." App. 93, 96. But they gave no factual detail.

Granting the motion, the District Court enjoined the Attorney General from enforcing any part of the Law against anyone. It held that the Foundation had standing and that the Law was preempted, but it did not reach the Foundation's other arguments. We granted a partial stay pending appeal.

The District Court had jurisdiction under 28 U.S.C. § 1331, and we have jurisdiction under § 1292(a)(1). We review the court's subject-matter jurisdiction de novo. *Great W. Mining & Min. Co. v. Fox Rothschild LLP*, 615 F.3d 159, 163 (3d Cir. 2010).

5

## II. THE FOUNDATION HAS NOT SHOWN STANDING

### A. The Foundation must show a case or controversy

Before reaching the merits, we must first ensure that this case presents a dispute suitable for courts to resolve. *See Trump v. New York*, 141 S. Ct. 530, 535 (2020) (per curiam). Article III of the Constitution limits the judicial power to "Cases" and "Controversies." That limit includes two requirements.

First, the plaintiff needs standing. The Foundation must "show an injury in fact caused by the defendant and redressable by a court order." *United States v. Texas*, 143 S. Ct. 1964, 1970 (2023). An injury in fact, in turn, must be "concrete, particularized, and imminent rather than conjectural or hypothetical." *Trump*, 141 S. Ct. at 535 (internal quotation marks omitted). To be "imminent," either a threat of injury must be "certainly impending," or there must at least be "a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks omitted).

Second, and closely related, the case must be ripe. It must not "depend[ ] on contingent future events that may not occur as anticipated, or indeed may not occur at all." *Trump*, 141 S. Ct. at 535 (internal quotation marks omitted). Standing and ripeness both stem from the same constitutional limit and often "boil down to the same question." *Driehaus*, 573 U.S. at 157 n.5 (internal quotation marks omitted). Following the Court's lead, we usually refer to standing, though most of our analysis applies to both.

Standing and ripeness demand certainty and immediacy. Pre-enforcement challenges fit oddly with these requirements.

6

They are "the exception rather than the rule." *Artway v. Att'y Gen. N.J.*, 81 F.3d 1235, 1247 (3d Cir. 1996). Even in constitutional cases, there is no "unqualified right to pre-enforcement review." *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 537–38 (2021). Yet we allow some such challenges. We do not force people seeking to exercise their constitutional rights to wait until they are prosecuted criminally. *Driehaus*, 573 U.S. at 161.

But pre-enforcement challenges must still satisfy Article III. So we apply a specialized test to discern whether the threat of enforcement is imminent. *Id.* at 159. The Foundation must show that it or its members (1) intend to take action that is (2) "arguably affected with a constitutional interest" but is (3) arguably forbidden by the Law, and (4) the threat of enforcement against them is substantial. *Id.* (internal quotation marks omitted). For a preliminary injunction, bare allegations are not enough; the Foundation must produce evidence showing "more than a mere possibility" that their rights are threatened. *Doe v. Nat'l Bd. of Med. Exam'rs*, 199 F.3d 146, 152–53 (3d Cir. 1999).

### B. The Foundation's intent to act is too general

The Foundation stumbles out of the gate. It offers two theories of injury. First, it says the "very act of being subjected to an amorphous nuisance suit under [the Law] … would injure [the Foundation] and its members" because federal law "creates a substantive rule of law granting [them] immunity." Appellee's Br. 18 (internal quotation marks omitted). Second, it says they are "*already* suffering" an injury to their First and Second Amendment rights. *Id.* at 20. Because they do not know

7

what marketing and manufacturing will be considered unreasonable, the Law supposedly chills their protected conduct. *Id.*

Both theories fail. The first theory goes not to standing, but to the merits. Even if federal law gives gun sellers a statutory immunity that New Jersey would violate just by filing a complaint, a statutory violation is not enough to show standing. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021). The Foundation must also show how violating their purported statutory immunity "has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *Id.* at 2204 (internal quotation marks omitted). It has not done so. Nor has it explained why this potential statutory (rather than constitutional) violation would justify pre-enforcement review. We will not try to connect the dots for it.

The Foundation's second theory is not much better. It rests on "generalized allegations." *Sherwin-Williams Co. v. County of Delaware*, 968 F.3d 264, 269 (3d Cir. 2020). The Foundation says little about what it plans to do. It has pleaded that it is an association of gun makers and sellers, and it has offered declarations that the Law chills its members' manufacturing, marketing, and sales. From that evidence, we can infer that its members plan to make, market, and sell guns. But that is all.

Yet "an allegation that certain conduct has (or will have) a chilling effect on one's speech must claim a … threat of specific future harm." *Id.* at 269–70 (internal quotation marks omitted). The same goes for one's Second Amendment rights. But the Foundation makes no such specific claim. It repeatedly conjures the specter of "sweeping liability" that will force its members to shutter their businesses. App. 24, 27, 46; *accord*

8

App. 93, 96. Yet its bold assertion is backed by no evidence. A plaintiff must do more than assert "subjective chill." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013) (internal quotation marks omitted).

Three years ago, we tossed out such a vague allegation. In *Sherwin-Williams*, the plaintiff company "claim[ed] that the specter of [a] potential lawsuit ha[d] caused it to reconsider and question its membership in various trade organizations and its petitioning to the government on any issues." 968 F.3d at 270 (cleaned up). We rejected that claim as a "generalized allegation insufficient to satisfy Article III's requirements." *Id.* (cleaned up). So too here.

These shortcomings undermine the Foundation's intent to act, which might alone suffice to torpedo standing. But they also influence the other prongs. Though the Law clearly regulates selling and marketing guns, whether the Foundation's intended conduct is arguably forbidden is murky. And in the same vein, they also undermine the threat of enforcement.

### C. The Foundation has not shown that the threat of enforcement is substantial

The Foundation asserts that New Jersey "has said—repeatedly—that it fully intends to deploy [the Law] against [the Foundation's] members, which it apparently considers appropriate targets for no other reason [than] that they participate in the legal firearms industry." Appellee's Br. 21. But it offers no concrete examples of New Jersey's making such statements. Nor does it show any of the traditional signs of a threat of enforcement. And its alternative evidence is unconvincing.

9

1. *The Foundation lacks any signs of an enforcement threat.* In *Driehaus*, the Supreme Court described the necessary threat of enforcement as "credible" and "substantial." 573 U.S. at 158–59, 164. Of course, those words are flexible and must be read in context. Fortunately, the Court supplied that context. It distilled from its precedents several signs of a substantial threat. *Id.* at 158–61. Some signs involve past enforcement; others concern the enforcer. Not one is present here.

Start with past enforcement. A strong sign of future enforcement is that a law has been enforced against the plaintiff, a closely related party, or others for similar conduct. *Id.* at 159–60, 164. It is also telling if enforcement actions are "not a rare occurrence." *Id.* at 161, 164–65. Yet the Law has not been enforced against anyone, let alone the Foundation or its members. True, the Law is new, so lack of enforcement does not tell us much either way. But the Foundation bears the burden to show standing, and this indeterminate factor does not help it carry that burden.

Nor do the enforcer-related signs help. For one, the risk of enforcement is greater when private parties can enforce the law. *Id.* at 164. Inversely, the risk is lower when enforcement is "restricted to state officials who are constrained by explicit guidelines or ethical obligations." *Id.* Only the Attorney General can enforce this Law. So any "eventual action will reflect both legal and practical constraints, making any prediction about future injury just that—a prediction." *Trump*, 141 S. Ct. at 536.

For another, we consider what the enforcer has said about enforcement plans. *Driehaus*, 573 U.S. at 161, 165. Though

10

statements made in litigation are hardly dispositive, they do matter. And the Attorney General has disavowed prosecuting the Foundation or its members just for participating in "lawful commerce," which is all the Foundation has said it wants to do. Oral Arg. 5:23–35; *see Matthew A. Goldstein, PLLC v. U.S. Dep't of State*, 851 F.3d 1, 5 (D.C. Cir. 2017) ("[Plaintiff] offers only vague and general descriptions of legal activities that the firm intends to undertake, none of which the [government] views as" unlawful).

Instead, the Attorney General insists that the Law covers only industry members' "own *misconduct*." Appellant's Br. 15. Granted, we are not sure just how far the Attorney General's view of "misconduct" sweeps. But the Foundation could have asked the Attorney General to clarify what he will prosecute. *See Presbytery of N.J. of Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454, 1466–67 (3d Cir. 1994). And it is even less clear what the Foundation and its members now fear to do.

To be sure, the Foundation need not "confess that [it] will in fact violate th[e] law." *Driehaus*, 573 U.S. at 163. But it must give us something to go on. For example, speakers need not admit a plan to violate a ban on "false" or "deceptive" statements; it is enough that "erroneous statement is inevitable in free debate." *Id.* at 160 (internal quotation marks omitted). Here, by contrast, the Foundation never explains how simply making, marketing, or selling guns will inevitably trigger this Law.

Indeed, the proposed "remedy crafted by the [Foundation] underscores the contingent nature of [its] injuries." *Trump*, 141 S. Ct. at 536. At oral argument, counsel for the Foundation said

11

an injunction trimming the Law down to fit the federal statute would remedy its injury, so long as we also clarified the scope of federal law. This concession reveals that the nature of individual enforcement actions matters more than the Law itself, especially for the Foundation's first theory of injury. So "the source of any injury to the plaintiffs is the action that the [Attorney General] *might* take in the future … not the [Law] itself in the abstract." *Id.* (internal quotation marks omitted).

With so much still vague and uncertain, a court should not weigh in. "Letting the Executive Branch's decisionmaking process run its course not only brings more manageable proportions to the scope of the parties' dispute, but also ensures that we act *as judges*, and do not engage in policymaking properly left to elected representatives." *Id.* (internal quotation marks and citations omitted).

2. *The Foundation's other evidence is weak.* Sensing the thinness of its proof, the Foundation points to four other pieces of evidence that enforcement looms. None moves the needle.

First, the Attorney General has set up an office to enforce the Law. But "an officer stand[ing] ready to perform his duty falls far short of such a threat as would warrant the intervention of equity. And this is especially true where there is a complete absence of any showing of a definite and expressed intent to enforce particular clauses of a broad, comprehensive and multi-provisioned statute." *Watson v. Buck*, 313 U.S. 387, 400 (1941). The office is "akin to a statement of intent to prosecute all violators of the statute under normal prosecutorial standards that, absent allegations of prior threats or characteristics indicating an especially high probability of enforcement, do[es] not

12

constitute a threat of enforcement." *Hemp Indus. Ass'n v. DEA*, 36 F.4th 278, 291 (D.C. Cir. 2022) (brackets and internal quotation marks omitted). The office suggests no specific threat to the Foundation or its intended conduct.

Second, New Jersey sought an emergency stay of the District Court's injunction. Yet we hesitate to infer the Attorney General's enforcement priorities from his zealous defense of a duly enacted state law. And because the District Court purported to enjoin enforcement against anyone, seeking a stay of that injunction tells us little about the threat to the Foundation or its members. Plus, the Foundation is the one who sued the state and got the preliminary injunction, provoking the Attorney General's response to restore the status quo ante. So that response does not create an injury. *See, e.g.*, *Clapper*, 568 U.S. at 416 (rejecting self-inflicted harm as injury in fact); *cf. New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.*, 101 F.3d 1492, 1503–04 (3d Cir. 1996) (observing, in removal context, that parties cannot "manipulate federal jurisdiction" through "strategic behavior").

Third, at oral argument, the Foundation noted that Buffalo has sued under a similar New York law. But a city's decision to sue under another state's law tells us nothing about the New Jersey Attorney General's plans. As in *Sherwin-Williams*, we will not impute one jurisdiction's choices to another. 968 F.3d at 272.

Fourth, also at oral argument, the Foundation cited the Law's preamble to show a threat. Though the preamble gives us a window into the legislature's thinking, it tells us nothing about the Attorney General's focus. And the preamble zeroes

in on "bad actors in the gun industry." N.J. Stat. § 2C:58-33. The Foundation does not show how this suggests, much less creates, a substantial risk of prosecution just for making, marketing, and selling guns.

So we are left with the same uncertainty we had in *Sherwin-Williams*—the Attorney General "might sue" the Foundation or its members, "but it might not." 968 F.3d at 272.

### D. Plus, this Law is less chilling because it is civil, not criminal

As discussed above, the Foundation has not shown a substantial likelihood that the Law will be enforced against it. That alone suffices to defeat standing. And our holding that this case is non-justiciable is bolstered by the Law's purely civil nature. The attenuated risk of enforcement here matters less for Article III standing than in many pre-enforcement cases because the Law is exclusively civil. In *Driehaus* and every pre-enforcement case that it recounted, the statutes at issue included criminal penalties. 573 U.S. at 158–60, 166. Indeed, as we noted at the start, much of the point of pre-enforcement challenges is to let people vindicate their constitutional rights without having to risk prosecution. *See id.* at 161. But civil penalties lower the temperature. And the same arguments made in the pre-enforcement challenge can be raised as affirmative defenses later. *See Whole Woman's Health*, 142 S. Ct. at 538; *Sherwin-Williams*, 968 F.3d at 270.

True, defending a civil suit can be cumbersome. *Driehaus* left open whether the threat of administrative penalties alone would be enough for standing. 573 U.S. at 165–66; *see also Const. Party of Pa. v. Aichele*, 757 F.3d 347, 364 n.20 (3d Cir.

14

2014). And we do not foreclose it either. But our inquiry into the concrete "burdens" on constitutional rights is holistic and fact-intensive. *Driehaus*, 573 U.S. at 165. And when the "ripeness question is otherwise close, the distinction between criminal and civil sanctions might tip the balance." 13B Charles Alan Wright et al., *Federal Practice and Procedure* § 3532.5 (3d ed. 2023). With the scales already tipped against the Foundation, the lack of criminal penalties seals the case against it.

In the end, "the chilling effect associated with a potentially unconstitutional law being on the books is insufficient to justify federal intervention in a pre-enforcement suit. Instead, [the Supreme] Court has always required proof of a more concrete injury …. whether the challenged law in question is said to chill the free exercise of religion, the freedom of speech, the right to bear arms, or any other right." *Whole Woman's Health*, 142 S. Ct. at 538 (internal quotation marks and citations omitted).

* * * * *

Pre-enforcement challenges are unusual. To bring one, the plaintiff must show that the stakes are high and close at hand. Normally, that means constitutional rights are at issue, those rights are threatened by significant penalties, and those penalties might well be imposed, as shown by past enforcement in similar situations or some other evidence of the threat.

Yet this suit falls far short of even the "normal" pre-enforcement challenge. A brand-new civil tort statute, without more, does not justify a federal court's intervention. Because the Foundation's case is not yet fully formed, we will vacate the preliminary injunction and remand with instructions to dismiss this action for lack of jurisdiction.

15